**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **SOUTH SIDE GAS, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No.  08 C  2071** |
| | ) | |
| **ESQUIRE PETROLEUM, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR**
**PRELIMINARY INJUNCTION**

Now comes the Plaintiff, South Side Gas, Inc., by and through its attorneys, Sullivan Hincks & Conway, and for its Memorandum of Law In Support Of Its Motion For Preliminary Injunction to be issued against the defendant, Esquire Petroleum, LLC states as follows:

Pursuant to the Petroleum Marketing Practices Act, 15 U.S.C. 2805, and  Rule 65 of the Federal Rules of Civil Procedure, the Plaintiff, South Side Gas, Inc., (hereinafter "Plaintiff") requests that this Court issue a Preliminary Injunction providing for the relief as requested within the Proposed Injunction Order submitted herewith. In particular, the Plaintiff requires immediate delivery of Mobil branded gasoline that since April 10, 2008, Esquire has refused to provide. Time is of the essence in this action.

The Plaintiff's counsel states under oath pursuant to Fed.R.Civ.P. 65 that he notified Esquire Petroleum, LLC's ("Esquire") counsel via Notice of Motion and informed her of the date and time on which this motion would be presented to this Court via facsimile and e-mail delivery to Amy Kurson at Greenberg Traurig on April 11, 2008. The relief requested herein is specifically provided for in 15 U.S.C. 2805 and Fed.R.Civ.P. 65. The factual basis for this Motion is set forth in the affidavit

1

submitted in support of the instant motion (Exhibit A), the Complaint filed by the Plaintiff in this matter (Exhibit B), the Plaintiff's Complaint for Specific Performance filed in the Circuit Court of Cook County (Exhibit C), the Plaintiff's Lease/Option Agreement with Esquire (Exhibit 2), the PMPA Supply Agreement between Plaintiff and Esquire (Exhibit 6) and other related documents attached hereto. (See Exhibits A through C and 1 through 10).

As stated in the Affidavit (Exhibit A) and Complaint (Exhibit B), the Plaintiff demonstrates that Esquire improperly terminated the franchise relationship between Esquire and the Plaintiff in violation of the Petroleum Marketing Practices Act ("PMPA"). Furthermore, Esquire has breached the Lease/Option Agreement and the Purchase and Sale Agreement ("PSA") between Esquire and the Plaintiff by refusing to sell the Property to the Plaintiff pursuant to the parties Lease/Option Agreement (the "Lease Option") and the Plaintiff's proper exercise of that Option.

The plaintiff paid $150,000 to Esquire in February of 2007 and now Esquire seeks to keep those funds and refuse to sell the Property to Plaintiff. Esquire also seeks to convert the earnest money Plaintiff deposited with Stewart Title Company notwithstanding Esquire's refusal to sign the PSA or the Escrow Agreement. See Exhibit 8.

On April 10, 2008 at 3:39 p.m., Esquire sent a letter to Plaintiff's attorney advising Plaintiff that Esquire was terminating the PMPA franchise immediately and that it refused to sell further gasoline to the Plaintiff. (See Exhibit 7). The letter, although sent at 3:39 p.m., asserted that Esquire would arrive on the premises at 3:00 p.m., thirty nine minutes before the letter was sent, in order to shut down the Plaintiff's business. There is no legal basis that allows for any such relief especially since the Plaintiff is not in default of any agreements with Esquire.

At approximately 5:00 p.m., Esquire's attorney arrived at the Plaintiff's station and demanded

2

demanded that the Plaintiff surrender possession. Esquire's attorney had also hired a locksmith which locksmith arrived on the scene purportedly to change the Plaintiff's locks. The Plaintiff has operated business at this Property for 18 years without incident or notice of default. The Hometown Police also arrived. Esquire had contacted the police earlier that morning yet waited until 3:39 p.m. to advise the Plaintiff's attorney of its illegal plan. The police advised the parties that the matter appeared to be a civil dispute and that they would not intervene. The Plaintiff advised the Hometown Police that he desired to file trespass charges and criminal damage charges in the event that Esquire's attorney and the locksmith attempted to effectuate possession of the Property. At this point, Esquire's attorney advised the police that Esquire would take no further action and the police left. The locksmith subsequently left but not before he was instructed by Esquire's attorney not to provide Plaintiff's attorney with any information or identification. Finally, after a lengthy stay that included blocking the Plaintiff's driveways, Esquire's attorney left the Property. There has never been any type of legal proceeding initiated by Esquire to seek possession of the Property.

The Plaintiff requests the entry of a preliminary injunction pursuant to section 2805 of the PMPA and pursuant to FRCP 65, to prevent Esquire from terminating the franchise relationship or terminating the Lease/Option and/or the PSA and shutting down the Plaintiff's business, and to compel Esquire to sell Plaintiff Mobil branded gasoline. Plaintiff also request this Court to make a declaration of rights under the various contracts. As set forth in the Plaintiff's Complaint in this matter, Plaintiff's Complaint filed in Cook County, and in the accompanying Affidavit and exhibits, unless Esquire is enjoined from terminating the Plaintiff's Lease/Option, PSA, and PMPA Supply Agreement and prevented from shutting down the Plaintiff's business, the Plaintiff will suffer irreparable harm. The Plaintiff has no adequate remedy at law and will suffer a continuing ongoing

3

injury without the relief requested. The Plaintiff is likely to succeed on the merits after trial.

## ARGUMENT

Under the Petroleum Marketing Practices Act ("PMPA"), the court shall grant a franchisee's request for a preliminary injunction based upon a lesser showing than would be required in the ordinary case under Fed. R. Civ. P. 65. Moody v. Amoco Oil Co., 734 F.2d 1200, 1216 (7th Cir. 1984)("*the franchisee's burden of proof for receiving a preliminary injunction under the PMPA is not a heavy one*"). The language of the PMPA strongly favors the franchisee and provides at section 2805(b)(2), that a district court is required to grant a preliminary injunction if: (A) the franchisee shows (i) the franchise of which he is a party has been terminated or the franchise relationship of which he is a party has not been renewed, and (ii) there exist sufficiently serious questions going to the merits to make such questions a fair ground for litigation; and (B) the court determines that, on balance, the hardships imposed upon the franchisor by the issuance of such preliminary injunctive relief will be less than the hardship which would be imposed upon such franchisee if such preliminary injunctive relief were not granted. 15 U.S.C. § 2805(b)(2). The Plaintiff meets this burden and the injunction should issue.

After showing that its franchise has been terminated or non-renewed, the franchisee need only show "a reasonable chance of success on the merits" and that the balance of hardships tips in its favor. Moody, 734 F.2d at 1216. *The franchisee need not establish irreparable harm.* Beachler v. Amoco Oil, 112 F.3d 902 (7th Cir. 1997) citing Hilo v. Exxon Corp., 997 F.2d 641, 643 (9th Cir. 1993). Provided that a franchisee can demonstrate that it has been terminated and that it has a reasonable chance of success on the merits, the franchisee is entitled to a preliminary injunction. Beachler v. Amoco, 112 F.3d 902, 905 (7th Cir. 1997).

4

## I.    **TERMINATION OR NON-RENEWAL**

Esquire has notified Plaintiff that it has terminated the PMPA Supply Agreement, the Lease/Option, the PSA and therefore the PMPA franchise and the PMPA franchise relationship. Esquire never provided any PMPA required notices, however. Attached to this memorandum as Exhibit 7 is Esquire's letter dated April 10, 2008, asserting that Esquire has terminated the franchise and is refusing to sell any more gasoline to the Plaintiff. The letter was sent to the undersigned at 3:39 p.m. advising that Esquire would be at the Property at 3:00 p.m. (39 minutes before sending the letter) to close the Plaintiff's business. The Plaintiff is in danger of running out of gasoline for sale to the motoring public if the injunction does not issue.

Once Plaintiff's counsel received the letter attached in Exhibit 7, the undersigned immediately traveled to the Plaintiff's business. The Plaintiff placed a call to the Hometown Police Department in order to send assistance. After the undersigned arrived at the Plaintiff's Property, Esquire's attorney appeared and advised that she was expecting to close the business and take possession of the Property and Plaintiff's business. Esquire had no court order authorizing this action and had never filed any court action seeking such relief.

Soon after, the Hometown Police arrived. A locksmith was hired by Esquire also arrived intending to change the locks to the Plaintiff's business. Only after the Plaintiff demanded that the police arrest those trespassing and arrest any person that attempted to change the locks did Esquire agree to cease its illegal shut down of the Plaintiff's business.

Esquire has advised Plaintiff that Esquire intends to evict the Plaintiff from the Property as soon as possible and continues to refuse to sell Plaintiff Mobil branded gasoline. The first prong of the requirements to obtain an injunction pursuant to 15 U.S.C. § 2805(b)(2) has been satisfied.

## II.    **LIKELIHOOD OF SUCCESS**

The Plaintiff will succeed on the merits against Esquire. For purposes of this requirement, the Plaintiff need only demonstrate that it has a "reasonable chance of success on the merits." Moody, 734 F.2d at 1216. As demonstrated by the material presented with this motion, the Plaintiff has demonstrated that its chance of prevailing is more than reasonable.

Esquire attempts to justify its actions by claiming that Plaintiff did not comply with Mobil imaging standards. The Plaintiff has operated his gas station at this site for 18 years and has never had a problem. Plaintiff previously operated the business pursuant to a PMPA lease agreement with ExxonMobil. During the Plaintiff's lease with ExxonMobil ("Mobil"), Mobil installed the imaging at the Property. Plaintiff has never been advised that any updated or different imaging was required nor has Plaintiff ever been advised that the imaging at his station did not comply with Mobil standards.

After Esquire purchased the Property from Mobil in February of 2007, Plaintiff entered into a Real Estate Lease/Option (the "Lease/Option") with Esquire (Exhibit 2). Plaintiff paid Esquire $150,000 for the right to purchase the Property. This money was never returned to the Plaintiff. During the period of the Lease/Option, Plaintiff never received any notices of default and was never advised of any defaults or that the Property needed different imaging. Plaintiff is ready, willing and able to install any imaging that is requested by the Mobil standards. (See Exhibit A).

After Plaintiff exercised the Option to purchase, Esquire refused to close the transaction, refused to sign the PSA, refused to sign the Escrow Agreement for the earnest money, expressly advised Plaintiff that Esquire did not acknowledge the exercise of the option as valid and was reviewing the various agreements between Esquire and Plaintiff with an eye toward claiming a default. In other words, Esquire terminated first and looked for a reason later.

6

**A.    The PMPA Protects Franchisees From Unreasonable Terminations.**

The PMPA is codified at 15 U.S.C. § 2801, et seq., and governs petroleum franchise agreements between oil companies and those in the business of selling the motor fuel of these oil companies. In enacting the PMPA, Congress sought to reduce the disparity in bargaining power between franchisees and franchisors, to prevent harsh consequences of sudden and unreasonable termination, and to prevent coercive or unfair franchisor practices. Brach v. Amoco Oil Company, 677 F.2d 1213, 1216 (7th Cir. 1982); Simmons v. Mobil Oil Corporation, 29 F.3d 505,509 (9th Cir. 1994); DuFresne's Auto Service, Inc. v. Shell Oil Company, 992 F.2d 920, 925 (9th Cir. 1993); Mobil Oil Corporation v. Virginia Gasoline Marketers and Automotive Repair Association, 34 F.3d 220, 223 (4th Cir. 1994); Duff v. Marathon Petroleum Company, 51 F.3d 741 (7th Cir. 741, 743-44); S.Rep. No. 95-731, 95th Cong., 2d Sess. 15 (1978), reprinted in 1978 U.S.C.C.A.N. 874.

See Doebereiner v. Sohio Oil Company, 880 F.2d 329, 331-332 (11th Cir. 1989):

The legislative history of the PMPA reveals that the Act was designed to protect franchisees from arbitrary or discriminatory termination or non-renewal. (Citation omitted.) Congress sought to equalize the obvious disparity in bargaining power between major oil companies and service station operators. (Citations omitted.) ... To attain these . . . goals, Congress specifically set forth the permissible grounds for termination or non-renewal of franchise relationships, and bestowed on federal courts jurisdiction to remedy violations of the Act.

The PMPA increases the bargaining strength of individual franchisees in the petroleum industry by limiting and regulating the circumstances under which a franchisor may terminate or fail to renew a petroleum franchise. Halder v. Standard Oil Co., 642 F.2d 107, 109-10 (5th Cir. 1981). It also allows franchisors the ability to exercise their business judgment and modify their franchise agreements without undue interference from the courts. Chestnut Hill Gulf, Inc. v. Cumberland Farms, Inc., 940 F.2d 744, 747 (1st Cir. 1991).

7

Consistent with the statute's remedial purposes, the PMPA must be construed consistent with its overriding purpose to protect franchisees. <u>Brach,</u> 677 F.2d at 1220. A franchisee may maintain a civil action where a franchisor fails to comply with Sections 2802, 2803 or 2804. 15 U.S.C. § 2805(a). Included is the right to obtain injunctive and declaratory relief. 15 U.S.C. 2805(b).

The PMPA provides that a franchisor may terminate a franchise or may decline to renew any franchise relationship **<u>only</u>** when (1) the notification requirements of Section 2804 are met, and (2) the termination or non-renewal is based on grounds described in Section 2802(b) of the statute. <u>Meghani v. Shell Oil Co.,</u> 115F.Supp.2d 747, 751 (S.D. Tex 2000), *aff'd per curiam*, 273 F.3d 1098 (5th Cir. 2001). In the matter at bar, Esquire has not met either requirement. There exists no ground for termination or nonrenewal as allowed by the PMPA and the notice requirements were not met.

### B. Esquire's Reliance On The Purported Defaults Is A Sham.

Esquire took $150,000 from the Plaintiff back in February of 2007 and agreed to sell the Property to the Plaintiff. Even though the Plaintiff properly exercised its option, Esquire refused to consummate the transaction. It is Esquire's intention to forfeit and convert Plaintiff's $150,000 paid for the Option and the $25,000 paid as Earnest Money and to leave the Plaintiff with nothing.

Plaintiff has operated at this Property as a Mobil dealer for over eighteen years without incident. Since February of 2007 after Esquire took possession of the Property from Mobil, the Plaintiff has operated under the Lease/Option without any notice of default from Esquire. Esquire has continued to accept all lease payments. Plaintiff was never given any notice of any defaults from Esquire. Most importantly, Esquire has never provided the Plaintiff with any information as to what the current Mobil imaging standards are or that Plaintiff was not in compliance with the Mobil imaging standards. Almost every other Mobil station owned by Esquire has imaging identical to that

8

of the Plaintiff. Mobil has never notified Plaintiff that there are any disputes with respect to the Mobil imaging that is currently at the Plaintiff's station, which imaging was placed at the Property by Mobil. Moreover, the Plaintiff does not have the ability to order Mobil imaging direct from Mobil as that order must be placed by the distributor, i.e Esquire. Esquire also must coordinate the re-imaging.

Further, the particular provision of the PSA relating to imaging has its own remedy contained in paragraph 18.21 permitting Esquire to perform its own imaging. Esquire has not elected to do the re-imaging itself. The fact that all the almost all other Mobil stations owned by Esquire are imaged identically to the Plaintiff's also demonstrates that this term is not a material term. As this Court is well aware, equity abhors forfeitures.

The Plaintiff has always been a loyal Mobil dealer and has worked very hard to achieve the American dream. Esquire should not be allowed to disregard the agreements between the parties, act in derogation of the PMPA, and to take the unusual and illegal step of attempting some kind of self help conversion of the Plaintiff's Property with the assistance of an attorney, who presumably knew that such acts were illegal.

In addition, Esquire also claims Plaintiff defaulted by selling non-Mobil branded gasoline, but this claim is also a sham as Esquire delivered gas to the Plaintiff mere hours before the so-called testing was done that declared the gas to be non-Mobil gas. Plaintiff fully cooperated in the investigation into this incident and provided Esquire with thousands of documents to support its gas purchases, deliveries and payment of taxes. Even though the event giving rise to this assertion occurred eight months ago, Esquire did not assert any default concerning this issue until after Esquire needed to manufacture a justification for its current actions.

Finally, contrary to Esquire's assertion, there is no health code violation and no Fire Marshall

9

violation. Esquire simply keeps grasping at manufactured events in an effort to convert the Plaintiff's business and steal over $175,000 from the Plaintiff.

Esquire refuses to sell the Property to the Plaintiff relying solely on the language found at Article 18.21 of the PSA. This clause, however, does not allow Esquire to unilaterally take possession of the Plaintiff's business, terminate the PMPA Supply Agreement, and to convert Plaintiff's property. The plaintiff is ready, willing and able to purchase the Property and is not in default of any agreements with Esquire. Plaintiff has never been advised that there is any problem with the imaging or that there were any other problems with the operation of the business.

These above referenced facts coupled with the lack of any notice that Esquire is withdrawing from the market indicate a clear violation of the PMPA. The Plaintiff has a 15 year PMPA Supply Agreement with Esquire. The Plaintiff had a 15 year Lease/Option with the Plaintiff. If the PSA can somehow be terminated by Esquire, the Lease/Option and the Supply Agreement have 14 years remaining on their respective terms. There has been no incident under the PMPA that would allow Esquire to terminate the franchise and the franchise relationship. It is apparent that Esquire will attempt to place another franchisee at the Property to continue to operate. It is evident that Esquire is attempting to use the so-called imaging default as a sham in order to make some ill-advised termination of the PSA, none of which is allowed as a condition to terminate a franchise under the PMPA. Moz, Inc. v. Shell Oil Company, 1986 U.S.Dist. Lexis 28149, 8 (N.D. Ill. 1986).

In Moz, Inc., the Court ruled that a franchisor "cannot use the condemnation exception to the PMPA's prohibition for terminating a dealer which it wants to terminate for other reasons such as replacing a dealership with a company owned mini-mart." (See Exh. 7). This is precisely what Esquire is attempting to do in this case. Esquire has no basis for terminating Plaintiff's franchise.

10

One overriding principle of courts in equity is that equity abhors forfeitures. <u>Looney v. Farmers Home Administration,</u> 794 F.2d 310 (7th Cir. 1986). Esquire seeks to have the Plaintiff forfeit his entire livelihood that he has developed over the past eighteen years at this location. Clearly, Esquires termination is wrongful.

C.    <u>**Esquire Has Allowed Similarly Situated Dealers To Purchase Their Property.**</u>

At least two other Mobil dealers that operated stations previously owned by Esquire still purchased the Property from Esquire despite not having done any re-imaging. This is a clear indication that (1) the imaging complies with the current Mobil imaging standards, and/or (2) this is not a material term. The two other properties purchased by these other dealers are located in Berwyn and River Forest, Illinois respectively. (See Exhibit A, affidavit of Ahmad Zahdan). Esquire's motivations in terminating the Plaintiff herein are not pure and Esquire is attempting to use manufactured events as an end around the law. Even if Esquire's so-called events of default exist (which they clearly do not), they still are not reasons as provided under the PMPA statute to allow for termination. Esquire cannot violate the PMPA and it must continue the PMPA supply agreement and perform under the terms of the agreements.

Even if there was a breach regarding the imaging, such a so-called breach is not material. Esquire never provided the Plaintiff with any of the specifications for the imaging and never provided the Plaintiff with any information that would put the Plaintiff on notice that his station was not in compliance with Mobil's current imaging standards. One of the factors that Illinois courts look at in determining the materiality of a breach is whether the breach defeated a bargained-for objective. <u>McBride v. Pennastt Supply Corp.,</u> 253 Ill.App.3d 363 (5th Dist. 1993). "A court must ask

11

whether the matter, in respect to which the failure of performance occurs, is of such a nature and of such importance that the contract would not have been made without it." Haisma v. Edgar, 218 Ill.App.3d 78 (1st Dist. 1991). In this case, no notices concerning the specifications for imaging were ever given to the Plaintiff. Further most other dealers in the Chicagoland area are imaged exactly as the Plaintiff. Imaging, therefore can hardly be considered a matter of suchimportance that the contract would not have been made without it.

In addition, Esquire's claim of a breach is not helpful in the context of this motion for a preliminary injunction. "Affirmative defenses such as breach of contract may not be litigated on the merits in the context of a hearing on a motion for preliminary injunctive relief." Mohanty v. St. John Heart Clinic, 225 Ill.2d 52, 81-82 (2006):

The reason for this rule…is that resolution of such matters requires the determination of controverted rights and resolution of matters bearing on the merits of the underlying case. Under established precedent, those are not appropriate objectives for proceedings seeking preliminary injunctive relief. As I have already indicated, preliminary injunctions precede hearings on the merits, and their purpose is not to decide the merits of a case, but to maintain the status quo and prevent a threatened wrong until the merits can be decided. Id., at 82.

Finally, Esquire waived any reliance on section 18.21 and the PSA in general by advising Plaintiff that Esquire did not recognize the exercise of the Option and Esquire waived any reliance on this section by its actions. Esquire never provided any imaging specifications to the Plaintiff and never notified the Plaintiff that any other imaging was required. A party can waive provisions of a contract through actions inconsistent with the assertion of those rights. Cole Taylor v. Truck Insurance Exchange, 51 F.3d 736 (7th Cir. 1995).

The Plaintiff will run out of gas if Esquire continues to refuse to supply gasoline to Plaintiff. This is precisely what the PMPA was meant to prevent. As such, a preliminary injunction is required.

**D.    Esquire's actions constitute violations of section 2802 of the PMPA.**

Esquire has attempted to terminate the franchise and franchise relationship with Plaintiff on an ad hoc, ex post facto basis. Esquire gave no notice of the termination. The after the fact letter sent at 3:49 p.m., asserting a termination at 3:00 p.m. clearly violates the notice provisions of the PMPA. The stated reasons by Esquire for terminating the franchise are unrelated to any PMPA statutory basis. (See Section 2802)(See Esquire's letter of April 10, 2008, Exhibit 7). Esquire's termination letter never even attempted to state that the alleged acts constitute an event relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable as is required under the PMPA.

What Esquire does not reveal in its letter is that Esquire never issued any type of default notices to Plaintiff as required under the Lease/Option Agreement and never advised Plaintiff of any problems with the imaging. When relying on the provision in the PMPA which allows a termination for the "occurrence of an event which is relevant to the franchise relationship." (15 U.S.C. 2802(b)(2)(C))  the event relied upon cannot be one that is only "technical or unimportant to the franchise relationship." Moody, at 1216; 15 U.S.C. 2801. As described above and shown by the inaction of Esquire, the imaging was clearly not considered material by Esquire. Moreover, paragraph 18.21 includes a self-contained remedy for Esquire, to do the imaging itself and to charge the Plaintiff. Esquire never did so and never demanded that any different imaging be installed. The so-called re-imaging by a date certain has been prevented by the acts of Esquire and cannot therefore serve as the basis for a termination of the franchise relationship. A party cannot take advantage of its own prevention of contract performance in order to declare a breach. Dodson v. Nink, 72 Ill.App.3d 59 (2d Dist. 1979). Furthermore, if the PSA is terminated, the lease portion of the Lease/Option is

13

still in effect for another 14 years. The PMPA is to be given a narrow construction is order to protect the franchisee. Moody, at 1217.

As set forth above, Section 2802(c) of the PMPA, a franchisor is allowed to terminate the franchise relationship under PMPA only upon certain events. The so-called occurrences relied upon by Esquire are not included therein. Esquire's termination, therefore, violates the PMPA.

E.    **Esquire has breached the Lease/Option, the Supply Agreement and the PSA.**

Esquire never provided the Plaintiff with any of the documents required in the PSA. Plaintiff was forced to file an action for specific performance in the Circuit Court of Cook County, Chancery Division, a copy of which is attached as Exhibit C.

In addition, Esquire breached the Lease/Option, the Supply Agreement and the Purchase and Sale Agreement "related agreements"), by among other acts and omissions, failing and refusing to sell Mobil branded gasoline to the Plaintiff, refusing to re-image the premises, withholding imaging information from the Plaintiff, making false and unfounded allegations against the Plaintiff, trespassing on the Plaintiff's business property and attempting to change the Plaintiff's locks without court order or legal authority, continuing efforts to convert the Plaintiff's Lease/Option payment and Earnest Money deposit, refusing to sell the Property to the Plaintiff and various other breaches.

Notwithstanding Esquire's false claims that Plaintiff breached the PMPA Agreement, Esquire's failure to perform its obligations under the contract would excuse any non-performance by the Plaintiff. Normand v. Orkin Exterminating, 193 F.3d 908, 912 (7th Cir. 1999). In other words, Esquire cannot complain of an asserted minor breach by the Plaintiff when Esquire has refused to sign the PSA, refused to sell the Property to Plaintiff, refused to sell gasoline to the Plaintiff, refused to provide any imaging specifications to the Plaintiff and failed or refused to notify the Plaintiff of

14

any issues with the imaging.

### III.    **BALANCE OF HARMS:**

Pursuant to the PMPA (15 U.S.C. 2805), the franchisee need not show an irreparable injury in order to obtain an injunction. The PMPA differs from FRCP 65 in this sense. <u>Beachler v. Amoco Oil,</u> 112 F.3d 902 (7th Cir. 1997).  However, Esquire will in no way suffer any harm in the event that Esquire is ordered to continue the franchise until a trial on the merits. Esquire will continue to be paid for the gasoline pursuant to the parties' agreements. The analysis of the balance of harms involves a "sliding scale" analysis whereby the court seeks to minimize the effects of granting such relief by mistake. <u>Abbott Laboratories v. Mead Johnson,</u> 971 F.2d 6 at 11 (7th Cir. 1992). The more likely it is the plaintiff will prevail on the merits, the less the balance of irreparable harms need weigh towards its side." <u>Id.</u> In this case, Plaintiff will very likely prevail on the merits and Plaintiff will suffer irreparable harm if his business is shut down and the lease and franchise relationships are terminated.

There exists an on-going legal relationship between the Plaintiff and Esquire protected by federal law, the PMPA, and further protected by the Lease/Option, the Supply Agreement and the Purchase and Sale Agreements that exist between the parties. The threat of the irreparable injury to the Plaintiff without any possible harm caused to Esquire causes the "balance of hardships" to weigh decidedly in favor of the Plaintiff. Moreover, the issuance of the preliminary relief requested herein will prevent harm to the public since, if the relief is not issued, the Plaintiff's loyal customers will have to find an alternative business and the Plaintiff will soon run out of gasoline.

### CONCLUSION

The Plaintiff respectfully requests that its Motion for a Preliminary Injunction be granted.

Memorandum in Support of Motion For Preliminary Injunction

Dated: April 11, 2008

Respectfully submitted,
South Side Gas, Inc.

By: /s/ John J. Conway                .
         One Of Its Attorneys

John J. Conway
Sullivan Hincks & Conway
122 West 22nd Street, Suite 100
Oak Brook, IL 60523
(630) 573-5021

16

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **SOUTH SIDE GAS, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No.  08 C  2071** |
| | ) | |
| **ESQUIRE PETROLEUM, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | **Plaintiff demands a trial by jury** |

## AFFIDAVIT OF AHMAD ZAHDAN IN SUPPORT OF
## PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING
## ORDER AND PRELIMINARY INJUNCTION

I, Ahmad Zahdan, declare as follows:

1.      I am the president and sole shareholder and director of the Plaintiff in the above referenced lawsuit. I am authorized to submit this affidavit and the statements made within this affidavit are made upon my personal knowledge. This affidavit shall submit certain facts in support of The Plaintiff's motion for a temporary restraining order and preliminary injunction.

2.      I am currently the owner and operator of a gasoline station located at 4000 Southwest Highway, Hometown, IL (the "Property"). I have operated my business at that location initially pursuant to a PMPA Lease with ExxonMobil and then via a Lease/Option Agreement, PMPA Supply Agreement, the Purchase and Sale Agreement and related agreements (the "Agreements") with Esquire Petroleum, LLC ("ESQUIRE"). The Agreements are attached to the Plaintiff's complaint and memorandum of law as exhibits thereto and are fully incorporated into, and are expressly made part of, this affidavit.

1

3.      In the PMPA Supply Agreement, attached hereto as Exhibit A-1 and fully incorporated into this Affidavit, South Side Gas, Inc. is granted a PMPA franchise and a Franchise Relationship as defined in the PMPA is established. (See paragraph 5 of the Supply Agreement). Pursuant to the Supply Agreement, ESQUIRE grants to the Plaintiff a franchise as that term is defined under the Petroleum Marketing Practices Act, 15 U.S.C. 2801, et seq. ("PMPA") to buy and sell Mobil trademarked fuel for sales to the public. Plaintiff is a franchisee as that term is defined under the PMPA. ESQUIRE is a franchisor as that term is defined under the PMPA. The Supply Agreement constitutes a franchise relationship as that term is defined under the PMPA. I have been selling gasoline and general merchandise from that location since approximately 1990.

4.      The imaging at my station was supplied by Mobil, was installed by Mobil and has been maintained and repaired by Mobil. I have never been advised of any current Mobil imaging standards nor of any instance or assertion that my station was not imaged in accordance with current Mobil imaging standards. I do not have the ability to directly order or obtain or install any Mobil branded imaging products. This must be done either by Mobil or by the Mobil distributor, which in my case is Esquire.

5.      Plaintiff was acting as the lessee of a lease for the Property pursuant to a Real Estate Lease/Option Agreement between Plaintiff and ESQUIRE dated February 15, 2007. (The "Lease"). The Lease/Option and the Supply Agreement form a franchise relationship as that term is defined at 15 U.S.C. § 2801 (B)(2).

6.      The Plaintiff has invested vast amounts of capital into his business, spent considerable sums for improvements at the Property and has grown the business since the commencement of

operations.

7.      Defendant, Esquire Petroleum, LLC (hereinafter referred to as Esquire) is the record title owner of and holds title to real property located at 4000 Southwest Highway, Hometown, Illinois, and legally described as set forth in Exhibit 1 attached hereto and fully incorporated herein. The real property, personal property, in addition to the buildings, land and equipment at 4000 Southwest Highway, Hometown, Illinois referred to herein shall be hereinafter referred to as the "Property."

8.      The Plaintiff, South Side Gas, Inc. ("Plaintiff") owns and operates a "Mobil®" branded retail gasoline service station and convenience store at the Property. South Side Gas has operated this business at the Property since approximately 1990.

9.      From approximately 1990 to approximately February of 2007, South Side Gas operated its business at the Property pursuant to a lease with Exxon Mobil Corporation pursuant to the protections of the Petroleum Marketing Practices Act, 15 U.S.C. 2801 et seq. ("PMPA").

10.      In and around February of 2007 Exxon Mobil sold the Property to Esquire pursuant to a transaction involving about 15 gasoline station properties in the Chicagoloand area.

11.      On February 15, 2007, Esquire and South Side Gas entered into a Real Estate Lease/Option (the "Lease/Option"), a copy of which attached hereto and fully incorporated herein by reference. (See Exhibit 1 to the Cook County Complaint, Exhibit B hereto).

12.      Pursuant to the Lease/Option, South Side Gas paid to Esquire the sum of One Hundred Fifty Thousand Dollars ($150,000) as consideration for an option to purchase the Property. Esquire accepted this $150,000 from South Side Gas and the consideration of $150,000 was transferred to Esquire.

13.    In consideration of the payment of $150,000 and other consideration as set forth in the Lease/Option, Esquire granted to South Side Gas an "exclusive and irrevocable option" to purchase the Property for the sum of $1,085,000 pursuant to the terms of a purchase agreement that was attached to and made part of the Lease/Option (the "Option"). The purchase agreement that was attached to and made part of the Lease/Option was entitled "Agreement of Purchase and Sale" (the "PSA").

14.    Pursuant to the terms of the Lease/Option, South Side Gas could exercise the Option at any time from February 16, 2008 and May 16, 2008 (See Exhibit 1).

15.    On February 18, 2008, pursuant to the terms of the Lease/Option, South Side Gas exercised the Option and forwarded its written notice of its exercise of the Option to Esquire and to Esquire's attorney pursuant to the terms of the Lease/Option.

16.    Pursuant to the terms of the exercise of the Option, South Side Gas executed the PSA and forwarded the signed PSA with the notice of the exercise of the Option. Concurrent thereto, South Side Gas signed the Escrow Agreement attached to the PSA and sent the signed Escrow Agreement along with the earnest money deposit to the Title Company as defined in the PSA all pursuant to the terms of the exercise of the Option.

17.    Pursuant to the terms of the exercise of the Option, South Side Gas included with the written notice of exercise of the Option, written proof that South Side Gas had the financial ability to close the transaction. South Side Gas included copies of cashier's checks totaling the amount of the purchase price in the PSA and advised Esquire that South Side Gas was ready, willing and able to purchase the Property. A copy of the written notice exercising the Option is attached as Exhibit 2 to the Cook County Complaint and fully incorporated herein by reference. Attached to the Cook County

4

Complaint as Exhibit 3 and fully incorporated herein by reference is a copy of the transmittal to the Title Company of the signed Escrow Agreement and the earnest money deposit.

18.    On February 18, 2008, pursuant to the exercise of the Option, South Side Gas entered into a contract with Esquire to purchase the Property for the sum of One Million Eighty Five Thousand Dollars ($1,085,000). A copy of the PSA signed by South Side Gas and forwarded to Esquire with the written notice of exercise of the Option is attached hereto and made a part hereof as Exhibit 4 and is fully incorporated herein by reference.

19.    On March 21, 2008, Esquire through its attorneys, advised South Side Gas that Esquire was refusing to close on the purchase of the Property pursuant to the PSA. Esquire gave no reason for the refusal but only advised that it was looking at all the agreements.

20.    Subsequent to this March 21, 2008 notification from Esquire that it was refusing to close the purchase of the Property pursuant to the PSA, on March 24, 2008 South Side Gas forwarded a letter to Esquire demanding a closing and again advised Esquire that South Side Gas was ready, willing and able to close on the purchase of the Property pursuant to the PSA. South Side Gas advised Esquire that it would close the purchase of the Property for cash and did not need any financing. Esquire never responded to this letter.

21.    Despite the exercise of the Option and the demands to close, Esquire continues to refuse to sell the Property to South Side Gas pursuant to the terms of the PSA as provided for in the Lease/Option.

22.    Since February 18, 2008, South Side Gas has continually requested that Esquire close the transaction. Esquire continues to refuse to close the transaction.

23.    South Side Gas has performed all the conditions of exercising the Option and the PSA that were to be performed by him except those which Esquire's actions prevented him from performing, i.e. closing and imaging.

24.    At all times relevant hereto, South Side Gas has been, and is ready, willing, and able to fulfill its obligations under the terms of the PSA and to fully perform the closing and imaging as set forth in the PSA.

25.    The property is unique in that it is a retail gasoline service station where South Side Gas has operated its business since 1990, where South Side Gas has made substantial improvements to the Property during the time period of South Side Gas' lease of the premises.

26.    The property that is the subject matter of this suit is a large tract of land in a very good location where South Side Gas operates its Mobil branded gasoline station and convenience store and uniquely suited to fulfill South Side Gas' business needs.

27.    Esquire took $150,000 from the Plaintiff back in February of 2007 and agreed to sell the Property to the Plaintiff. The Plaintiff properly exercised its option yet the Plaintiff refused to consummate the transaction. It is ESQUIRE's intention to forfeit and convert Plaintiff's $150,000 paid for the Option and the $25,000 paid as Earnest Money and to leave the Plaintiff with nothing. See Exhibits 6 and 7.

28.    Plaintiff has operated at this Property as a Mobil dealer for over eighteen years without incident. Since February of 2007 after Esquire took possession of the Property from Mobil, the Plaintiff has operated under the Lease/Option without any notice of default from Esquire. Esquire has continued to accept all lease payments. Plaintiff was never given any

Affidavit In Support Of Motion For TRO

6

notice of any defaults from Esquire. Most importantly, Esquire has never provided the

Plaintiff with any information as to what the current Mobil imaging standards are or that

Plaintiff was not in compliance with the Mobil imaging standards. Almost every other Mobil

station owned by Esquire has imaging identical to that of the Plaintiff. Mobil has never

notified Plaintiff that there are any disputes with respect to the Mobil imaging that is currently

at the Plaintiff's station, which imaging was placed at the Property by Mobil. Moreover, the

Plaintiff does not have the ability to order Mobil imaging direct from Mobil as that order must

be placed by the distributor, i.e Esquire. Esquire also must coordinate the re-imaging. Further,

this particular provision of the PSA has its own remedy contained in paragraph 18.21 and

Esquire has not elected to do the re-imaging itself. The fact that all the almost all other Mobil

stations owned by Esquire are imaged identically to the Plaintiff's also demonstrates that this

term is not a material term.

     29.    The Plaintiff has been a loyal Mobil dealer for over eighteen years and has

worked very hard to achieve the American dream.

     30.    The issue with respect to the non Mobil gas being sold was manufactured by

Esquire as Esquire delivered gas to the Plaintiff just hours before the so-called testing was

done. Plaintiff fully cooperated in the investigation into this incident and provided Esquire

with thousands of documents to support its gas purchases, deliveries and payment of taxes.

See Exhibit 9.

     31.    There is no health code violation. See Exhibit 9. There is no Fire Marshall

violation. During the time of operating under the Mobil Lease, the Fire Marshall inspects on a

Affidavit In Support Of Motion For TRO

7

regular basis. The Fire Marshall provides 60 days to comply with all noted inspection items. The Plaintiff has fully complied with all the inspection items with the exception of the tank testing which is being performed by Tanknology today. Typically the tank testing is ordered by the registered owner of the underground storage tanks (UST's). Esquire is the registered owner of the tanks and failed and refused to order the testing or to provide the required paperwork or release authorization to the Plaintiff. There are no Fire Marshall violations and never have been.

32.    At least two other Mobil dealers that operated stations previously owned by Esquire still purchased the Property from Esquire despite not having done any re-imaging. This is a clear indication that (1) the imaging complies with the current Mobil imaging standards, and/or (2) this is not a material term. The two other properties purchased by these other dealers are located in Berwyn and River Forest, Illinois respectively.

33.    Esquire refuses to correspond with the Plaintiff and the only way that Plaintiff is able to get through to Esquire if I first dial *67 into my phone to block my identify. Otherwise, Esquire does not answer my calls.

34.    My station is across the street from the City of Chicago border, thereby making my location more valuable.

35.    At various points in time during the past 20 years I have operated four Mobil stations and have never had any problems. I have always been a very good dealer for Mobil.

36.    Esquire has notified Plaintiff that it has terminated the PMPA Supply Agreement, the Lease/Option, the PSA and therefore the PMPA franchise and the PMPA

Affidavit In Support Of Motion For TRO

8

franchise relationship. Plaintiff never provided any PMPA required notices. Attached to this

Affidavit and fully incorporated herein as Exhibit 7 is Esquire's letter dated April 10, 2008

notifying Plaintiff that Esquire has terminated the franchise and is refusing to sell any more

gasoline to the Plaintiff. The letter was sent to my attorney at 3:49 p.m. advising that Esquire

would be at the Property at 3:00 p.m. (49 minutes before sending the letter) to close the

Plaintiff's business. The Plaintiff is in danger of running out of gasoline for sale to the

motoring public if the injunction does not issue.

37.    After I received the letter purporting to terminate my franchise, I called the

Hometown Police Department in order to send assistance. Esquire's attorney appeared at my

station at approximately 5:00 p.m. and demanded that I vacate the premises and turn over my

business to her. Esquire's attorney had no court order authorizing this action and had never

filed any court action seeking such relief that I was made aware of. No court documents were

provided to me.

38.    Soon after, the Hometown Police arrived, a locksmith that was hired by

Esquire also arrived with the intent on changing the  locks to my station. Only after the

Plaintiff demanded that the police arrest those trespassing and any person that attempted to

change the locks did Esquire agree to cease its illegal shut down of the Plaintiff's business.

The locksmith left the Property.

39.    In addition, Esquire continued to advise me that Esquire intends to evict the

Plaintiff from the Property as soon as possible and has continued to refuse to sell Mobil branded

gasoline to the Plaintiff.

Affidavit In Support Of Motion For TRO

9

40.　　I made a request direct to Mobil to obtain a delivery of Mobil fuel and another request of Esquire to deliver additional fuel. As of the time of this writing I have not received any response.

41.　　Since February of 2007 after Esquire took possession of the Property from Mobil, the Plaintiff has operated under the Lease/Option without any notice of default from Esquire. Plaintiff was never given any notice of any defaults from Esquire. Most importantly, Esquire has never provided the Plaintiff with any information as to what the current Mobil imaging standards are or that Plaintiff was not in compliance with the Mobil imaging standards. Almost every other Mobil station owned by Esquire has imaging identical to that of the Plaintiff. Mobil has never notified Plaintiff that there are any disputes with respect to the Mobil imaging that is currently at the Plaintiff's station, which imaging was placed at the Property by Mobil. Moreover, the Plaintiff does not have the ability to order Mobil imaging direct from Mobil as that order must be placed by the distributor, i.e Esquire. Esquire also must coordinate the re-imaging. Almost all other Mobil stations owned by Esquire are imaged identically to the Plaintiff's as are the stations owned by Mobil directly.

42.　　The Plaintiff will run out of gas soon if Esquire is allowed to continue to refuse to supply gasoline to the Plaintiff's station.

Affidavit In Support Of Motion For TRO

10

I declare under penalty of perjury under the laws of the United States of America, and the State of Illinois that the foregoing is true and correct to the best of my information and belief.

South Side Gas, Inc.
By Ahmad Zahdan, its president, the Plaintiff

Subscribed and sworn to before me
this 11ᵗʰ day of April 2008

Notary Public

"OFFICIAL SEAL"
JOHN J. CONWAY
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 3/30/2011

Affidavit In Support Of Motion For TRO

11

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SOUTH SIDE GAS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  08 C  2071 |
| | ) | |
| ESQUIRE PETROLEUM, LLC, | ) | Judge Guzman |
| | ) | Magistrate Mason |
| Defendant. | ) | |
| | ) | Plaintiff demands a trial by jury |

## COMPLAINT

Now comes the Plaintiff, South Side Gas, Inc., by and through his attorneys, Sullivan Hincks & Conway, and for his Complaint against the Defendant, Esquire Petroleum, LLC alleges and states as follows:

## INTRODUCTION

1.　　This is an action for violation of the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. 2801 et. Seq., pursuant to the defendant's breach of the PMPA Supply Agreement entered into between the parties and the defendant's attempted termination of the Supply Agreement.

## JURISDICTION AND VENUE

2.　　Jurisdiction of this court is founded on the basis that there is a federal statute involved and jurisdiction is appropriate pursuant to 28 U.S.C. §1331. This matter arises under the Petroleum Marketing Practices Act, 15 U.S.C.S. Section 2801 et seq. ("PMPA"). Section 2805 of the PMPA provides that enforcement actions may be brought, without regard to the amount in controversy, in the district court of the United States in any judicial district in which the principal place of business of such franchisor is located or in which such franchisee is doing business. The court has

supplemental jurisdiction of the contract claims pursuant to 28 U.S.C. §1367.

## PARTIES

3.      Plaintiff, South Side Gas, Inc. ("Plaintiff") is an Illinois corporation doing business in the State of Illinois within the geographical boundaries of this District. Plaintiff is the owner of certain leasehold rights and purchase rights to the motor fuel sales Property (the "Property") located at 4000 West Southwest Highway, Hometown, Illinois (the "Property"). The Plaintiff is a franchisee as that term is defined in the Petroleum Marketing Practices Act, ("PMPA"), 28 U.S.C. §2801 et seq.

4.      Defendant, Esquire Petroleum, LLC (hereinafter "ESQUIRE") is an Illinois limited liability company  licensed and qualified to do business within the State of Illinois. ESQUIRE is a franchisor as the term is defined at 15 U.S.C. § 2801(B)(3) and a distributor as defined at 15 U.S.C. § 2801(B)(6).

## COMMON FACTS

5.      Plaintiff was acting as the lessee of a lease for the Property pursuant to a Real Estate Lease/Option Agreement between Plaintiff and ESQUIRE dated February 15, 2007. (The "Lease/Option"). The Lease forms a franchise relationship as that term is defined at 15 U.S.C. § 2801 (B)(2).

6.      The Plaintiff operates a retail gasoline sales station at the Property. The Plaintiff has operated the gasoline station since approximately 1990. The Plaintiff has invested vast amounts of capital into his business, spent considerable sums for improvements at the Property and has grown the business since the commencement of operations.

7.      Defendant, Esquire Petroleum, LLC (hereinafter referred to as Esquire) is the record title owner of and holds title to real property located at 4000 Southwest Highway, Hometown, Illinois.  The real property, personal property, in addition to the buildings, land and

equipment at 4000 Southwest Highway, Hometown, Illinois referred to herein shall be hereinafter referred to as the "Property."

8.     The Plaintiff, South Side Gas, Inc. ("Plaintiff") owns and operates a "Mobil®" branded retail gasoline service station and convenience store at the Property. South Side Gas has operated this business at the Property since approximately 1990.

9.     From approximately 1990 to approximately February of 2007, South Side Gas operated its business at the Property pursuant to a lease with Exxon Mobil Corporation pursuant to the protections of the Petroleum Marketing Practices Act, 15 U.S.C. 2801 et seq. ("PMPA").

10.     In and around February of 2007 Exxon Mobil sold the Property to Esquire pursuant to a transaction involving about 15 gasoline station properties in the Chicagoloand area.

11.     Prior to entering into the Lease/Option, ExxonMobil ("Mobil") installed the Mobil branded imaging at the Property without any input from the Plaintiff. Plaintiff has never been advised of any required changes to the imaging.

12.     Pursuant to the Lease/Option, South Side Gas paid to Esquire the sum of One Hundred Fifty Thousand Dollars ($150,000) as consideration for an option to purchase the Property. Esquire accepted this $150,000 from South Side Gas and the consideration of $150,000 was transferred to Esquire.

13.     In consideration of the payment of $150,000 and other consideration as set forth in the Lease/Option, Esquire granted to South Side Gas an "exclusive and irrevocable option" to purchase the Property for the sum of $1,085,000 pursuant to the terms of a purchase agreement that was attached to and made part of the Lease/Option (the "Option"). The purchase agreement

3

that was attached to and made part of the Lease/Option was entitled "Agreement of Purchase and Sale" (the "PSA").

14. Pursuant to the terms of the Lease/Option, South Side Gas could exercise the Option at any time from February 16, 2008 and May 16, 2008.

15. On February 18, 2008, pursuant to the terms of the Lease/Option, South Side Gas exercised the Option and forwarded its written notice of its exercise of the Option to Esquire and to Esquire's attorney pursuant to the terms of the Lease/Option.

16. Pursuant to the terms of the exercise of the Option, South Side Gas executed the PSA and forwarded the signed PSA with the notice of the exercise of the Option. Concurrent thereto, South Side Gas signed the Escrow Agreement attached to the PSA and sent the signed Escrow Agreement along with the earnest money deposit to the Title Company as defined in the PSA all pursuant to the terms of the exercise of the Option.

17. Pursuant to the terms of the exercise of the Option, South Side Gas included with the written notice of exercise of the Option, written proof that South Side Gas had the financial ability to close the transaction. South Side Gas included copies of cashier's checks totaling the amount of the purchase price in the PSA and advised Esquire that South Side Gas was ready, willing and able to purchase the Property.

18. On February 18, 2008, pursuant to the exercise of the Option, South Side Gas entered into a contract with Esquire to purchase the Property for the sum of One Million Eighty Five Thousand Dollars ($1,085,000).

19. On March 21, 2008, Esquire through its attorneys, advised South Side Gas that Esquire was refusing to close on the purchase of the Property pursuant to the PSA. Esquire did

4

not advise the basis for its refusal and acknowledged at that time there was no basis but that Esquire was reviewing the agreements to determine if there was compliance by the Plaintiff.

20.    Subsequent to this March 21, 2008 notification from Esquire that it was refusing to close the purchase of the Property pursuant to the PSA, on March 24, 2008 South Side Gas forwarded a letter to Esquire demanding a closing and again advised Esquire that South Side Gas was ready, willing and able to close on the purchase of the Property pursuant to the PSA. South Side Gas advised Esquire that it would close the purchase of the Property for cash and did not need any financing.

21.    Despite the exercise of the Option and the demands to close, Esquire continues to refuse to sell the Property to South Side Gas pursuant to the terms of the PSA as provided for in the Lease/Option.

22.    Since February 18, 2008, South Side Gas has continually requested that Esquire close the transaction. Esquire continues to refuse to close the transaction.

23.    South Side Gas has performed all the conditions of exercising the Option and the PSA that were to be performed by him except those which Esquire's actions prevented him from performing, i.e. closing, imaging.

24.    At all times relevant hereto, South Side Gas has been, and is ready, willing, and able to fulfill its obligations under the terms of the PSA and to fully perform the closing as set forth in the PSA.

25.    The property is unique in that it is a retail gasoline service station where South Side Gas has operated its business since 1989, where South Side Gas has made substantial improvements to the Property during the time period of South Side Gas' lease of the premises.

5

26.     The property that is the subject matter of this suit is a large tract of land in a very good location where South Side Gas operates its Mobil branded gasoline station and convenience store and uniquely suited to fulfill South Side Gas' business needs.

27.     Plaintiff has no adequate remedy at law.

28.     On April 10, 2008, without prior notice, ESQUIRE forwarded a letter to the Plaintiff advising the Plaintiff that ESQUIRE was terminating the Lease as of 3:00 p.m. April 10, 2008. The letter was sent to Plaintiff's counsel at 3:49 p.m. on April 10, 2008. Esquire further advised that Esquire was terminating the PSA, the very agreement that Esquire had previously refused to acknowledge or honor or sign. Esquire has further sent a demand to the title company demanding the release of the $25,000 earnest money deposit.

29.     ESQUIRE's proposed termination of the Lease would deprive the Plaintiff of his business and would prevent him from recovering any amounts for the value of his business and illegally terminates the PMPA franchise in violation of the PMPA. The Plaintiff remains ready, willing and able to fully perform all obligations and has fully performed all its obligations except those which Esquire prevents it from performing.

## COUNT I
## INJUNCTIVE RELIEF

30.     Plaintiff realleges and restates paragraphs 1 through 29 above as though fully recited herein this paragraph 18 of Count I.

31.     Section 2805 of the PMPA provides in pertinent part as follows:

> (b) Equitable relief by court; bond requirements; grounds for nonexercise of court's equitable powers.

(1) In any action under subsection (a), the court shall grant such equitable relief as the court determines is necessary to remedy the effects of any failure to comply with the requirements of section 102, 103, or 107 [*15 USCS § 2802, 2803*, or *2807*], including declaratory judgment, mandatory or prohibitive injunctive relief, and interim equitable relief.

(2) Except as provided in paragraph (3), in any action under subsection (a), the court shall grant a preliminary injunction if--

(A) the franchisee shows—

(i) the franchise of which he is a party has been terminated or the franchise relationship of which he is a party has not been renewed, and
(ii) there exist sufficiently serious questions going to the merits to make such questions a fair ground for litigation; and

(B) the court determines that, on balance, the hardships imposed upon the franchisor by the issuance of such preliminary injunctive relief will be less than the hardship which would be imposed upon such franchisee if such preliminary injunctive relief were not granted.

32.    Esquire has terminated the Plaintiff's franchise and franchise relationship without cause and without notice.

33.    Section 2805(c) of the PMPA provides in pertinent part as follows:

(c) Burden of proof; burden of going forward with evidence.  In any action under subsection (a), the franchisee shall have the burden of proving the termination of the franchise or the nonrenewal of the franchise relationship. The franchisor shall bear the burden of going forward with evidence to establish as an affirmative defense that such termination or nonrenewal was permitted under section 102(b) or 103 [*15 USCS § 2802(b)* or *2803*], and, if applicable, that such franchisor complied with the requirements of section 102(d) [*15 USCS § 2802(d)*].

34.    Plaintiff seeks the entry of an appropriate court order enjoining Esquire (a) from interfering with Plaintiff's business, (b) from terminating the franchise and franchise relationship, (c) from taking further actions attempting to evict the Plaintiff from the premises. Plaintiff

7

further seeks an Order compelling Esquire to sell Mobil branded gas to Plaintiff or ordering that Plaintiff may purchase Mobil branded gas from another Mobil distributor.

35.    Plaintiff seeks the entry of an order declaring the rights of the Plaintiff under the Purchase and Sale Agreement, in particular, an Order declaring the Purchase And Sale Agreement valid and enforceable in favor of Plaintiff, that Plaintiff has the right to purchase the Property from Esquire and that Esquire is compelled to sell the Property to Plaintiff.

WHEREFORE, the Plaintiff, South Side Gas, Inc., requests this Honorable Court to enter judgment in its favor and against the Defendant, Esquire Petroleum, LLC and in said judgment provide for the following:

1) Awarding Plaintiff, South Side Gas, Inc. its compensatory damages; and

2) Awarding Plaintiff, South Side Gas, Inc. its attorneys fees and costs;

3) For an award of exemplary damages against ESQUIRE in order to punish ESQUIRE for acting with a reckless disregard of the rights of Plaintiff and to deter ESQUIRE to act as such in the future;

4) For a declaration that ESQUIRE cannot terminate the franchise relationship, from taking further actions attempting to evict the Plaintiff from the premises, compelling Esquire to sell Mobil branded gas to Plaintiff or ordering that Plaintiff may purchase Mobil branded gas from another Mobil distributor, declaring the rights of the Plaintiff under the Purchase and Sale Agreement, in particular, an Order declaring Purchase And Sale Agreement valid and enforceable in favor of Plaintiff, that Plaintiff has the right to purchase the Property from Esquire and that Esquire is compelled to sell the Property to Plaintiff;

5) For temporary and injunctive relief, and

8

6) For such other relief that this Honorable Court deems just and appropriate.

## COUNT II
## VIOLATION OF THE PMPA - IMPROPER NOTICE

36.     Plaintiff realleges and restates paragraphs 1 through 35 above as though fully recited

herein this paragraph 18 of Count II.

37.     Section 2802(a) of the Petroleum Marketing Practices Act ("PMPA") provides as

follows:

> (a) General prohibition against termination or nonrenewal. Except as provided in
> subsection (b) and Section 103 [15 USCS Section 2803(b)], no franchisor engaged in the
> sale, consignment, or distribution of motor fuel in commerce may

> > (1) terminate any franchise (entered into or renewed on or after the date of
> > enactment of this Act [enacted June 19, 1978]) prior to the conclusion of the term,
> > or the expiration date, stated in the franchise; or

> > (2) fail to renew any franchise relationship (without regard to the date on which
> > the relevant franchise was entered into or renewed).

38.  Section 2802(b) of the PMPA provides as follows:

> (b)   Precondition and grounds for termination or nonrenewal

> > (1)   Any franchisor may terminate any franchise (entered into or renewed on or
> > after June 19, 1978) or may fail to renew any franchise relationship, if - -

> > > (A)   The notification requirements of section 2804 of this title are met;
> > and,

> > > (B)   Such termination is based upon a ground described in paragraph (2) or
> > > such nonrenewal is based upon a ground described in paragraph (2) or (3).

39.  Section 2804(a) of the PMPA provides as follows:

> (a)  General requirements applicable to franchisor.
> Prior to termination of any franchise or nonrenewal of any franchise relationship, the
> franchisor shall furnish notification of such termination or such nonrenewal to the franchisee
> who is a party to such franchise or such franchise relationship - -

(1)  In the manner described in subsection (c) of this section; and

(2)  Except as provided in subsection (b) of this section, not less than 90 days

prior to the date on which such termination or nonrenewal takes effect.

40.  Section 2804(c) of the PMPA provides as follows:

Manner and form of notification
Notification under this section - -
    (1)  shall be in writing;
    (2)  Shall be posted by certified mail or personally delivered to the franchisee;
and
    (3)  Shall contain -
        (A)  A statement of intention to terminate the franchise or not to renew
        the franchise relationship, together with the reasons therefor;
        (B)  The date on which such termination or nonrenewal takes effect; and
        (C)  The summary statement prepared under subsection (d) of this
        section.

41.  ESQUIRE violated Section 2802 of the PMPA by terminating its franchise

relationship with the Plaintiff and by terminating the franchise and franchise relationship without

providing notice as required by Section 2802(b)(1)(A) and Section 2804 of the PMPA. The letter

dated April 10, 2008 asserts an immediate termination and an immediate refusal to sell more gas to

the Plaintiff.

42.  The Plaintiff suffered actual damages as a result of ESQUIRE's violation of Section

2802 of the PMPA.

WHEREFORE, the Plaintiff, South Side Gas, Inc., requests this Honorable Court to enter

judgment in its favor and against the Defendant, Esquire Petroleum, LLC and in said judgment

provide for the following:

1) Awarding Plaintiff, South Side Gas, Inc. its compensatory damages; and

10

2) Awarding Plaintiff, South Side Gas, Inc. its attorneys fees and costs;

3) For an award of exemplary damages against ESQUIRE in order to punish ESQUIRE for acting with a reckless disregard of the rights of Plaintiff and to deter ESQUIRE to act as such in the future;

4) For an alternative declaration that ESQUIRE cannot terminate the franchise relationship,

5) For temporary and injunctive relief, and

6) For such other relief that this Honorable Court deems just and appropriate.

## COUNT III
## TERMINATION OF THE FRANCHISE
## RELATIONSHIP WITHOUT JUST CAUSE

43.     The Plaintiff realleges and incorporates paragraphs 1 through 42 above by reference as if set forth fully herein as paragraph 43 of Count III.

44.     The Plaintiff performed all duties required of him by his franchise agreement and related agreements with ESQUIRE that Esquire did not prevent Plaintiff from performing.

45.     ESQUIRE terminated its franchise relationship with the Plaintiff for a reason other than those reasons for termination set forth in Section 2802(b)(2) or (3) of the PMPA.

46.     ESQUIRE violated the Section 2802 of the PMPA by terminating its franchise relationship with the Plaintiff for a reason other than those set forth in Section 2802(b)(2) or (3) of the PMPA.

47.     The Plaintiff has suffered actual damages as a result of ESQUIRE's unlawful termination.

WHEREFORE, the Plaintiff, South Side Gas, Inc., requests this Honorable Court to enter judgment in its favor and against the Defendant, Esquire Petroleum, LLC and in said judgment

11

provide for the following:

    1) Awarding Plaintiff, South Side Gas, Inc. its compensatory damages;

    2) Awarding Plaintiff, South Side Gas, Inc. its attorneys fees and costs;

    3) For an award of exemplary damages against ESQUIRE in order to punish ESQUIRE for acting with a reckless disregard of the rights of Plaintiff and to deter ESQUIRE to act as such in the future;

    4) For an alternative declaration that ESQUIRE cannot terminate the franchise relationship,

    5) For temporary and injunctive relief, and

    6) For such other relief that this Honorable Court deems just and appropriate.

**COUNT IV**
**BREACH OF THE PMPA SUPPLY AGREEMENT AND RELATED AGREEMENTS**

    48.    Plaintiff realleges and restates paragraphs 1 through 47 above as though fully recited herein this paragraph 48 of Count IV.

    49.    Plaintiff and Esquire had operated pursuant to the Lease/Option and the PMPA Supply Agreement dated February 15, 2007.

    50.    On February 16, 2008, Plaintiff exercised his option to purchase the Property and executed that certain Agreement of Purchase And Sale (the "PSA") drafted by Esquire and part of the Lease/Option and in accordance with the terms of the exercise of the Option granted to the Plaintiff in the Lease/Option.

    51.    At all relevant times to this Complaint the Plaintiff and Esquire were parties to that certain Esquire Petroleum, LLC PMPA Supply Agreement dated February 15, 2007.

    52.    ESQUIRE breached the Lease/Option, the Supply Agreement and the Purchase

12

and Sale Agreement "related agreements"), by among other acts and omissions, failing and refusing to sell Mobil branded gasoline to the Plaintiff, refusing to re-image the premises, withholding imaging information from the Plaintiff, making false and unfounded allegations against the Plaintiff, trespassing on the Plaintiff's business property and attempting to change the Plaintiff's locks without court order or legal authority, continuing efforts to convert the Plaintiff's Lease/Option payment and Earnest Money deposit, refusing to sell the Property to the Plaintiff and various other breaches.

53.    As a result of ESQUIRE's acts and omissions and breaches of the Supply Agreement and related agreements, the Plaintiff has suffered actual damages.

54.    The Plaintiff fully performed all obligations required of him under the Supply Agreement and the related agreements except in those instances where Esquire has prevented it from performing.

WHEREFORE, the Plaintiff, South Side Gas, Inc., requests this Honorable Court to enter judgment in its favor and against the Defendant, Esquire Petroleum, LLC and in said judgment provide for the following:

1) Awarding Plaintiff, South Side Gas, Inc. its compensatory damages;

2) Awarding Plaintiff, South Side Gas, Inc. its attorneys fees and costs;

3) For an award of exemplary damages against ESQUIRE in order to punish ESQUIRE for acting with a reckless disregard of the rights of Plaintiff and to deter ESQUIRE to act as such in the future;

4) For an alternative declaration that ESQUIRE cannot terminate the franchise relationship,

5) For temporary and injunctive relief, and

13

6) For such other relief that this Honorable Court deems just and appropriate.

Respectfully submitted,
South Side Gas, Inc.

By: _____
One of its Attorneys

John J. Conway
Sullivan Hincks & Conway
120 West 22nd Street, Suite 100
Oak Brook, Illinois 60523
(630) 573-5021
Atty No. 06217597

14

State of Illinois )
) ss
County of DuPage )

## VERIFICATION AFFIDAVIT

I, Ahmad Zahdan, the president of the Plaintiff, South Side Gas, Inc., being first duly sworn on oath depose and state that:

1.    That I have read the foregoing Complaint. I am authorized by the Plaintiff to submit this affidavit.

2.    That, if called as a witness in the above-captioned cause, I could testify competently to the facts stated in the foregoing Complaint.

3.    Under penalties as provided by the laws of the State of Illinois and the United states of America, I certify under oath that the statements set forth in the foregoing Complaint are true and correct, except as to matters therein stated to be on information and belief and as to such matters I certify as aforesaid that I verily believe the same to be true.

FURTHER, AFFIANT SAYETH NOT

Ahmad Zahdan, president of South Side Gas, Inc.

Subscribed and Sworn to before me this 11th day of April, 2008.

Notary Public

"O F F I C I A L   S E A L"
JOHN J. CONWAY
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 3/30/2011

15

# EXHIBIT C

#24689

# IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

| | | | |
|---|---|---|---|
| SOUTH SIDE GAS, INC., | ) | | |
| | ) | | |
| Plaintiff, | ) | | 2008CH125... |
| | ) | | CALENDAR... |
| v. | ) | No. | TIME 00:00... |
| | ) | | General Chancery |
| ESQUIRE PETROLEUM, LLC, | ) | | |
| | ) | | |
| Defendant. | ) | | |

## COMPLAINT FOR SPECIFIC PERFORMANCE AND OTHER RELIEF

Now comes the Plaintiff, South Side Gas, Inc., by and through its attorneys, Sullivan Hincks & Conway and for its Complaint against the Defendant, Esquire Petroleum, LLC, for specific performance of their contract for the sale of real estate and other relief, states as follows:

## COUNT I - SPECIFIC PERFORMANCE

1.     Defendant, Esquire Petroleum, LLC (hereinafter referred to as Esquire) is the owner of, and holds title to, real property located at 4000 Southwest Highway, Hometown, Illinois, and legally described as set forth in Exhibit 1 attached hereto and fully incorporated herein. The real property, personal property, in addition to the buildings, land and equipment at 4000 Southwest Highway, Hometown, Illinois referred to herein shall be hereinafter referred to as the "Property."

2.     The Plaintiff, South Side Gas, Inc. ("South Side Gas" or "Plaintiff") owns and operates a "Mobil®" branded retail gasoline service station and convenience store at the Property. South Side Gas has operated this business at the Property since approximately 1990.

1

3.      From approximately 1990 to approximately February of 2007, South Side Gas operated its business at the Property pursuant to a lease with Exxon Mobil Corporation pursuant to the protections of the Petroleum Marketing Practices Act, 15 U.S.C. 2801 et seq. ("PMPA").

4.      In and around February of 2007, Exxon Mobil sold the Property to Esquire pursuant to a transaction involving about 15 gasoline station properties in the Chicagoland area whereby Exxon Mobil sold these stations to Esquire.

5.      On February 15, 2007, Esquire and South Side Gas entered into a Real Estate Lease/Option (the "Lease/Option"), a copy of which is attached hereto as Exhibit 2 and fully incorporated herein by reference. The Lease/Option is also subject to the PMPA.

6.      Pursuant to the terms of the Lease/Option, South Side Gas paid to Esquire the sum of One Hundred Fifty Thousand Dollars ($150,000) as consideration for an option to purchase the Property. Esquire accepted this $150,000 from South Side Gas and the consideration of $150,000 was transferred to Esquire.

7.      In consideration of the payment of $150,000 and other consideration as set forth in the Lease/Option, Esquire granted to South Side Gas an "exclusive and irrevocable option" to purchase the Property for the sum of $1,085,000 pursuant to the terms of a purchase agreement that was attached to and made part of the Lease/Option (the "Option"). The purchase agreement that was attached to and made part of the Lease/Option was entitled "Agreement of Purchase and Sale" (the "PSA").

8.      Pursuant to the terms of the Lease/Option, South Side Gas could exercise the Option at any time from February 16, 2008 to May 16, 2008 (See Exhibit 2, ¶2.2).

2

9.    On February 18, 2008, pursuant to the terms of the Lease/Option, South Side Gas exercised the Option and forwarded its written notice of its exercise of the Option to Esquire and to Esquire's attorney pursuant to the terms of the Lease/Option as set forth in paragraph 2.2.

10.    Pursuant to the terms of the exercise of the Option, South Side Gas executed the PSA and forwarded the signed PSA with the notice of the exercise of the Option. Concurrent thereto, South Side Gas signed the Escrow Agreement attached to the PSA and sent the signed Escrow Agreement along with the earnest money deposit to the Title Company as defined in the PSA all pursuant to the terms of the exercise of the Option as recited in paragraph 2.2 of the Lease/Option.

11.    Pursuant to the terms of the exercise of the Option, South Side Gas included with the written notice of exercise of the Option, written proof that South Side Gas had the financial ability to close the transaction. South Side Gas included copies of cashier's checks totaling the amount of the purchase price in the PSA and advised Esquire that South Side Gas was ready, willing and able to purchase the Property. A copy of the written notice exercising the Option is attached hereto as Exhibit 3 and fully incorporated herein by reference. Attached hereto as Exhibit 4 and fully incorporated herein by reference is a copy of the transmittal to the Title Company of the signed Escrow Agreement and the earnest money deposit.

12.    On February 18, 2008, pursuant to South Side Gas' exercise of the Option in accordance with the terms of paragraph 2.2 of the Lease/Option, South Side Gas entered into a contract with Esquire to purchase the Property for the sum of One Million Eighty Five Thousand Dollars ($1,085,000). A copy of the PSA signed by South Side Gas and forwarded to Esquire with the written notice of exercise of the Option is attached hereto and made a part hereof as Exhibit 5 and is fully incorporated herein by reference.

3

13.    On March 21, 2008, Esquire through its attorneys advised South Side Gas that Esquire was refusing to close on the purchase of the Property pursuant to the PSA.

14.    Subsequent to this March 21, 2008 notification from Esquire that it was refusing to close the purchase of the Property pursuant to the PSA, on March 24, 2008 South Side Gas forwarded a letter to Esquire demanding a closing and again advised Esquire that South Side Gas was ready, willing and able to close on the purchase of the Property pursuant to the PSA. South Side Gas advised Esquire that it would close the purchase of the Property for cash and did not need any financing. South Side Gas advised Esquire that South Side Gas was ready, willing and able to buy the Property.

15.    Despite the exercise of the Option in accordance with the terms of the Lease/Option, and further despite South Side Gas' demands to close, and its demonstration of the ability to pay the purchase price, Esquire continues to refuse to sell the Property to South Side Gas pursuant to the terms of the PSA as provided for in the Lease/Option.

16.    Since February 18, 2008, South Side Gas has continually demanded and requested that Esquire close the transaction. Esquire continues to refuse to close the transaction. South Side Gas remains ready, willing and able to purchase the Property.

17.    South Side Gas has performed all the conditions required in the Lease/Option to properly exercise the Option and has exercised the Option. South Side Gas has further performed all conditions required of it to be performed pursuant to the PSA that were to be performed by South Side Gas except those certain acts which Esquire's actions prevented it from performing, i.e. closing, et al.

4

18.     At all times relevant hereto, South Side Gas has been, and remains, ready, willing, and able to fulfill its obligations under the terms of the PSA and to fully perform the closing as set forth in the PSA. South Side Gas is ready, willing and able to purchase the Property.

19.     The Property is unique in that it is a retail gasoline service station where South Side Gas has operated its business since 1990 and where South Side Gas has made substantial improvements to the Property during the time period of South Side Gas' lease of the premises.

20.     The Property that is the subject matter of this suit is a large tract of land in a very desirable location where South Side Gas operates its Mobil branded gasoline station and convenience store and is uniquely suited to fulfill South Side Gas' business needs.

21.     Plaintiff has no adequate remedy at law.

WHEREFORE, Plaintiff, South Side Gas, Inc. prays that this Court enter judgment in its favor and against Esquire Petroleum, LLC and grant the following relief in its favor and against the Defendant Esquire Petroleum, LLC:

A.     Enter Judgment in favor of Plaintiff, South Side Gas, Inc. and against Esquire Petroleum, LLC, directing Esquire to specifically perform and fulfill the terms of the PSA contract attached hereto as Exhibit 5.

B.     Enter a Temporary Restraining Order and Preliminary Injunction enjoining Esquire from conveying title in the Property to anyone other than Plaintiff.

C.     Award costs of this suit to Plaintiff, including its reasonable attorneys' fees, and;

D.     Award such other relief as the Court deems just and equitable.

## COUNT II - BREACH OF CONTRACT

22.     Plaintiff adopts and realleges Paragraphs 1 through 21 of Count I as though fully recited into and fully incorporated into this Paragraph 22 of Count II.

23.     Esquire's refusal to close on the sale of the Property to South Side Gas constitutes a breach of the PSA real estate contract.

24.     Plaintiff has fully performed pursuant to the PSA contract.

25.     Plaintiff has been damaged as a result of the breach in that it has continued to make lease payments to Esquire, has been deprived of the ownership of the Property, and has been otherwise damaged. The Plaintiff has also made significant permanent improvements to the Property that it has not been compensated for.

WHEREFORE, Plaintiff, South Side Gas, Inc. prays that this Court enter judgment in favor of the Plaintiff and against Esquire Petroleum, LLC in an amount in excess of thirty thousand dollars ($30,000) in compensatory damages, its costs and reasonable attorneys' fees in this suit and for such other relief this Honorable Court deems just.

Respectfully submitted,
South Side Gas, Inc.

By: _____
One of its Attorneys

John J. Conway, Esq.
Sullivan Hincks & Conway
120 West 22nd Street, Suite 100
Oak Brook, Illinois 60523
(630) 573-5021
Atty. No. 24689

6

## VERIFICATION

Ahmad Zahdan, the president of South Side Gas, Inc., being first duly sworn on oath, deposes and states that he is the president of the plaintiff in this action, and the allegations contained in this Complaint are true and correct.

**South Side Gas, Inc.**
**Ahmad Zahdan**

By: 

Subscribed and Sworn to
before me this 31st day of
March 2008.

Notary Public

```
"OFFICIAL SEAL"
JOHN J. CONWAY
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 3/30/2011
```

7

# EXHIBIT 1

## EXHIBIT 1

Located in the City of Hometown, County of Cook, State of Illinois:

Part of Lots 875 and 877 in J. E. Merrion and Co.'s Hometown Unit No. 3, being a Subdivision of part of the Northeast ¼ of Section 3, and part of the East ½ of the Northeast ¼ of Section 3 Township 37 North Range 13 East of the Third Principal Meridian, per Document 1370408, described as follows:

Beginning at the Southwest corner of said Lot 877; thence North 00 degrees 26 minutes 00 seconds East along the West line of said Lot 877, 96.00 feet; thence North 44 degrees 34 minutes 00 seconds West 35.36 feet; thence North 00 degrees 26 minutes 00 seconds West 55.00 feet; thence North 45 degrees 26 minutes 00 seconds East 35.36; thence North 00 degrees 26 minutes 00 seconds East 48.96 feet; thence South 89 degrees 35 minutes 22 seconds East 195.97 feet; thence South 69 degrees 56 minutes 09 seconds East 14.87 feet; thence South 22 degrees 08 minutes 27 seconds East 20.68 feet; thence South 25 degrees 39 minutes 15 seconds West 14.87 feet; thence South 45 degrees 18 minutes 28 seconds West 299.87 feet to the point of beginning, in Cook County, Illinois.

Commonly known as 4000 West Southwest Highway, Hometown, Illinois 60456, Tax Parcel Identification No. 24-03-201-026.

8

# EXHIBIT 2

## REAL ESTATE LEASE/OPTION

THIS REAL ESTATE LEASE ("Lease") is made and entered into as of this 15th day of February, 2007, by and between Esquire Petroleum, LLC, an Illinois limited liability company ("Landlord") and South Side Gas, Inc. ("Tenant").

## ARTICLE 1: THE PREMISES.

1.1    Lease. Landlord does hereby lease to Tenant, and Tenant does hereby lease from Landlord, subject to and in accordance with the terms and the provisions of this Lease, the real estate described in Exhibit A attached hereto with a common address of 4000 Southwest Highway, Hometown, Illinois, along with all buildings and other improvements located thereon (the "Premises"). This Lease supersedes all prior leases with respect to the Premises.

1.2    Use. The Premises shall be used by Tenant exclusively for the operation of a gas station and convenience store, and other related businesses and activities. Tenant agrees to restrict its use to such purposes, and not to use, or permit the use of, the Premises for any other purpose without first obtaining the written consent of Landlord. Tenant agrees that the Premises shall be used and occupied in a careful, safe, lawful and proper manner, and that no waste shall be committed upon or any damage done to the Premises.

1.3    Possession. Landlord shall deliver possession of the Premises to Tenant on the date hereof. If Landlord shall be unable for any reason whatsoever to deliver possession of the Premises on the date of commencement, it shall not be liable to Tenant for any damage caused thereby, nor shall this Lease thereby become void or voidable, nor shall the term hereof in any way be extended, but in such event Tenant shall not be liable for any rent until such time as Landlord can and does deliver possession.

## ARTICLE 2: TERM, OPTION, SUPPLY AGREEMENT.

2.1    Term. The term ("Term") of this Lease shall be (2) years, commencing on the date hereof, unless sooner terminated as provided herein.

2.2    Option. In consideration of the payment of the sum of One Hundred Fifty Thousand 00/100 Dollars ($150,000.00) to Landlord by Tenant (the "Option Payment"), Landlord hereby grants to Tenant the exclusive and irrevocable option ("Option") to purchase the Premises from Landlord for the additional payment of One Million Eighty Five Thousand and 00/100 Dollars ($1,085,000.00) subject to the terms of the Agreement of Purchase and Sale attached hereto as Exhibit B (the "Purchase Agreement"). The option hereby granted may be exercised no earlier than one year and one day, and no later than fifteen (15) months after the Lease inception date after which all of the rights of Tenant under this Section 2.2 will expire and terminate and Landlord shall retain the Option Payment described above. Tenant shall exercise the Option by delivering the following to Landlord in accordance with Section 19.7 of this Lease: (i) written notice of Tenant's exercise of the Option; (ii) an original executed Purchase Agreement; and (iii) proof acceptable to Landlord of Tenant's ability to purchase the Premises.

2.3    Closing Date. In the event Tenant exercises the Option pursuant to Section 2.2, the closing (the "Closing") shall be held on a date mutually agreed upon by Tenant and Landlord, but not later than sixty (60) days following the date of exercise of the Option (the "Closing Date").

2.4    Supply Agreement. Tenant agrees, simultaneously with the execution of this Lease, to execute the PMPA Supply Agreement (the "Supply Agreement") attached hereto as Exhibit



EXHIBIT<br>2

C. This Lease and the consummation of the transactions contemplated by this Lease are subject to and conditioned upon Landlord's approval of Tenant's creditworthiness in respect of the obligations of Tenant under this Lease and the Supply Agreement. Notwithstanding anything set forth herein or in the Supply Agreement to the contrary, the Supply Agreement shall terminate upon expiration of this Lease.

    2.5    Letter of Credit. Within 10 days of the date of this Lease, Tenant shall deliver to Landlord an irrevocable unconditional letter of credit in the amount of $15,000.00 U.S Dollars, in form and substance acceptable to Landlord in the exercise of Landlord's sole discretion, from a banking institution acceptable to Landlord in the exercise of Landlord's sole discretion (the "LOC") in favor of Landlord as beneficiary; provided, however, that to the extent Tenant has delivered to Landlord on or prior to the date of execution of this Lease, a letter of credit which has been accepted by Landlord, then the LOC may be reduced by an amount equal to the letter of credit from Tenant then being held by Landlord. Such LOC shall: (1) permit partial draws, (2) contain a so called "evergreen" provision whereby such LOC will automatically renew on an annual basis unless the issuer delivers sixty (60) days' prior written notice of cancellation to Landlord and Tenant and (3) have an initial expiry date not sooner than one year following the date of this Lease. At least thirty (30) days prior to the expiry date (both the initial expiry date and each subsequent expiry date), Tenant shall deliver a renewal or replacement LOC. This LOC shall secure Tenant's and any Affiliate of Tenant's obligations and performance of the Supply Agreement and the provisions of such Supply Agreement as they affect the Letter of Credit are incorporated herein by this reference and Tenant hereby agrees to be subject thereto. Such LOC shall be payable to Landlord on sight in partial or full draws and shall be assignable by Landlord to a beneficiary other than Landlord at Landlord's request without cost therefor to Landlord. Any and all fees or cost charged by the issuer in connection with the LOC shall be paid by Tenant. For purposes of this Lease "Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such Person. For purposes of this definition, the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of any Person, whether through the ownership of voting securities or by contract or otherwise. "Person" means an individual, partnership (whether general or limited), limited liability company, corporation, trust, estate, unincorporated association, nominee, joint venture or other entity. The provisions of this Section 2.5 shall survive the termination of this Lease.

ARTICLE 3: RENT.

    3.1    Rent. During the Term of this Lease, Tenant will pay Landlord, as the annual rent hereunder to lease the Premises, the sum of One Hundred Eight Thousand Nine Hundred Four and 44/100 Dollars ($108,904.44), and Tenant will pay such rent in installments four times per month, on the 7th, 14th, 21st and 28th of each month in advance, without offset or deduction, and without previous demand therefor, of Two Thousand Two Hundred Sixty Eight and 84/100 Dollars ($2,268.84), commencing on the date hereof and continuing thereafter during the Term of this Lease. Tenant will receive "credit" against the option purchase price in the amount of all "principal" payments, as referenced in Exhibit E. The sum of $2,268.84 shall be drafted by Electronic Fund Transfer (EFT) on a weekly basis. Additionally, 1/52 of the current annual real estate taxes will be drafted weekly by EFT. Tenant shall furnish all information and signatures required to effectuate the EFT rights of Seller. Tenant shall provide ten (10) days advance notice of any change in banking relationships which would impact any EFT. If an EFT is not honored, there shall be a fee of $100 on the first occasion, and $250 on the second occasion. On the third such occasion, Landlord shall have the right to terminate the Lease. Any holdover tenancy beyond the initial term of this Lease shall be at 150% of the rental amounts set forth above.

3.2    Late Payment. Any rental payment not paid within ten (10) days after the first day of the month shall bear interest at the rate of twelve percent (12%) per annum from the date payment was due until paid.

3.3    No Offset. Tenant waives and disclaims any present or any future right to apply any rental payment or any partial payment of rent against any obligation of the Landlord, however incurred, or to assert any such obligation as a offset or a counterclaim in any action for rent, and agrees that it will not claim or assert any such right, offset or counterclaim.

## ARTICLE 4: TAXES AND ASSESSMENTS.

4.1    Responsibility of Tenant. Tenant shall pay and discharge all taxes, general and special assessments, and other charges of every description which during the Term of this Lease may be levied on or assessed against the Premises, all interests therein and all improvements and other property thereon, whether belonging to Landlord or to Tenant, or for which either of them may become liable in relation thereto, and must keep all sales and other taxes current. Landlord shall have the right to verify Tenant's tax payment status with the State of Illinois, and Tenant shall execute all documents necessary to allow for such verification. Tenant agrees to and shall pay all such taxes, assessments, and charges not less than twenty (20) days prior to the date of delinquency thereof, except to the extent taxes have already been paid to Landlord.

4.2    Proration. All such taxes, assessments, and charges for the first and last years of this Lease shall be prorated between Landlord and Tenant on the basis of the ratio between the time the Premises are leased to Tenant and the time the Premises are not so leased.

4.3    Tenant's Failure to Pay. If Tenant fails to pay such taxes, assessments, or charges, prior to the date of delinquency thereof, Landlord may, at its option, pay such taxes, assessments, or charges, together with all penalties and interest which may have been added thereto because of Tenant's delinquency or default, and may likewise redeem the Premises, or any part thereof, or the buildings or improvements situated thereon, from any tax sale or sales. Any amounts so paid by Landlord shall become immediately due and payable as rent by Tenant to Landlord, together with interest thereon at the rate of twelve percent (12%) per annum from the date of payment by Landlord until repaid to Landlord by Tenant. Any such payment by Landlord shall not be deemed to be a waiver of any other rights which Landlord may have under the provisions of this lease or as provided by law.

## ARTICLE 5: UTILITIES.

5.1    Responsibility of Tenant. Tenant shall, during the term hereof, pay all charges for utilities, including, without limitation, all charges for telephone, gas, electricity, sewage, garbage, heat, power and water used in or on the Premises immediately on becoming due.

## ARTICLE 6: REPAIRS AND MAINTENANCE.

6.1    Responsibility of Tenant. Tenant shall, at its own expense and risk, keep the Premises in good order and repair, reasonable wear and tear excepted. Tenant shall also, at its own expense and risk, maintain and repair (including necessary replacements of) the entire Premises including, without limitation, the roof, foundation, plumbing (including underground or otherwise concealed plumbing, plumbing fixtures and pipes), the structural soundness of the exterior walls (including all windows, window glass, plate glass, and all doors), floors, stairways, railings, windows, window glass, plate glass, doors, heating system, air-conditioning equipment, fire

-3-

protection sprinkler system, elevators, the entire interior of the building, landscaping, curbs, pavements, entryways and awnings outside the building and any railroad siding, and all other parts of the building, and other improvements on the Premises. Tenant shall also keep such curbs and pavements free of ice and snow.

Tenant will not permit the existence or continuance of any mechanic's lien on or against the Premises. Within ten (10) days after receiving a notice of the filing of a mechanic's lien, Tenant will cause such mechanic's lien to be removed by payment or posting of appropriate bonds, or by depositing an amount equivalent to such claimed mechanic's lien as security with Landlord if Tenant, in good faith, contests such claimed mechanic's lien.

6.2    Responsibility of Landlord. Landlord shall have no maintenance and repair (including replacement) responsibilities with respect to the Premises hereunder.

6.3    Tanks, Lines, Dispensers. Tenant shall be responsible for, and assumes the obligation for compliance with all applicable laws, including but not limited to, all environmental laws and applicable registration and testing requirements, including, but not limited to, calibration of weights and measures, with respect to tanks, lines and dispensers on or under the Premises.

6.4    Imaging. Purchaser shall complete "imaging" or "re-imaging" of the Property to current Mobil Imaging Standards, on or before the earlier of Closing or March 1, 2008. So long as Purchaser is in full compliance with its obligations hereunder, all rebates provided by Mobil with respect to any such imaging or re-imaging shall be retained by Purchaser, to help offset the costs of imaging or re-imaging. If Purchaser breaches its obligations pursuant to this Section, Seller shall have the right, but not the obligation, to perform such imaging or re-imaging, and to recover any amounts expended in such endeavors from Purchaser, through any and all available means.

ARTICLE 7: ALTERATIONS AND ADDITIONS.

7.1    Consent of Landlord Required. Tenant shall make no alterations or additions to the Premises without first obtaining the written consent of Landlord and Landlord's written approval of the plans and specifications for the alterations and additions, which approval shall not unreasonably be withheld.

7.2    Construction of Alterations and Additions. If Tenant receives Landlord's consent and approval set forth in Section 7.1 above, Tenant shall (a) pay promptly, as due, the cost and the expense of any such alterations or additions to the Premises, so that the Premises shall, at all times, be free and clear of liens for labor, materials and supplies; (b) procure all necessary permits prior to undertaking such alterations and additions; (c) perform such alterations and additions, or to cause them to be performed, in a good and workmanlike manner, in accordance with plans and specifications expressly approved, in writing, by Landlord and in compliance with all applicable governmental laws, statutes, and regulations, including applicable fire and building codes; and (d) hold Landlord harmless and indemnified from and against any and all injury, all loss, all claims and all damage to any person or to property (including attorneys' fees and costs) occasioned by or arising from such alterations and additions.

7.3    Ownership and Removal. Once alterations and additions to the Premises have been made (except unattached movable fixtures which Tenant shall be permitted to remove prior to the termination of this Lease) they shall not be removed by Tenant without Landlord's written consent, and shall become part of the Premises and the sole property of Landlord; provided,

however, that Landlord shall have the option, upon expiration of this Lease, to require Tenant to remove any or all of such alterations or additions.

## ARTICLE 8: INSURANCE.

       8.1    Responsibility of Tenant. Tenant agrees to and shall, prior to the date of commencement of this Lease, secure from a good and responsible company or companies doing insurance business in the State of Illinois, and maintain during the Term of this Lease, the following coverage:

            (a)    Fire and extended coverage insurance in an amount not less than current replacement value of the Premises and other improvements thereon.

            (b)    Comprehensive public liability insurance, insuring against claims, demands and actions with respect to bodily injury, death or property damage arising from Tenant's use of the Premises, with minimum limits of coverage acceptable to Landlord.

            (c)    Business Interruption Insurance.

            (d)    Environmental Insurance/UST Policy, in excess of the Illinois Leaking Underground Storage Tank Fund, in the amount of $1,000,000 per occurrence. (Tenant shall reimburse Landlord for 1/15[th] of its Environmental Insurance/UST Policy which it has procured in connection with its purchaser of fifteen (15) sites from ExxonMobil which is currently 1/15 of $34,392 or $2,292 per year.)

       8.2    Certificates. Tenant shall deliver to Landlord appropriate insurance certificates evidencing such coverages, such certificates providing for 30 days notice to Landlord of cancellation or termination.

       8.3    Additional Insured. Tenant agrees that Landlord and all mortgagees of Landlord with respect to the Premises shall be named as an additional insured on the aforementioned policies of insurance.

       8.4    Proceeds. Tenant specifically agrees that the proceeds from any and all fire and extended coverage or casualty insurance policy or policies with respect to the Premises shall be payable to Landlord, who shall use such proceeds to make repairs and replacements as provided in Article 9 below.

## ARTICLE 9: DAMAGE OR DESTRUCTION.

       9.1    Notice. If the building or other improvements on the Premises should be damaged or destroyed by fire, flood, or other casualty, Tenant shall give immediate written notice thereof to Landlord.

       9.2    Full Risk of Loss upon Tenant. No destruction or damage to any building or improvement on the Premises by fire, windstorm, or any other casualty shall entitle the Tenant to surrender possession of the Premises, to terminate this Lease, to violate any of its provisions, or to cause any rebate or abatement in rent then due or thereafter becoming due under the terms hereof.

9.3     Damage and Restoration.  In case of damage to or destruction of any building on the Premises or of the machinery, fixtures, and equipment (except movable trade fixtures, furniture, and furnishings) used in the operation and maintenance thereof, by fire or otherwise, the Tenant will, at such time and upon the conditions hereinafter set forth, restore, repair, replace, rebuild, or alter the same as nearly as possible to the condition such property was in immediately prior to such damage or destruction.  Such restoration, repair, replacement, rebuilding, or alteration shall be commenced as soon as practicable after the receipt by the Landlord or the holder of any mortgage of the insurance money to be paid on account of such damage or destruction, and, after such work has been commenced, it shall be prosecuted with reasonable diligence.

9.4     Application of Funds.  All insurance money received by the Landlord or such mortgagee on account of such damage or destruction, less the cost, if any, of such recovery, shall be applied by the Landlord or such mortgagee to the payment of the cost of such restoration, repair, replacement, rebuilding, or alteration (the "Work"), including expenditures made for temporary repairs or for the protection of property pending the completion of permanent restoration, repair, replacement, rebuilding, or alteration to the leased property, and shall be paid out, as hereinafter provided, from time to time, as such Work progresses, upon the written request of the Tenant which shall be accompanied by the following:

> A.     A certificate of the architect or engineer in charge of the work (the certificate), dated not more than 30 days prior to such request, setting forth that the sum then requested either has been paid by the Tenant or is justly due to contractors, subcontractors, materialmen, engineers, architects, or other persons (whose names and addresses shall be stated), who have rendered services or furnished materials for certain Work.  The certificate shall give a brief description of such services and materials, shall list the several amounts so paid or due to each of such persons, shall state the fair value of the Work at the date of the requisition, and shall state that no part of such expenditures has been or is being made the basis for any other request for payment.  The certificate shall state also that except for the amounts listed therein, there is no outstanding indebtedness known to such architect or engineer, after due inquiry, which is then due for labor, wages, materials, supplies, or services in connection with such Work which, if unpaid, might become the basis of a vendor's, mechanic's, laborer's, materialman's, or similar lien upon such Work or upon the Demised Premises.

> B.     An affidavit sworn to by the Tenant that all materials and all property constituting the Work described in such certificate of the architect or engineer are free and clear of all security interests, liens, charges, or encumbrances, except encumbrances, if any, securing indebtedness due to persons specified in such certificate which are to be discharged upon payment of such indebtedness.

9.5     Disbursement.  Upon compliance with the foregoing provisions of Section 9.4, the Landlord or such mortgagee shall, out of such insurance money, on request of the Tenant, pay to the persons named in such certificate the respective amounts stated to be due to them, or shall pay to the Tenant the amount stated to have been paid by the Tenant; provided, however, that such payments shall not exceed in amount the fair value of the relevant Work as stated in the certificate. If the insurance money in the hands of the Landlord or such mortgagee exceeds the amount required to pay the cost of such Work, the Landlord or such mortgagee, as the case may be, shall be entitled to retain such excess.

9.6    No Rent Abatement. The Tenant's obligation to pay the basic rent and all other charges and to perform all other terms of this Lease shall not be affected by any such damage to or destruction of any building on the Premises or of the machinery, fixtures, and equipment used in the operation and maintenance thereof, and the Tenant waives the provisions of any statute or law now or hereafter in effect to the contrary.

9.7    Tenant Default. Notwithstanding the foregoing provisions of this paragraph, any insurance moneys in the hands of the Landlord or such mortgagee shall not be required to be paid out if, at the time of the request for payment, the Tenant is in default in the performance of any term in this Lease as to which notice of default has been given and which has not been remedied within the time limit specified in this Lease.

## ARTICLE 10: ADDITIONAL COVENANTS; QUIET ENJOYMENT.

Throughout the Term of this Lease, Tenant agrees to abide by and perform in all respects all the obligations, restrictions, and covenants, including but not limited to those relating to use, zoning, and records maintenance, contained in Sections 6.6 and 6.7 of the Purchase Agreement, which are hereby incorporated herein by this reference. All rights and remedies of Landlord shall be continuing and enforceable with respect to any violations of this Article 10. In addition to Landlord's rights and remedies under this Lease, Landlord shall have all rights and remedies available at law or in equity. In the event Tenant fails to comply with its obligations under this Article 10, in addition to any rights and remedies available to Landlord under this Lease, at law or in equity, Tenant hereby agrees to indemnify, defend and hold Landlord harmless from any claims made against Landlord by any persons or entities as a result, directly or indirectly, of Tenant's failure to comply with its obligations under this Article 10. The provisions of this Article 10 shall survive the termination of this Lease.

If Tenant pays the rent and other charges herein described and otherwise performs the terms, covenants, and conditions of this Lease on the part of Tenant to be performed hereunder, Tenant may lawfully and quietly possess and enjoy the Premises during the term of this Lease.

## ARTICLE 11: ASSIGNMENT AND SUBLEASE.

Tenant shall not assign this Lease or sublet the Premises, or any portion thereof, or permit the use or the occupancy of the Premises, or any portion thereof, by any party other than Tenant, without obtaining the prior written consent of Landlord and without first requiring that the sublessee agree in writing to assume the obligations of this Lease. The consent of Landlord to any assignment or any subletting, or the election of Landlord to accept, as the Tenant hereunder, any assignee or any sublessee shall not release that original Tenant from any obligation or any responsibility hereunder. The consent of Landlord shall not be unreasonably withheld.

## ARTICLE 12: INDEMNIFICATION.

Tenant shall indemnify and hold Landlord harmless from and against: (i) all claims, liabilities, suits, damages, costs and expenses arising from Tenant's use of the Premises, or from the conduct of Tenant's business or from any activity, work or things done, permitted or suffered by Tenant in or about the Premises; (ii) all claims arising from any breach or default in the performance of any obligation on Tenant's part to be performed under the terms of this Lease, or arising from any negligence of the Tenant, or any of the Tenant's agents, contractors or employees, and from and against all costs, attorney's fees, expenses and liabilities incurred in the defense of any such claim or any action or proceeding brought thereon; and (iii) any and all costs or expenses incurred by

Landlord as a result of Tenant's failure to perform any of its obligations hereunder. In case any action or proceeding is brought against Landlord by reason of any claim described above, Tenant shall defend the same at Tenant's expense by counsel satisfactory to Landlord.

## ARTICLE 13: SURRENDER.

13.1 Expiration of Term; Holding Over. At the expiration or termination of this Lease, Tenant shall surrender immediate possession of the Premises in as good condition as when delivered to Tenant, reasonable wear and tear and permitted alterations and additions excepted. Any holding over by Tenant shall not operate, except by written agreement, to extend or renew this Lease or to imply or create a new Lease, but in such case Landlord's rights shall be limited to either the immediate termination of Tenant's occupancy or the treatment of Tenant's occupancy as a month to month tenancy, any custom or law to the contrary notwithstanding.

13.2 Removal of Tenant Personal Property. If owned by Tenant, the equipment and machinery located within the Premises and not permanently affixed thereto may be removed by Tenant at or prior to the termination of this Lease. Tenant shall repair any damage caused by the removal of such items.

13.3 Abandoned Personal Property. Any equipment, machinery, vehicles or other personal property of Tenant remaining on or in the Premises ninety (90) days after the termination of this Lease may, at the option of Landlord, be considered abandoned by Tenant and retained by Landlord or disposed of without accountability in such manner as Landlord may deem appropriate.

## ARTICLE 14: CONDEMNATION.

14.1 Total Condemnation. If during the term of this Lease or any extension or renewal thereof, all of the Premises should be taken for any public or quasi-public use under any law, ordinance, or regulation or by right of eminent domain, or should be sold to a condemning authority under threat of condemnation, this Lease shall terminate and the rent shall be abated during the unexpired portion of this Lease, effective as of the date of the taking of the Premises by the condemning authority.

14.2 Partial Condemnation. If during the term of this Lease or any extension or renewal thereof, less than all of the Premises shall be taken for any public or quasi-public use under any law, ordinance, or regulations, or by right of eminent domain, or should be sold to a condemning authority under the threat of condemnation, Landlord shall have the option to (i) terminate this Lease or (ii) forthwith at its sole expense, restore and reconstruct the building and other improvements, situated on the Premises, provided such restoration and reconstruction shall make the same reasonably tenantable and suitable for the uses for which the Premises are leased. The rent payable hereunder during the unexpired portion of this Lease shall be adjusted equitably.

14.3 Condemnation Awards. Landlord and Tenant shall each be entitled to receive and retain such separate awards and portions of lump-sum awards as may be allocated to their respective interests in any condemnation proceedings. The termination of this Lease shall not affect the rights of the respective parties to such awards.

## ARTICLE 15: DEFAULT.

15.1 Events of Default. The occurrence of any one or more of the following events shall constitute an event of default ("Event of Default") under this Lease:

A.    The failure by Tenant to pay any installment of rent or any money due under this Lease within five (5) days after receiving a notice of the delinquency thereof from Landlord;

B.    The failure by Tenant to perform any other covenant or agreement to be performed by Tenant under this Lease within thirty (30) days after receiving a notice from Landlord or, if more than thirty (30) days are required to perform such covenant or agreement, the failure of Tenant to commence the performance thereof within such thirty (30) day period and thereafter to diligently pursue such performance to completion;

C.    A receiver or similar officer becomes entitled to the leasehold interest of Tenant under this Lease;

D.    Abandonment of the Premises by Tenant;

E.    Levy, seizure, attachment, or sale of the leasehold interest of Tenant under this Lease;

F.    Dissolution of Tenant; and

G.    Tenant becomes insolvent or unable to pay debts as they mature, or admits in writing to such effect, or makes an assignment for the benefit of creditors, or a proceeding is instituted by or against Tenant alleging that Tenant is insolvent or unable to pay debts as they mature, or a petition under any bankruptcy or insolvency law is brought by or against Tenant.

15.2 Tenant Notice to Landlord.  Tenant shall promptly notify Landlord in writing upon the happening or occurrence or existence of any Event of Default, or any event or condition which with the passage of time or giving of notice, or both, would constitute an Event of Default.

15.3 Landlord Remedies.  Upon the occurrence of any of the Events of Default, Landlord may, at its option, without notice to or demand upon Tenant, exercise any one or more of the following remedies:

A.    Landlord may reenter the Premises immediately, with or without process of law and with the use of such force as may be necessary, and remove all persons and all property therefrom, and Landlord shall not be liable or responsible for any damages resulting therefrom.  After reentering, Landlord may relet the Premises or any part thereof, for any term, without terminating this Lease at such rent and on such terms as Landlord may choose.  Tenant shall be liable to Landlord for the difference between the rent received by Landlord under the reletting and the rent installments that are due for the same period under this Lease;

B.    Landlord may terminate this Lease by ten (10) days written notice to Tenant.  Upon termination of this Lease, Landlord may recover from Tenant all damages proximately resulting from the termination, including the cost of recovering the Premises, the unpaid rent that had been earned at the time of the termination of this Lease, and the unpaid rent that would have been earned from the date of such termination until the time this Lease would have

expired but for such termination. All such amounts shall be immediately due and payable from Tenant; and

C.　　Landlord may pursue any other remedy or combination of remedies legally available to Landlord, including the recovery of damages caused by Tenant's failure to perform or observe any covenant or condition of this Lease.

15.4 _Performance by Landlord_.  In the event Tenant fails to perform any of its obligations under this Lease, Landlord may, at its option, perform such obligations on Tenant's behalf without waiving the Event of Default.  Tenant agrees to repay Landlord any expenses incurred in such performance plus interest of twelve percent (12%) per annum from the date of Landlord's payment or incurrence of such expenses.

15.5 _Landlord's Legal Expenses_.  Tenant agrees to pay all costs incurred by Landlord in the collection of the rent and enforcement of its rights under this Lease, including attorney's fees and legal expenses of Landlord.

## ARTICLE 16:  LEASE SUBORDINATE AND CONDITIONAL

This Lease shall be subject and subordinate to any mortgages or trust deeds now on or that may be hereafter placed against the Premises, and to all advances made or that may be made on account of the encumbrances, to the full extent of the principal sums secured thereby and interest thereon; provided that any such mortgagee agrees not to disturb Tenant's use and possession of the Premises so long as Tenant shall be in compliance with its agreements and covenants hereunder. Tenant agrees to execute any and all documents necessary for such subordination upon the request of Landlord.

Tenant understands and acknowledges that this Lease and the consummation of the transactions contemplated by this Lease are subject to and conditioned upon the closing of the purchase of the Premises by Landlord from Exxonmobil Oil Corporation (the "Exxon Closing") under that certain Agreement of Purchase and Sale made and entered into as of August 10, 2006 by and between Exxonmobil Oil Corporation and Landlord. If, for any reason, Landlord does not purchase the Premises from Exxonmobil Oil Corporation, this Lease shall be null and void, and Tenant's Option Payment shall be promptly released and returned to Tenant.

## ARTICLE 17:  INSPECTION AND ACCESS BY LANDLORD.

Tenant shall permit Landlord and its agents to enter into and upon the Premises at all reasonable times for the purpose of inspecting the same or for the purpose of maintaining or making repairs or alterations to the building, and/or for purposes related to environmental remediation or investigation.

## ARTICLE 18:  COMPLIANCE WITH LAWS.

Tenant shall promptly comply, or cause prompt compliance with all laws, ordinances, orders, rules and regulations of all municipal, county, state, federal or other governmental authorities properly applicable to the Premises.

ARTICLE 19:  GENERAL PROVISIONS.

19.1 Title to Articles and Sections. Titles to Articles and Sections herein are for informational purposes only.

19.2 Binding Effect.  The provisions of this Lease shall be binding upon and inure to the benefit of the parties hereto, their heirs, executors, administrators, successors and assigns.

19.3 Governing Law.  This Lease shall be construed, enforced and governed in all respect, in accordance with the laws and the statutes of the State of Illinois, and any litigation arising hereunder shall be in McHenry County, Illinois.

19.4 Partial Invalidity.  The invalidity of any particular term or provisions of this Lease shall not affect the validity of the remaining terms and provisions hereof.

19.5 Amendments.  No alterations to or modifications of the terms or the provisions of this Lease shall be effective unless such alteration or such modification is reduced to writing, and is then properly executed by the parties hereto.

19.6 Complete Agreement.  This Lease supersedes any prior contract or arrangement between the parties hereto, and represents the complete agreement of the parties hereto.

19.7 Notices.  All notices provided by this Lease shall be given in writing (i) either by hand delivery of the notice to the party thereunto entitled, or (ii) by mailing of the notice in the United States mail, first-class postage prepaid, to the address of the party entitled thereto, registered or certified mail, return receipt requested.  The notice shall be deemed to be received (i) on the date of its actual receipt by the party entitled thereto and (ii) on the second business day after the date of its mailing.  All notices, demands or other communications to any of the other parties to this Lease shall be addressed as follows:

| | |
|---|---|
| To Landlord: | Esquire Petroleum, LLC<br>One Magnificent Mile<br>980 North Michigan Avenue, Suite 1400<br>Chicago, IL 60611<br>Attention: Ulice Payne, Jr.<br>Facsimile: (262) 784-0098 |
| With a copy to: | Robert M. Riffle<br>Elias, Meginnes, Riffle & Seghetti, P.C.<br>416 Main Street, Suite 1400<br>Peoria, Illinois 61602<br>Facsimile: 309-637-8514 |
| To Tenant: | South Side Gas<br>Attn:  Ahmad Zahdan<br>4000 Southwest Highway<br>Hometown, IL 60456 |

With a copy to:        John J. Conway, Esq.
                       Sullivan Hincks & Conway
                       120 W. 22nd Street, Suite 100
                       Oak Brook, IL 60523
                       Facsimile: (630) 573-5130

The address of any party hereto may be changed by notice to the other party duly served in accordance with the provisions hereof.

   19.8 <u>Waiver</u>. Any waiver by a party hereto of a breach of any term or condition of this Lease shall not be considered as a waiver of any subsequent breach of the same or any other term or condition hereof.

   19.9 <u>No Other Legal Relationship Created</u>. Nothing contained in this Lease shall be deemed or construed as creating a relationship of principal and agent, or of partnership or of joint venture between the parties hereto.

   19.10 <u>Tenant Certification</u>. Tenant does hereby agree at any time, and from time to time, upon request in writing by Landlord, to execute, to acknowledge and to deliver to Landlord a statement, in writing, certifying that this Lease is unmodified and is in full force and effect, there is no default by Landlord hereunder, and any other factual data or information relating to this Lease, or the Premises, which Landlord may request.

   19.11 <u>Rights and Remedies Cumulative</u>. The rights and remedies provided by this Lease are cumulative, and the use of any one right or remedy by either party shall not preclude or waive its right to use any of all other remedies. Said rights and remedies are given in addition to any other rights the parties may have by law, statute, ordinance, or otherwise.

   19.12 <u>PMPA Obligations/Release and Indemnification</u>. Tenant hereby indemnifies and holds Landlord harmless of and from any and all claims (including attorneys' fees) arising under the PMPA, State and/or Federal law relating to the premises. Tenant hereby releases Landlord from any and all claims and causes of action arising out of or relating to any event or occurrence occurring prior to the execution hererof.

   19.13 <u>Lease Subordination</u>. Tenant shall execute the Subordination Non-Disturbance and Attornment Agreement attached hereto as Exhibit D.

   19.14 <u>Real Estate Tax Challenge</u>. Tenant shall have the right, at its sole cost and expense, to challenge the real estate taxes with respect to the Premises, and hereby agrees to indemnify and hold Landlord harmless of and from any and all costs, fees and expenses arising out of or relating to any such challenge.

   19.15 Esquire shall promptly notify Tenant of receipt of any eminent domain offers or notifications received during the term of this Lease.

EXECUTED as of the day and year first above written.

LANDLORD:                                    TENANT:
ESQUIRE PETROLEUM, LLC                       SOUTH SIDE GAS, INC.

By: _____                 By: _____
                                                 Ahmad Zahdan
Name: _____
Title: _____

607-0104

-13-

EXHIBIT A

LEGAL DESCRIPTION


Part of Lots 875 and 877 in J.E. Merrion and Co's Hometown Unit No. 3, being a subdivision of part of the NE ¼ of Section 3, and part of the East ½ of the NE ¼ of Section 3 Township 37 North Range 13 East of the Third Principal Meridian, per Document 1370408, described as follows:

Beginning at the SW corner of said Lot 877; thence North 00 degrees 26 minutes 00 seconds east along the West line of said Lot 877, 96.00 feet; thence North 44 degrees 34 minutes 00 seconds West 35.36 feet; thence North 00 degrees 26 minutes 00 seconds West 55.00 feet; thence North 45 degrees 26 minutes 00 seconds East 35.36; thence North 00 degrees 26 minutes 00 seconds East 48.96 feet; thence South 89 degrees 35 minutes 22 seconds East 195.97 feet; thence South 69 degrees 56 minutes 09 seconds East 14.87 feet; thence South 22 seconds, 08 minutes, 27 seconds East 20.68 feet; thence South 25 degrees 39 minutes 15 second West 14.87 feet; thence South 45 degrees 18 minutes 28 seconds West 299.87 feet to the point of beginning; in Cook County, Illinois.


Commonly known as:          4000 Southwest Highway, Hometown, IL 60456

PIN:     24-03-201-026
         24-03-201-025

EXHIBIT B

AGREEMENT OF PURCHASE AND SALE

[Attach 607-0105]

EXHIBIT C

PMPA SUPPLY AGREEMENT

[Attach 607-0106]

<u>EXHIBIT D</u>

SEE ATTACHED SUBORDINATION, NON-DISTURBANCE
AND ATTORNMENT AGREEMENT

## EXHIBIT E

SEE ATTACHED AMORTIZATION SCHEDULE

# EXHIBIT 3

Law Offices Of

# SULLIVAN HINCKS & CONWAY

A PARTNERSHIP OF PROFESSIONAL CORPORATIONS
120 WEST 22nd STREET, SUITE 100
OAK BROOK, ILLINOIS 60523

DANIEL C. SULLIVAN
PATRICK M. HINCKS
JOHN J. CONWAY
JOHN P. CALLAHAN, JR.
DESMOND P. CURRAN
MATTHEW P. BARRETTE
MATTHEW B. SPEISER
RYAN A. MAHONEY

TEL (630) 573-5021
FAX (630) 573-5130
www.shlawfirm.com

**Via Certified Mail, Return Receipt Requested**
**Via Fax (262) 784-0098 and Overnight Mail**
**Formal Notice Of Exercise Of Option To Purchase**
February 18, 2008

Ulice Payne, Jr.
Esquire Petroleum, LLC
One Magnificent Mile
980 North Michigan
Suite 1400
Chicago, IL 60611

Re:   South Side Gas, Inc. and Ahmad Zahdan
        4000 Southwest Highway, Hometown, IL (the "Premises")

Dear Mr. Payne:

This letter shall serve as the formal written notice of South Side Gas, Inc. and its president Ahmad Zahdan (the "Buyer"), of the exercise of the Option to purchase as set forth in paragraph 2.2 of that certain Real Estate Lease/Option agreement dated February 15, 2007 between South Side Gas, Inc. and Esquire Petroleum, LLC (the "Lease/Option"). Pursuant to the provisions of the Lease/Option please be advised that enclosed herewith are the following, (i) this formal written notice of the exercise of the Option, (ii) an original Agreement of Purchase And Sale ("Purchase Agreement") executed by the Buyer, and (iii) proof acceptable to Esquire Petroleum, LLC of the Buyer's ability to purchase the Premises as evidenced by the enclosed copies of cashier's checks totaling $1,081,298.74 available to be applied to the purchase of the Premises. The copies of the cashier's checks demonstrate the availability of funds in the total amount exceeding the net funds due toward the purchase price, indicating that the Buyer has the ability to close on the transaction immediately for cash. The Buyer is ready, willing, and able to purchase the Premises in accordance with the terms of the Lease/Option and the enclosed Agreement of Purchase and Sale ("Purchase Agreement").

1



EXHIBIT

3

SULLIVAN HINCKS & CONWAY

      Also enclosed herewith is a copy of the Irrevocable Letter of Credit in the sum of $25,000 that has been delivered to the title company pursuant to paragraph 3.2 of the Purchase Agreement as the Earnest Money deposit.

      We look forward to closing this transaction as soon as possible. If you have any questions please call.

                     Very truly yours,
                     Sullivan Hincks & Conway

           By:

                     John J. Conway

JJC/le
encl.

Cc:    Robert M. Riffle, Esq., Elias, Meginnes, Riffle & Seghetti, 416 Main Street, Peoria, IL 61602. Facsimile number (309) 637-8514



FIFTH THIRD BANK

CASHIER'S CHECK

23119
421

12081418

September 05, 2007

Pay to the
Order of: AHMAD ZAHDAN *****

Amount: TWO HUNDRED EIGHTY ONE THOUSAND TWO HUNDRED NINETY EIGHT 74/100 US DOLLARS

$*****281,298.74

Transaction Number 256396935
Cost Center: 2515

Drawn on:  Fifth Third Bank, Kentucky, Inc
           Lexington, KY

Memo:       AHMAD ZAHDAN
Purchased by: AHMAD ZAHDAN

The purchase of a Surety Bond may be required before any Cashier's Check on this
bank will be replaced or refunded in the event it is lost, misplaced, or stolen.

Authorized Signature

⑈12081418⑈ ⑆042101890⑆ 008 26194400⑈



**LaSalle Bank**
ABN AMRO

OFFICIAL CHECK                487603771-2

Issued by Integrated Payment Systems Inc., Englewood, Colorado
JPMorgan Chase Bank, N.A., Denver, Colorado

Date
02/13/2008    202   12104   4876037712

Pay to the order of
AHMAD ZAHDAN                    $50,000.00

                                                23-97
                                                1020

FIFTY THOUSAND AND NO/100 DOLLARS

Remitter
MMA DDA 5712

Drawer: LaSalle Bank N.A., Chicago, Illinois

FACSIMILE SIGNATURE VOID OVER 99999999.99    MP

⑈099652⑈ ⑆102000979⑆ 6800487603771⑆

---

**LaSalle Bank**
ABN AMRO

OFFICIAL CHECK                487603772-1

Issued by Integrated Payment Systems Inc., Englewood, Colorado
JPMorgan Chase Bank, N.A., Denver, Colorado

Date
02/13/2008    202   12104   4876037721

Pay to the order of
AHMAD ZAHDAN                    $65,000.00

                                                23-97
                                                1020

SIXTY-FIVE THOUSAND AND NO/100 DOLLARS

Remitter
MMA DDA 5654

Drawer: LaSalle Bank N.A., Chicago, Illinois

FACSIMILE SIGNATURE VOID OVER 99999999.99    MP

⑈099652⑈ ⑆102000979⑆ 6800487603772⑆



**LaSalle Bank**
ABN AMRO

OFFICIAL CHECK                487603770-3

Issued by Integrated Payment Systems Inc., Englewood, Colorado
JPMorgan Chase Bank, N.A., Denver, Colorado

Date
02/13/2008    202   12104   4876037703

Pay to the order of
AHMAD ZAHDAN                    $65,000.00

                                                23-97
                                                1020

SIXTY-FIVE THOUSAND AND NO/100 DOLLARS

Remitter
MMA DDA 5738

Drawer: LaSalle Bank N.A., Chicago, Illinois

FACSIMILE SIGNATURE VOID OVER 99999999.99    MP

⑈099652⑈ ⑆102000979⑆ 6800487603770⑆

**LaSalle Bank**
ABN AMRO

OFFICIAL CHECK

487603769-4

HOLD DOCUMENT UP TO THE LIGHT TO VIEW TRUE WATERMARK

| Date | Issued by Integrated Payment Systems Inc., Englewood, Colorado<br>JPMorgan Chase Bank, N.A., Denver, Colorado |
|---|---|
| 02/13/2008 | 202  12104  4876037694 |

23-97
1020

Pay to the order of
AHMAD ZAHDAN                                    $65,000.00

SIXTY-FIVE THOUSAND AND NO/100 DOLLARS

Remitter
MMA DDA 5670

Drawer: LaSalle Bank N.A., Chicago, Illinois

FACSIMILE SIGNATURE VOID OVER 99999999.99                MP

⑈099652⑈ ⑆102000979⑈ 68004876037694⑈

---

**LaSalle Bank**
ABN AMRO

OFFICIAL CHECK

HOLD DOCUMENT UP TO THE LIGHT TO VIEW TRUE WATERMARK

487603766-7

| Date | Issued by Integrated Payment Systems Inc., Englewood, Colorado<br>JPMorgan Chase Bank, N.A., Denver, Colorado |
|---|---|
| 02/13/2008 | 202  12104  4876037667 |

23-97
1020

Pay to the order of
AHMAD ZAHDAN                                    $65,000.00

SIXTY-FIVE THOUSAND AND NO/100 DOLLARS

Remitter
MMA DDA 5720

Drawer: LaSalle Bank N.A., Chicago, Illinois

FACSIMILE SIGNATURE VOID OVER 99999999.99                MP

⑈099652⑈ ⑆102000979⑈ 68004876037667⑈

---

**LaSalle Bank**
ABN AMRO

OFFICIAL CHECK

HOLD DOCUMENT UP TO THE LIGHT TO VIEW TRUE WATERMARK

487603765-8

| Date | Issued by Integrated Payment Systems Inc., Englewood, Colorado<br>JPMorgan Chase Bank, N.A., Denver, Colorado |
|---|---|
| 02/13/2008 | 202  12104  4876037658 |

23-97
1020

Pay to the order of
AHMAD ZAHDAN                                    $65,000.00

SIXTY-FIVE THOUSAND AND NO/100 DOLLARS

Remitter
MMA WD 5704

Drawer: LaSalle Bank N.A., Chicago, Illinois

FACSIMILE SIGNATURE VOID OVER 99999999.99                MP

⑈099652⑈ ⑆102000979⑈ 68004876037658⑈



HOLD DOCUMENT UP TO THE LIGHT TO VIEW TRUE WATERMARK    **OFFICIAL CHECK**    487603764-0

**LaSalle Bank**
ABN AMRO

Issued by Integrated Payment Systems Inc., Englewood, Colorado
JPMorgan Chase Bank, N.A., Denver, Colorado

Date    02/13/2008    202  12104  4876037640

23-97
1020

Pay to the order of
AHMAD ZAHDAN                    $65,000.00

SIXTY-FIVE THOUSAND AND NO/100 DOLLARS

Remitter
MMA WD 5688

Drawer: LaSalle Bank N.A., Chicago, Illinois

FACSIMILE SIGNATURE VOID OVER 99999999.99    MP

⑆099652⑆ ⑈102000979⑉: 68004876037640⑆

---

HOLD DOCUMENT UP TO THE LIGHT TO VIEW TRUE WATERMARK    **OFFICIAL CHECK**    HOLD DOCUMENT UP TO THE LIGHT TO VIEW TRUE WATERMARK    487603763-1

**LaSalle Bank**
ABN AMRO

Issued by Integrated Payment Systems Inc., Englewood, Colorado
JPMorgan Chase Bank, N.A., Denver, Colorado

Date    02/13/2008    202  12104  4876037631

23-97
1020

Pay to the order of
AHMAD ZAHDAN                    $65,000.00

SIXTY-FIVE THOUSAND AND NO/100 DOLLARS

Remitter
MMA 5647

Drawer: LaSalle Bank N.A., Chicago, Illinois

FACSIMILE SIGNATURE VOID OVER 99999999.99    MP

⑆099652⑆ ⑈102000979⑉: 68004876037631⑆

---

HOLD DOCUMENT UP TO THE LIGHT TO VIEW TRUE WATERMARK    **OFFICIAL CHECK**    HOLD DOCUMENT UP TO THE LIGHT TO VIEW TRUE WATERMARK    487603768-5

**LaSalle Bank**
ABN AMRO

Issued by Integrated Payment Systems Inc., Englewood, Colorado
JPMorgan Chase Bank, N.A., Denver, Colorado

Date    02/13/2008    202  12104  4876037685

23-97
1020

Pay to the order of
AHMAD ZAHDAN                    $65,000.00

SIXTY-FIVE THOUSAND AND NO/100 DOLLARS

Remitter
MMA DDA 5662

Drawer: LaSalle Bank N.A., Chicago, Illinois

FACSIMILE SIGNATURE VOID OVER 99999999.99    MP

⑆099652⑆ ⑈102000979⑉: 68004876037685⑆

## Check 1

**LaSalle Bank**
ABN AMRO

OFFICIAL CHECK

487603767-6

Issued by Integrated Payment Systems Inc., Englewood, Colorado
JPMorgan Chase Bank, N.A., Denver, Colorado

Date   02/13/2008     202  12104   4876037676

23-97
1020

Pay to the order of
AHMAD ZAHDAN                     $65,000.00

SIXTY-FIVE THOUSAND AND NO/100 DOLLARS

Remitter
MMA DDA 5696

Drawer: LaSalle Bank N.A., Chicago, Illinois

Security
Features
Details on
Back.

FACSIMILE SIGNATURE VOID OVER 99999999.99          MP

⑆099652⑆ ⑈102000979⑈ 68004876037676⑈

## Check 2

HOLD DOCUMENT UP TO THE LIGHT TO VIEW TRUE WATERMARK     OFFICIAL CHECK     HOLD DOCUMENT UP TO THE LIGHT TO VIEW TRUE WATERMARK

**LaSalle Bank**
ABN AMRO

628861803-3

Issued by Integrated Payment Systems Inc., Englewood, Colorado
JPMorgan Chase Bank, N.A., Denver, Colorado

Date   02/13/2008     202  12112   6288618033

23-97
1020

Pay to the order of
AHMAD ZAHDAN                     $65,000.00

SIXTY-FIVE THOUSAND AND NO/100 DOLLARS

Remitter
MMA DDA 5746

Drawer: LaSalle Bank N.A., Chicago, Illinois

Security
Features
Details on
Back.

FACSIMILE SIGNATURE VOID OVER 99999999.99          MP

⑆099652⑆ ⑈102000979⑈ 68006288618033⑈

## Check 3

UTB **united trust bank**
8028 S. Harlem Ave.
Bridgeview, IL 60455

019996

REMITTER:  AHMAD ZAHDAN              DATE   2/13/08

PAY TO THE
ORDER OF     AHMAD  ZAHDAN
            EXACTLY **100,000 AND 00/100 DOLLARS      $    $100,000.00

**CASHIER'S CHECK**

THE PURCHASE OF AN INDEMNITY BOND WILL BE REQUIRED BEFORE ANY
CASHIER'S CHECK OF THIS BANK WILL BE REPLACED OR REFUNDED IN
THE EVENT IT IS LOST, MISPLACED OR STOLEN.

UNITED TRUST BANK

AUTHORIZED SIGNATURE

⑆000001999⑆ ⑈071974505⑈ 50000000 26⑈

# EXHIBIT 4

Law Offices Of

# SULLIVAN HINCKS & CONWAY

A PARTNERSHIP OF PROFESSIONAL CORPORATIONS
120 WEST 22nd STREET, SUITE 100
OAK BROOK, ILLINOIS 60523

DANIEL C. SULLIVAN
PATRICK M. HINCKS
JOHN J. CONWAY
JOHN P. CALLAHAN, JR.
DESMOND P. CURRAN
MATTHEW P. BARRETTE
MATTHEW B. SPEISER
RYAN A. MAHONEY

TEL (630) 573-5021
FAX (630) 573-5130
www.shlawfirm.com

**Via Fax (773) 442--0320 and Overnight Mail**
**And Via E-Mail** fwhalum@stewart.com
February 18, 2008

Fran Whalum
Commercial Escrow Officer
Stewart Title Guaranty Company NTS
2 N. LaSalle Street, Suite 1400
Chicago, Illinois  60602
(773) 442-0320 (Fax)

Re:    South Side Gas, Inc. and Ahmad Zahdan
       4000 Southwest Highway, Hometown, IL (the "Premises")

Dear Ms. Whalum/Stewart Title:

Enclosed with this letter is the $25,000 Earnest Money deposit for the purchase of the above referenced Premises in the form of an Irrevocable Letter of Credit, No. 2008-02 pursuant to paragraph 3.2 of the Agreement For Purchase And Sale ("Purchase Agreement"). Also enclosed is an escrow agreement signed by the Buyer, South Side Gas, Inc. The Buyer is ready, willing, and able to complete the purchase. We look forward to closing this transaction as soon as possible. If you have any questions please call.

Very truly yours,
Sullivan Hincks & Conway

By: _John J. Conway_

JJC/le
encl.
Cc:
Ulice Payne, Jr. Esquire Petroleum, LLC, 980 N. Michigan, Ste. 1400, Chicago, IL  60611. Facsimile number (262) 784-0098
Robert M. Riffle, Esq., Elias, Meginnes, Riffle & Seghetti, 416 Main Street, Peoria, IL 61602. Facsimile number (309) 637-8514

1

EXHIBIT
4

 **united trust bank**

IRREVOCABLE STANDBY LETTER OF CREDIT NO. 2008-02 (Revised)
BENEFICIARY:    ESQUIRE PETROLEUM, LLC.
                333 BISHOPS WAY, SUITE 110
                BROOKFIELD, WI 53005
                PH: (262) 767-0970

Gentlemen:

We hereby establish our Irrevocable Standby Letter of Credit No. 2008-02 in your favor for the account of South Side Gas, 4000 Southwest Hwy, Hometown IL 60456 up to the aggregate sum of $25,000.00 (Twenty Five Thousand and No / 100 United States Dollars) available by your draft(s) at sight drawn on United Trust Bank and accompanied by the following documents:

1.    The original Letter of Credit, and all amendments, if any.

2.    A letter executed on behalf of the beneficiary stating that South Side Gas has failed to pay the invoices as agreed upon under the terms of the Credit Agreement.

All sight drafts drawn under this Credit must be marked "Drawn under United Trust Bank Irrevocable Standby Letter of Credit No. 2008-02 dated February 6, 2008."

The Letter of Credit cannot be modified or revoked without the consent of the beneficiary hereto. Partial payments are permitted. In every case of partial draw, the Letter of Credit shall remain valid for the balance unused.

We hereby agree that this Letter of Credit shall be automatically renewed for successive nine month periods unless we give notice to you no later than 60 (sixty) days preceding an expiration date that we elect not to consider this Letter of Credit renewed. Such notice shall be sent to you by certified mail return receipt requested.

This credit shall be governed by the Uniform Commercial Code as enacted in Illinois from time to time and to the extent not modified by said law, the Uniform Customs and Practice for Documentary Credits international Chamber of Commerce Publication No. 500 (1993 Revision).

The original of this Letter of Credit must be submitted to us whenever a partial draw or cancellation of this credit is requested.

We hereby agree with the bonafide holders that all sight drafts drawn under and in compliance with the terms of this credit shall meet with due honor upon presentation and delivery of the documents as specified if negotiated at the counter of United Trust Bank on or before November 6, 2008.

Very truly yours,

Josephine Corso
President & CEO
United Trust Bank





200/200 d                                                                01:91 (NH1)8002-91-83J

EXHIBIT "D"

**ESCROW AGREEMENT**

To:    Stewart Title Guaranty Company

South Side Gas, Inc. ("Purchaser") herein deposits Twenty Five Thousand and 00/100 Dollars ($25,000.00) in favor of Esquire Petroleum, LLC (the "Earnest Money Deposit"), as the earnest money deposit required to be deposited by Purchaser pursuant to the terms of that certain Agreement of Purchase and Sale dated _____ 2-15, 2007 ("Agreement of Purchase and Sale") by and between Esquire Petroleum, LLC ("Esquire") and Purchaser, which deposit is to be held by Stewart Title Guaranty Company ("Stewart Title") as "Escrow Agent", and disbursed in accordance with these Escrow Instructions. Stewart Title, by its signature below, acknowledges receipt of the Earnest Money Deposit.

Stewart Title is not a party to the Agreement of Purchase and Sale, and does not assume or have any liability for performance or non-performance of any party to the Agreement of Purchase and Sale.

Stewart Title agrees that the Earnest Money Deposit is to be released to Esquire upon certification to Stewart Title by Esquire that the Closing (as such term is defined in the Agreement of Purchase and Sale) has occurred or that Purchaser has defaulted under the terms of the Agreement of Purchase and Sale.

In the event that the Closing has not occurred within one year from the date hereof, Stewart Title, at its option, may interplead the Earnest Money Deposit into the registry of Court (as defined below), unless the one year escrow period is extended by additional written instructions from Esquire and Purchaser prior to expiration of the one year period.

Should any dispute arise between Esquire and Purchaser in connection with the release of the Earnest Money Deposit, Stewart Title shall have the option to not release the Earnest Money Deposit to any party or, join or commence a court action, or interplead the money and documents into the registry of Court, whereupon Stewart Title will be relieved of further responsibility in connection therewith.   Venue shall be in the District Court of Cook County, Illinois (the "Court").

In the event of any suit or claim made against Stewart Title by any parties to the Agreement of the Purchase and Sale, the party commencing the suit or claim shall be required to pay Stewart Title all expenses, costs and reasonable attorney's fees in connection therewith, unless such party prevails in such suit or claim, in which case Stewart Title shall bear it's own expenses, costs and attorneys fees.

Dated this _____ 16th day of February, 2008.

Stewart Title Guaranty Company

BY:_____

Esquire Petroleum, LLC

BY: _____
      Ulice Payne, Jr.

South Side Gas, Inc.

BY:_____
      Ahmad Zahdan

SOCIAL SECURITY NUMBER: _____or

FEDERAL TAX ID NUMBER: _____

# EXHIBIT 5

## AGREEMENT OF PURCHASE AND SALE

**THIS AGREEMENT OF PURCHASE AND SALE** (this "Agreement") is made and entered into as of this 18th of February , 2008, (the "Effective Date") between **ESQUIRE PETROLEUM, LLC**, an Illinois limited liability company ("Seller"), and South Side Gas, Inc. ("Purchaser") upon the terms and conditions set forth herein.  When provisions herein apply to both or either Seller and Purchaser, they sometimes are referred to as "Parties" or "Party."

## R E C I T A L S

WHEREAS, Seller is in the process of acquiring a service station located at 4000 Southwest Highway, Hometown, Illinois, as more particularly described in Exhibit "A" and made a part hereof (the "Property"); and

WHEREAS, Seller has agreed to sell certain assets, including certain contract rights, associated with its potential ownership of the Property and Purchaser is willing to purchase the same from Seller in accordance with the terms of this Agreement.

WHEREAS, Purchaser has represented that Purchaser is ready, willing and able to purchase the Property pursuant to the terms hereof.

**NOW THEREFORE,** in consideration of the Recitals and for other good and valuable consideration, the receipt and sufficiency of which hereby are mutually acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

## TERMS AND CONDITIONS

## ARTICLE I

## Transfer and Sale by Seller

**1.1     Transfer of Property; Equipment and Personal Property; Inventory.**

A.      Subject to the provisions of this Agreement, and subject to the Exxon Closing, as defined in Section 4.2, Seller agrees to sell and convey the Property to Purchaser and Purchaser agrees to purchase and pay for the Property.

B.      Seller's conveyance and assignment of its interests in the Property shall include Seller's interest in: (i) the real estate, in fee simple, all easements and rights appurtenant to the Property, all buildings and improvements located thereon, (ii) all of Seller's personal property and equipment including underground storage tanks ("Tanks"), located on the Property as of the Effective Date, all as shown on the Bill of Sale (as hereinafter defined).  The real and personal property referred to in this Agreement shall not include any accounts receivable or notes receivable.



EXHIBIT

5

## ARTICLE II

### Motor Fuels Business Terms

**2.1    Base Volume.** In the event that Purchaser subsequently rebrands any Property to a brand other than Exxon or Mobil (unless such rebranding is due exclusively to the fault of Seller or Mobil) during the fifteen (15) year term of the Supply Agreement, Purchaser, following thirty (30) days' written notice from Seller of its election to impose liquidated damages, shall pay as liquidated damages to Seller an amount equal to the product of 3.0 cents per gallon multiplied by the motor fuels volume at such Property as set forth on Exhibit "A" (the "Base Volume"), multiplied by the number of years (including any partial year) remaining in the term of the Supply Agreement as of the date such rebranding(s) occur(s) or occurred. The provisions of this Section 2.1 shall survive the Closing and delivery of the conveyance documents.

## ARTICLE III

### Purchase Price

**3.1    Amount.** The purchase price to be paid by Purchaser for the transfer and sale and assignment by Seller of the Property and all other assets, contract rights and personal property described in Article I is: One Million Eighty Five Thousand and 00/100 Dollars ($1,085,000.00) ("Purchase Price") which shall be allocated as shown on Exhibit "C". On the day before the Closing Date, Purchaser shall pay into escrow at the office of the Title Company (as hereinafter defined) the Purchase Price, without offset, by wire transfer of immediately available funds to the account designated by the Title Company or its assignee. As of the day before the Closing Date, no conditions to the release of such funds to Seller on the Closing Date shall be imposed by Purchaser or any lender of Purchaser.

**3.2    Earnest Money Deposit.** Simultaneously with the delivery to Seller of an executed copy of this Agreement, Purchaser shall deliver to the Title Company, to be held pursuant to the escrow agreement in the form attached as Exhibit "D" to this Agreement, an irrevocable letter of credit (or similar instrument acceptable to Seller), in the amount of Twenty Five Thousand and 00/100 Dollars ($25,000.00 U.S.), as an earnest money deposit (the "Earnest Money Deposit").

## ARTICLE IV

### Survey and Title Matters

**4.1    Surveys.** Seller will provide to Purchaser any and all surveys of the Property in Seller's possession. Purchaser may obtain any additional survey of the Property at Purchaser's sole expense.

**4.2    Title Commitments and Permitted Encumbrances.** Seller will provide to Purchaser at Seller's expense a current title commitment for an American Land Title Association ("ALTA") Form B owner's policy of title insurance on the Property ("Title Commitment"), issued through Stewart Title Insurance Company, (the "Title Company") setting forth the state of title of the Property and all liens, encumbrances and matters of record, including easements, restrictions,

2

rights-of-way, covenants, conditions and reservations, if any, affecting such Property, together with legible copies of the recorded instruments relating to such title matters and exceptions. The Title Commitment shall contain only those exceptions (the "Permitted Exceptions"): (i) listed on Exhibit "E" attached hereto and incorporated herein, and/or (ii) recorded or otherwise arising pursuant to the closing of the purchase of the Property by Seller from Exxonmobil Oil Corporation (the "Exxon Closing") under that certain Agreement of Purchase and Sale made and entered into as of August 10, 2006 by and between Exxonmobil Oil Corporation and Seller. Purchase will obtain at its expense any extended coverage and/or endorsements and any lender's title insurance required by or of Purchaser or its lender(s) in connection with the transactions contemplated by this Agreement.

**4.3    Owner/Leasehold Policies of Title Insurance.**  At Closing, Seller shall obtain in the name of the Purchaser an Owner's Policy of Title Insurance issued by the Title Company in the amount of the purchase price of the real estate, and insuring marketable fee simple title to such Property as being vested in Purchaser, subject only to the Permitted Encumbrances and such policy's standard printed exceptions.  Seller shall at Closing pay the cost of such policy and Seller shall be responsible to pay the title commitment fee at Closing.

**ARTICLE V**

**Closing**

**5.1    Closing; Closing Date.**  Completion of the transactions contemplated by this Agreement and Seller's delivery of the Deed and the Bill of Sale and the execution and delivery by the Parties of the other documents referred to herein ("Closing") shall take place at the office of the Title Company in the City of Chicago, Illinois, on the date specified in the Lease/Option to Purchase (the "Closing Date").  Purchaser and Seller agree to provide all closing deliveries to the Title Company at least twenty-four (24) hours in advance of Closing.

**5.2    Delivery of Documents at Closing.**  At the Closing, the following shall occur:

A.    Seller shall:

    (1)    deliver to the Title Company a duly executed and acknowledged special warranty deed or equivalent statutory form of deed for the Property conveying marketable title to such Property to Purchaser subject only to the Permitted Encumbrances and as provided in Section 4.2 ("Deed"). The Deed for each Property shall be in the form of Exhibit "F" attached hereto and made a part hereof;

    (2)    deliver to Purchaser an executed bill of sale for all personal property but only specifically itemizing the major equipment owned by Seller that is located on the Property ("Bill of Sale"), which shall be in the form of Exhibit "G" which is attached hereto and made a part hereof;

    (3)    deliver to the Title Company and to Purchaser such certificates of incumbency and evidence of corporate authority for the execution and delivery of this Agreement and all documents required hereunder in such

3

form and content as the Title Company and Purchaser reasonably may require; and

(4)   deliver such other standard closing documents as may be required by state, federal or local authorities, including W-9 forms, and certificate of non-foreign status.

B.   Purchaser shall:

(1)   pay the Purchase Price and any other amounts owed to Seller hereunder, without offset, as provided in Section 3.1;

(2)   deliver to Seller an executed Bill of Sale;

(3)   deliver to Seller an executed Deed for the Property;

(4)   deliver to Seller an executed Supply Agreement in the form attached hereto as Exhibit I;

(5)   deliver to Seller an executed covenant that Purchaser will satisfy and abide by the standards applicable to the then current franchise agreement with Exxonmobil;

(6)   deliver to Seller an executed Assignment and Assumption of Non-Petroleum Leases, if any, in the form attached as Exhibit "H"; and,

(7)   deliver such other standard closing documents as may be required by state, federal or local authorities.

5.3   **Closing Costs.**   General real estate taxes and special taxes or assessments for the then current year relating to the Property shall be prorated as of the Closing Date and shall be adjusted at the Closing. If the Closing shall occur before taxes are finally fixed for the then current year for the Property, the apportionment of taxes at the Closing shall be upon the basis of the latest tax rate applied to the latest assessed valuation for the Property.   Seller shall collect from Purchaser at Closing and shall pay all sales taxes applicable to the personal property and equipment transferred to Purchaser. The Parties shall each pay one-half of escrow fees. Seller shall pay the recording fee to release any existing mortgage(s).   Purchaser shall pay all other recording fees.   Seller shall pay any transfer taxes as of the Closing Date exclusive of any transfer taxes imposed with respect to any mortgage or deed of trust placed on the Property as part of Purchaser's financing of the acquisition of the Property.   Each Party shall bear its own attorneys' fees in connection with the transaction contemplated by this Agreement. Purchaser shall bear any sales tax imposed on the sale of equipment by Seller to Purchaser.

## ARTICLE VI

## Environmental Matters

**6.1** **Definitions.** The following terms shall have the meanings set forth below for all purposes of this Article VI and corresponding Exhibits.

**6.1.1** "Affiliate" shall mean, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such Person. For purposes of this definition, the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of any Person, whether through the ownership of voting securities or by contract or otherwise.

**6.1.2** "Authorities" shall mean any state, federal and local governmental agency or agencies having jurisdiction over Remediation Activities at the Property.

**6.1.3** "Claim" shall mean any loss, cost, claim, obligation, damage, liability, payment, fine, penalty, cause of action, judgment, lien or expense, alleged by any Person, Affiliate, other entity or any Authority. "Claim" or "Claims" shall include, but shall not be limited to, reasonable attorneys' fees and other litigation expenses.

**6.1.4** "Contamination" shall mean the presence at, on, under or originating from the Property of any chemical, compound, material, substance or other matter that (i) is flammable, explosive, hazardous, a waste, a toxic substance, or a related injurious or potentially injurious material, whether injurious or potentially injurious by itself or in combination with other materials; (ii) is controlled, designated in or governed by any Environmental Law (as herein defined); and (iii) gives rise to any reporting, notice or publication requirements, or remediation under any Environmental Law.

**6.1.5** "Engineering Controls" shall mean structural modifications to the Property or buildings, personal property or equipment on the Property which may be required or recommended by the Authorities, applicable laws, rules and regulations or by environmental consultants to prevent human exposure to vapors and/or liquids containing hazardous materials and to prevent the migration of vapors and/or liquids containing hazardous materials into any buildings, underground utilities or storm water retention/detention ponds, including without limitation, vapor extraction systems, vapor barriers, sealed sumps and storm pond liners.

**6.1.6** "Environmental Laws" shall mean any and all federal, state, county or local laws, ordinances, rules, decrees, orders, regulations or court decisions relating to hazardous substances, hazardous materials, hazardous waste, toxic substances, environmental conditions on, under or about the Property, or soil and groundwater conditions, including, but not limited to, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 24 U.S.C. §9601, et seq., The Resource Conservation and Recovery Act, 42 U.S.C. §1801, et seq., the Illinois Environmental Protection Act, 415 ILCS §5/1 et. seq., any amendments to the foregoing, and any similar federal, state or local laws, ordinances, rules, decrees, orders or regulations.

**6.1.7** "Person" or "Persons" shall mean an individual, partnership (whether general or limited), limited liability company, corporation, trust, estate, unincorporated association, nominee, joint venture or other entity.

**6.1.8** "Purchaser-Related Party" shall mean Purchaser's parent, subsidiaries, and Affiliates and their respective owners, officers, employees, agents, consultants, contractors, invitees, servants, representatives, successors and assigns, and all Persons who acquire an ownership interest, the right to occupy or use the Property, or any other interest in the Property from or through Purchaser or another Purchaser-Related Party. Purchaser-Related Party shall include heirs and legal representatives if Purchaser is a natural person.

**6.1.9** "Remediation Activities" shall mean any investigation (including without limitation, any site investigation), study, assessment, testing, monitoring, containment, removal, disposal, closure, corrective action, remediation (whether active or passive), natural attenuation, bioremediation, response, cleanup or abatement, whether on-site or off-site, of Contamination to standards required by Environmental Laws in effect at such time.

**6.2    Tanks, Lines, Dispensers.** After Closing, Purchaser is responsible for, and assumes the obligation for compliance with all applicable laws, including but not limited to, all Environmental Laws and applicable registration and testing requirements, including, but not limited to, calibration of weights and measures. Within thirty (30) days after the date following Closing, Purchaser shall notify appropriate state and/or local agencies that Seller's interest in the tanks and lines was conveyed to Purchaser as of the date of Closing and that Purchaser is the owner of any tanks and lines included in this Agreement as of the date of Closing.

**6.3    Environmental Assessment.**

**6.3.1    Environmental Data.** Seller shall deliver to Purchaser any and all environmental data and reports that Seller receives from Exxonmobil Oil Corporation during its own due diligence, which will include a Phase I environmental assessment of the Property generally consistent with ASTM Standard E 1527-00, and will include a Phase II environmental assessment of the Property if the Phase I environmental assessment recommends that one be done. Purchaser understands and acknowledges that Purchaser does not have a right to conduct independent environmental inspections or assessments of the Property prior to Closing.

**6.3.2    Confidentiality and Privilege.**

A.    Confidentiality. All environmental assessment data and other data provided to or obtained by Purchaser with respect to the Property under this Article VI shall be considered confidential information and shall not be disclosed by Purchaser to any third parties. Purchaser may provide copies of such data to its attorneys, environmental consultants, and potential lenders, but only after Purchaser has agreed in writing to keep such information confidential. Seller shall be a third party beneficiary of any such agreement.

B.    Privilege. If Purchaser or any Purchaser-Related Party comes into possession of any of Seller's internal communications or any materials subject to the attorney client or attorney work product privileges, Purchaser shall not copy, disclose or distribute the materials but shall return them to Seller. Purchaser shall not use the materials or information contained therein for any purpose.

**6.4    Environmental Remediation.** Seller or its designee shall remediate any petroleum Contamination that exists on the Property which requires reporting to the Illinois Environmental Protection Agency as of the Closing Date to Tier II Industrial Commercial standards and obtain a No Further Action or No Further Remediation determination (hereinafter, an "NFA") from the relevant authorities in a reasonable and timely manner after Closing.

**6.5    Insurance.** Purchaser shall be responsible for obtaining and paying for all insurance. Specifically, but not by way of limitation, Purchaser shall remain in full force and effect, for a period of ten (10) years from the date of closing, Environmental Insurance/UST Policy in excess of the Illinois Leaking Underground Storage Tank Fund, in the amount of $1,000,000 per occurrence. Purchaser shall reimburse Seller for 1/15th of its Environmental Insurance/UST Policy which it has procured in connection with its purchase of fifteen (15) sites from ExxonMobil in satisfaction of this requirement.

**6.6    Maintenance of Records.** Purchaser and all Purchaser-Related Parties shall maintain inventory and tank and line maintenance records for the Property as required to comply with all applicable laws, rules and regulations. Purchaser shall deliver legible copies of such records to Seller within five (5) days of Seller's request for such records. Seller shall have the right to review these records as Seller deems necessary so as to be assured of the integrity of tanks and lines systems at the Property. Within twenty (20) days after Seller's request, Purchaser shall deliver to Seller legible copies of surveys or construction plans which show the location of any underground storage tanks and lines, any underground piping or other improvements installed or constructed by Purchaser. Following the Closing, Purchaser agrees to continue to use, maintain, repair and keep in good order the existing remote monitoring system (e.g. a Veeder-Root system) for the tanks and lines located on the Property. Purchaser shall impose obligations identical to this Section 6.6 on all of its successors and assigns.

**6.7    Restrictions on Use.**

**6.7.1    Prohibited Uses**. Purchaser covenants and agrees, on its behalf and that of the Purchaser-Related Parties, that the Property herein conveyed, whether separately or in conjunction with any other property cannot be used for:

A.    Any purpose involving residence of any type (including a bed & breakfast establishment, rooming house, or long term care facility,) or any other type of use where individuals are on the Property for more than a normal work day (except for the operation of a 24 hour gas station and convenience store where allowed by applicable law);

B.    A place of worship (including Churches and synagogues), hospital, nursing home, child care, playground, recreational area, school (including any other type of educational facility or use), care facility (including but not limited to day, night or extended care for children, the elderly or the infirm), or farm (including any other type of agricultural use); or

C.    Below grade living, working, storage or parking.

7

**6.7.2 Zoning**. Purchaser and Purchaser-Related Parties shall not at any time apply to the relevant Authorities to amend the zoning of the Property, or support any change in zoning of any Property which would allow any use prohibited by this Agreement, whether on an "as of right" basis or on any other basis whatsoever. Neither Purchaser nor any Purchaser-Related Party shall at any time seek to take advantage of any non-conforming user rights or exceptions to use including special use permits. Nothing herein is intended to prevent Purchaser from operating a retail gasoline station, convenience store, car wash, and/or repair shop.

**6.7.3 Option to Repurchase**. Purchaser acknowledges that ExxonMobil Oil Corporation may seek to enforce the provisions of this Article VI and that ExxonMobil Oil Corporation has a right to repurchase the Property if Purchaser, Purchaser-Related Parties, or any subsequent owner, user or occupier of the Property uses or plans to use the Property in a manner contrary to the Deed Restrictions or Engineering Controls attempts in any way to change zoning or make use of non-conforming user rights or exceptions, or otherwise materially violates the provisions of Article VI. Purchaser acknowledges and agrees to be bound by the following terms applicable to Exxonmobil Oil Corporation's right to repurchase the Property:

    A.    Repurchase Price. The repurchase price shall be equal to the lesser of:

        1)  The Purchase Price paid by Seller for the Property, or

        2)  The fair market value of such Property determined by an MAI appraiser hired by Exxonmobil Oil Corporation.

    B.    Closing for a Repurchase. The closing for any repurchase transaction will occur at the offices of Exxonmobil Oil Corporation's title company, thirty (30) days following Exxonmobil Oil Corporation's receipt of the fair market value from the appraiser. At the closing, Purchaser shall deliver to Exxonmobil Oil Corporation a valid special warranty deed (or its statutory equivalent in the jurisdiction where the Property is located), in recordable form and a bill of sale for any personal property of Purchaser that Purchaser does not remove from such Property prior to closing, both conveying good and marketable title, free and clear of all liens and encumbrances, except for any easements and restrictions set forth in the permitted encumbrances attached to the deed from Seller to Purchaser for the Property pursuant to this Agreement. Purchaser shall be responsible for all fees for recording the deed for the Property being repurchased by Exxonmobil Oil Corporation, including, without limitation, all transfer taxes and any documentary or other fees payable in connection with the recording of such deed and any similar charges imposed in connection with the repurchase of the Property by Exxonmobil Oil Corporation.

**6.8    Indemnification.**

**6.8.1 Purchaser's Indemnification**. From and after the Closing Date, Purchaser shall defend, indemnify and hold Seller and its Affiliates harmless from and against all Claims of all Persons, including without limitation Claims of Seller, its heirs, assigns, and employees, arising from or related to:

8

A.    Purchaser's breach of its obligations under Article VI; and

B.    The existence of Contamination at, on, under or originating from the Property which first arises on or after Closing.

## 6.9    Warranties and Releases.

**6.9.1    Acceptance of Property By Purchaser.** Except as otherwise expressly provided in this Article VI, Purchaser accepts the conveyance of the Property, in its "AS IS, WHERE IS" condition as of the Effective Date.

**6.9.2    Warranty Disclaimer.** Without limiting the "AS IS, WHERE IS" nature of the sale of the Property, Seller makes no representation or warranty whatsoever, express or implied, of any kind or nature as to the status of the registration of the tanks and lines and dispensers, or the condition of, the merchantability of or the fitness for any particular purpose of any tanks, lines, property equipment, tests, or assessments. ALL WARRANTIES OF MERCHANTABILITY AND/OR FITNESS FOR A PARTICULAR PURPOSE ARE EXPRESSLY DISCLAIMED. THE TANKS AND LINES CONTAIN EXPLOSIVE GASES AND HAVE BEEN USED FOR THE STORAGE OF PETROLEUM PRODUCTS. THE TANKS AND LINES ARE UNFIT FOR THE STORAGE OF WATER OR ANY OTHER ARTICLE OR COMMODITY INTENDED FOR HUMAN OR ANIMAL CONTACT OR CONSUMPTION, AND PURCHASER EXPRESSLY AGREES NOT TO USE OR PERMIT THE USE OF SUCH TANKS AND LINES FOR SUCH STORAGE.

## 6.10    Access.

**6.10.1    Purchaser's Grant of Continuing Access.** Purchaser and all Purchaser-Related Parties hereby grant Seller, Seller's employees, officers, heirs assigns, consultants, contractors, the Authorities, and all other Persons identified by Seller any and all access that may be requested by Seller to the Property after Closing for any and all purposes related to this Agreement, including: tank testing and removal, taking groundwater, soil or other samples, drilling wells and borings, reviewing records, excavation, removal, disposal, treatment of the soil, groundwater or other equipment, property or media. There will be no cost or charge for such access. Seller shall use good faith and reasonable diligence to minimize disruption of the activities of Purchaser or any Purchaser-Related Parties on the Property. If Seller's activities on the Property, in Purchaser's belief, have or may have a material adverse impact on Purchaser's activities, Seller shall make commercially reasonable efforts to modify its activities to eliminate the adverse impact on Purchaser's activities. Consistent with the foregoing, Purchaser shall cooperate with Seller and Seller's employees, officers, heirs, assigns, consultants, and contractors can reasonably complete their activity without incurring additional costs or expenses. Purchaser and Purchaser-related Parties release Seller from any claims related to such access and inspection other than those resulting, directly or indirectly, from Seller's willful misconduct.

**6.10.2    Seller's Obligations.** Seller shall restore the surface and existing structures, if any, on the Property to a condition substantially similar to that at the time immediately prior to the action taken by Seller and shall replace or repair damage to Purchaser's equipment and personal property on the Property caused by Seller or its contractors. Seller shall no liability to anyone,

9

including Purchaser, for business disruption, lost profits, incidental, punitive or consequential damages arising from such actions or access.

**6.10.3 Notice of Access.** Seller or its contractors shall provide Purchaser advance notice, if practical, of all disruptive or intrusive activities to be undertaken on the Property. The notice may, but need not be in the form of a periodic written schedule of activities delivered from time to time. No advance notice shall be required for non-disruptive activities.

## 6.11  Engineering Controls

**6.11.1 Purchaser's Obligation.** Purchaser agrees that in developing the Property it will, at its sole cost and expense, adopt and use appropriate Engineering Controls, which at minimum, shall include the following.

A.  Slab on Grade.  All buildings constructed on the Property shall be constructed slab on grade and shall have no living, working, storage or parking areas below grade. Notwithstanding the foregoing, below grade utilities and foundations are permitted, provided that they are protected from vapor or liquid intrusion by installing a vapor ventilation system and vapor/liquid barrier which shall be maintained by Purchaser or a subsequent Purchaser-related Party.

B.  No Water Wells.  The Property will be used for the purpose of obtaining from beneath the surface of the Property any water for any reason whatsoever from any ground water table or similar water basin accessed from such Property, except for environmental sampling that may be required by an Authority.

C.  Cessation of Use of Existing Wells.  Purchaser shall permanently cap, disable, and seal in accordance with all applicable Environmental Laws and industry standards all existing bore-water or groundwater wells used for obtaining water from the Property.

D.  Impervious Liner.  All new foundations for buildings must have an impervious liner under them to act as an effective vapor barrier. Seller does not require that existing foundations be retrofitted with an impervious liner. Impervious liner shall be installed by a licensed contractor experienced in the installation of such liners, and shall be maintained by Purchaser or a Purchaser-Related Party. The liner shall be of the appropriate strength and quality and resistant to hydrocarbons and shall be installed at an appropriate level beneath ground level. The installation shall be performed in accordance with all applicable laws and in accordance with the highest industry standards to protect human health and safety.

**6.12  Deed Restrictions.** The prohibited uses set forth in Section 6.7.1, the prohibitions related to zoning in Section 6.7.2, Engineering Controls in Section 6.11, the Access requirements in Section 6.10, the maintenance of records requirements in Section 6.6, and Exxonmobil Oil Corporation's rights to repurchase in Section 6.7.3, shall be known as Deed Restrictions and shall be incorporated into the Deed for the Property, and shall survive the Delivery of the Deed for the Property, and shall be covenants that run with the Land. Purchaser shall insure that these Deed Restrictions are included in any deed or lease or other instrument conveying or demising

the Property interest so that all Purchaser-Related Parties are bound by the Deed Restrictions and that the Deed Restrictions are enforceable against them. These Deed Restrictions shall continue in full force and effect for a period of thirty (30) years following the date Purchaser or the Purchaser Related Parties, subsequent owners, users, and occupiers of the Property, including any successors, lessees, assignees, and licensees cease to store motor fuel on the Property provided, however, if and to the extent that any of the reservations or covenants herein would otherwise be unlawful or void for violation of (a) the rule against perpetuities, (b) the rule restricting restraints on alienation, or (c) any other applicable statute or common law rule analogous thereto or otherwise imposing limitations upon the time for which such covenants may be valid, then the provisions concerned shall continue and endure only until the expiration of a period of twenty-one (21) years after the death of the last to survive the class of persons consisting of all of the lawful descendants of former U.S. President George H. W. Bush, living as of the date of the deed. Exxonmobil Oil Corporation shall be a third party beneficiary of Purchaser's covenant and obligation to abide by the Deed Restrictions.

**6.13   Subsequent Transfers**.  Purchaser agrees that Purchaser shall not complete any sale, transfer or assignment of its interest in the Property or enter into any lease, license or right to occupy or use such Property without first obtaining from the Purchaser-Related Party an enforceable agreement to abide by the Deed Restrictions. Seller shall be a third party beneficiary of any such agreement.

**6.14   Successors and Assigns**.  Any transferee, assignee, or successor owner, lessee, licensee, occupier or user of the Property shall take title to such Property subject to these Deed Restrictions. The rights and benefits of the Deed Restrictions are personal to Seller, inuring to the benefit of Seller, its Affiliates, successors and assigns.

**6.15   Material Inducement**. Purchaser's acceptance of Article VI (specifically including the Deed Restrictions) was a material inducement to Seller's sale of the Property to Purchaser.

**6.16   Seller's Remedies**. All rights and remedies of Seller shall be continuing and enforceable with respect to any violations of Article VI.  In addition to Seller's rights and remedies under this Agreement Seller shall have all rights and remedies available at law or in equity. In the event Purchaser or any Purchaser-Related Party fails to comply with its obligations under this Article VI in addition to any rights and remedies available to Seller under this Agreement, at law or in equity, Purchaser hereby agrees to indemnify, defend and hold Seller harmless from any Claims made against Seller by any persons or entities including, without limitation, the Authorities, incurred by Seller or assessed against Seller as a result, directly or indirectly, of Purchaser's failure to comply with its obligations under Article VI.

**6.17     Waiver**. Seller's failure to exercise any right or remedy set forth in Article VI shall not extinguish, or be deemed to constitute a waiver of Seller's right to exercise that right or remedy.

**6.18     Time Periods**. If Seller shall fail to deliver any notice or document to Purchaser within a time period set forth in Article VI, then Purchaser's sole remedy shall be to extend the closing date for the Property for which the notice or document was delivered late, by one day for each day of that the notice or document was late.

**6.19   Survival.** The provisions of this Article VI, including the Deed Restrictions as described in Section 6.12 and the obligations with regard to privileged and confidential materials of Section 6.3.2, shall survive the Closing of this transaction, delivery of the Deeds and subsequent transactions involving Purchaser so that Purchaser remains liable for compliance with Article VI even after it transfers its Property interests.

## ARTICLE VII

### Representations and Warranties

**7.1   Seller's Representations and Warranties.** Except as may otherwise be expressly provided in this Agreement, Seller makes no representation or warranty whatsoever. Without limiting the foregoing, Seller makes no representation or warranty, express or implied, that the Property, or Seller's use thereof, comply or have complied with any federal, state or local law, rule, regulation or ordinance including but not limited to the Petroleum Marketing Practices Act, the Americans with Disabilities Act, the Comprehensive Environmental Response Compensation and Liability Act and the Resource Conservation and Recovery Act.

Seller hereby represents and warrants to Purchaser as follows, which representations and warranties shall be deemed made by Seller also as of the Closing Date:

    A.   Seller is an Illinois limited liability company duly organized, validly existing, and in good standing under the laws of the State of Illinois. Seller has full power and authority to enter into this Agreement and to perform its obligations hereunder.

    B.   All requisite corporate and other authorizations for the execution, delivery, and performance of this Agreement have been duly obtained by Seller.

**7.2   Purchaser's Representations and Warranties.** Purchaser hereby represents and warrants to, and covenants and agrees with Seller that as of the date hereof and as of the Closing Date:

    A.   Purchaser is an Illinois corporation, duly organized, validly existing, and in good standing under the laws of the State of Illinois and is duly qualified to do business as a foreign corporation in the State of Illinois. Purchaser has full power and authority to enter into this Agreement and to perform its obligations hereunder.

    B.   No provision of (i) Purchaser's articles of incorporation or organization or bylaws or operating agreement, as the case may be, or, (ii) to Purchaser's knowledge, any agreement, instrument or understanding to which it is a party or by which it is bound, or, to (iii) Purchaser's knowledge, any order, writ, injunction, decree, statute, rule or regulation applicable to Purchaser has been or will be violated by the execution by Purchaser of this Agreement or by Purchaser's performance or satisfaction of any agreement or condition herein contained upon its part to be performed or satisfied.

    C.   All requisite corporate or company and other authorizations for the execution, delivery and performance of this Agreement have been duly obtained by Purchaser.

D.    To Purchaser's knowledge, no consent or approval of any governmental or regulatory authority is required, except as noted herein, for the due authorization, execution, or delivery by Purchaser of this Agreement.

## ARTICLE VIII

## Purchaser's Indemnity

**8.1    Purchaser Indemnification Obligations.**  Without in any manner limiting any other indemnification by Purchaser of Seller, Purchaser shall defend (with counsel satisfactory to Seller in Seller's sole, but reasonable discretion), indemnify and hold harmless Seller, and Seller's successors, assigns, directors, employees, subsidiaries, affiliates and agents ("Indemnitees"), from and against each and every Claim, which results from, arises out of or is attributable in any way to any of the following:

A.    Purchaser's ownership, possession, operation, use or maintenance of the Property both prior to and after the Closing Date (except as limited by the provisions of Article VI);

B.    Claims with respect to brokers', finders' and agents' fees and commissions in connection with the transaction contemplated in this Agreement asserted by any person on the basis of any statement, instrument, action, inaction or agreement alleged to have been made by the Purchaser;

C.    Purchaser's entry onto the Property pursuant to the terms of Article XIII of this Agreement;

D.    any representation or warranty made by Purchaser in this Agreement or in documents delivered by Purchaser at the Closing which is misleading or untrue in any material respect;

E.    any breach of the obligations, covenants or agreements made by Purchaser in this Agreement; or

F.    the non-compliance of Purchaser with any directive, order or requirement of the Authorities, including but not limited to environmental cleanup orders relating to the Property.

**8.2    Seller Indemnification Obligations.**  Without in any manner limiting any other indemnification by Seller of Purchaser, Seller shall indemnify and hold harmless Purchaser, and Purchaser's successors, assigns, directors, employees, subsidiaries, affiliates and agents ("Indemnitees"), from and against each and every Claim, which results from, arises out of or is attributable in any way to any of the following:

A.    Claims with respect to brokers', finders' and agents' fees and commissions in connection with the transaction contemplated in this Agreement asserted by any person on the basis of any statement, instrument, action, inaction or agreement alleged to have been made by the Seller;

13

B.    any representation or warranty made by Seller in this Agreement or in documents delivered by Seller at the Closing which is misleading or untrue in any material respect; or

C.    any breach of the obligations, covenants or agreements made by Seller in this Agreement.

**8.3    Notice to Indemnifying Party.**  Any party seeking indemnification under this Article VIII shall give the indemnifying party written notice of an alleged Claim for which indemnification is being sought not later than thirty (30) days after receipt thereof, and in all events at least ten (10) business days prior to the date any formal response to such Claim is required.  Such written notice shall describe in reasonable detail the nature of the damages and legal proceedings for which indemnification is sought and shall be accompanied by a copy of the notice received from the third party.

**ARTICLE IX**

**Brokerage Commissions**

**9.1    Commissions.**  It is acknowledged and agreed that no brokers have been involved in the negotiation and consummation of this Agreement and no broker's commission is due or payable to any person.  Each Party shall indemnify and hold harmless the other Party from any and all claims for any broker's commission arising through its acts or dealings with any third party.

**ARTICLE X**

**Conditions Precedent**

**10.1    Supply Agreement.**  Purchaser understands and acknowledges that this Agreement and the consummation of the transactions contemplated by this Agreement are subject to and conditioned upon Purchaser and Seller entering into a supply agreement in substantially the form attached hereto as Exhibit "I" (the "Supply Agreement") thirty (30) days before the Closing Date. Purchaser further acknowledges and agrees that this Agreement and the consummation of the transactions contemplated by this Agreement are subject to and conditioned upon Seller's approval of Purchaser's creditworthiness in respect of the obligations of Purchaser under this Agreement and the Supply Agreement.

**10.2    Letter Of Credit.**  No later than 10 days prior to Closing, Purchaser shall deliver to Seller an irrevocable unconditional letter of credit or cash deposit in the amount of $15,000.00 U.S Dollars, in form and substance acceptable to Seller in the exercise of Seller's sole discretion, from a banking institution acceptable to Seller in the exercise of Seller's sole discretion in an amount satisfactory to Seller in the exercise of its sole discretion  (the "LOC") in favor of Seller as beneficiary; provided, however, that to the extent Purchaser has delivered to Seller on or prior to the date of execution of this Agreement, a letter of credit which has been accepted by Seller, then the LOC may be reduced by an amount equal to the letter of credit from Purchaser then being held by Seller.  Such LOC shall: (1) permit partial draws, (2) contain a so called "evergreen" provision whereby such LOC will automatically renew on an annual basis unless the issuer delivers sixty (60) days' prior written notice of cancellation to Seller and Purchaser and (3) have an initial expiry date not sooner than one year following the Closing Date.  At least thirty

14

(30) days prior to the expiry date (both the initial expiry date and each subsequent expiry date), Purchaser shall deliver a renewal or replacement LOC. This LOC shall secure Purchaser's and any Affiliate of Purchaser's obligations and performance of the Supply Agreement and the provisions of such Supply Agreement as they affect the Letter of Credit are incorporated herein by this reference and Purchaser hereby agrees to be subject thereto. Such LOC shall be payable to Seller on sight in partial or full draws and shall be assignable by Seller to a beneficiary other than Seller at Seller's request without cost therefor to Seller. Any and all fees or cost charged by the issuer in connection with the LOC shall be paid by Purchaser. For purposes of this Agreement "Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such Person. For purposes of this definition, the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of any Person, whether through the ownership of voting securities or by contract or otherwise. "Person" means an individual, partnership (whether general or limited), limited liability company, corporation, trust, estate, unincorporated association, nominee, joint venture or other entity. The provisions of this Section 10.2 shall survive the Closing and delivery of the Deed.

**10.3   Closing of Purchase from ExxonMobil Oil Corporation.**  Purchaser understands and acknowledges that this Agreement and the consummation of the transactions contemplated by this Agreement are subject to and conditioned upon the Exxon Closing. If, for any reason, Seller does not purchase the Property from Exxonmobil Oil Corporation, this Agreement shall be null and void, and Purchaser's Earnest Money Deposit shall be promptly released and returned to Purchaser.

**ARTICLE XI**

**Defaults; Remedies**

**11.1   Purchaser's Default.**  In the event of the non-performance, default or breach of this Agreement by Purchaser, including, without limitation, the breach by Purchaser of the obligations of Purchaser under Article VI and/or failure to close on the Closing Date, (collectively such non-performance, default or breach is herein called a "Default"), then Seller may at its sole option take any one or more of the following courses of action:

A.    If this Agreement is not consummated as a result of Purchaser's default, Seller may terminate this Agreement and retain the Earnest Money Deposit. Moreover, in the event that Purchaser used a Letter of Credit to fund its Earnest Money Deposit, Seller may draw down the full amount of the letter of credit deposited as the Earnest Money Deposit, and upon Seller's receipt of such sums from the letter of credit, Seller and Purchaser shall have no further obligation or liability one to the other hereunder; or

B.    either prior to or subsequent to Closing hereunder, bring an action to enforce specific performance of this Agreement according to the terms hereof by all means available at law or in equity; or

C.    either prior to or subsequent to Closing hereunder, Seller may elect to hold the Earnest Money in escrow pending resolution of its claims by notice to the Title Company, and

15

bring an action at law and/or in equity to recover damages and enforce such portions of the Agreement as it may desire which are subject to enforcement by specific performance.

In the event Seller elects first to enforce this Agreement by specific performance and at any time during pursuit of enforcement elects not to pursue specific performance, Seller shall be entitled to pursue its remedies under Subparagraphs A, if Closing has not occurred hereunder, or B or D as if it had elected to do so as above set forth, and such subsequent election to pursue its courses of action under Subparagraph A or B or C above shall be deemed to be an election of remedies at that time and not before.

**11.2     Seller's Default.**  In the event of a Default by Seller, then Purchaser may, at its sole option, as its exclusive remedy, take the following course of action:

A.     If this Agreement is not consummated because of Seller's Default, terminate this Agreement and (1) Seller shall return the Earnest Money Deposit, and (2) Seller shall pay Purchaser an amount not greater than Five Thousand and 00/100ths Dollars ($5,000.00) for reimbursement of Purchaser's actual out of pocket third party due diligence costs provided that Purchaser shall have given Seller written evidence of such actual costs. Upon the termination based on Seller's Default, reimbursement of the Purchaser's due diligence costs as stated above, and return of Earnest Money Deposit,  Seller and Purchaser shall have no further obligation or liability one to the other hereunder; or

B.     Seek specific performance.

The provisions of this Article XI shall survive the Closing of the sale to Purchaser and the delivery of the Deed and any termination of this Agreement prior to Closing.

## ARTICLE XII

### Property Loss

**12.1     Notice.**  Seller shall endeavor to give Purchaser prompt notice of (i) any casualty affecting the Property between the Effective Date and the Closing Date, and (ii) any actual taking or condemnation of all or any portion of the Property or any planned or pending condemnation action as to which Seller has received written notice from the condemning authority.

**12.2     Casualty.**  In the event the Property suffers damage or destruction subsequent to the Effective Date, but prior to the Closing Date, Seller shall elect either (i) to repair or make adequate provision for the repair of such Property prior to Closing or (ii) to reimburse Purchaser by an amount agreed upon by Seller and Purchaser to represent the reduction in the real estate value of the Property by reason of the casualty at Closing.

**12.3     Condemnation.**

A.     If after the Effective Date and prior to the Closing Date, there shall occur the transfer of title or possession of all or any part of the Property by condemnation ("Taking"), the Closing shall take place as provided herein without abatement of the Purchase Price, and there

shall be assigned to Purchaser at the Closing all interest of Seller in any award which may be payable to Seller on account of such Taking.

B.    If prior to the Closing Date, Seller shall receive written notice of a planned or threatened Taking of all or part of the Property, the Closing shall take place as provided herein without abatement of the Purchase Price and there shall be assigned to Purchaser at Closing the interest of Seller, if any, in any award which may be payable to Seller on account of such Taking.

**12.4    Risk of Loss.**  Except as otherwise provided herein, Seller shall retain the risk of loss or damage with respect to the Property until title passes, which shall occur on the Closing Date.

## ARTICLE XIII

### Right of Entry; Equipment

**13.1    No Warranty for Equipment.**  All fixtures, improvements, and equipment shall be transferred to Purchaser at the Closing in an "as is, where is" condition, with no representations or warranties whatsoever, express or implied, of merchantability, fitness, condition or otherwise.

**13.2    Purchaser's Right to Install Equipment.**  Subject to the legal rights of Seller's franchisees, Purchaser, at its sole expense, shall have the right, after the Effective Date, personally or through agents, employees, contractors, or subcontractors, to enter the Property, at Purchaser's expense and at such reasonable times as Purchaser may elect, to install point of sale equipment, telephone lines and other equipment as needed to effect an orderly transition of operations after the Closing Date.  Purchaser shall assume all risks involved in entering the Property pursuant to this Section 13.2 and all risk of damage or loss to any such installation made and/or equipment installed.  Purchaser shall keep the Property free from any liens or claims arising out of any work performed, materials furnished or obligations incurred by or on behalf of Purchaser.  If any such mechanic's or other lien is recorded against the Property, Purchaser shall have that lien discharged of record within thirty (30) days after receiving notice of the recording of the lien, by paying the lien or posting bonds as necessary to remove the lien from the Property.

## ARTICLE XIV

### Excused Delay in Performance

**14.1    Excused Performance.**  The performance by either Party of any of its obligations set forth in this Agreement shall not be deemed untimely to the extent any late performance is due to acts of God, acts of war, acts of terrorism, civil disturbance, acts of government (including, but not limited to, governmental or court orders), strikes or other labor disputes (the settlement of which shall be totally within the discretion of the Party having the difficulty) or any other act or event beyond the reasonable control of the affected Party; provided, however, that the affected Party is taking all reasonable steps to perform and promptly notifies the other Party of the details of such occurrence; and provided further that the time for the performance of any undertaking shall not be extended or any failure to perform excused for more than sixty (60) days pursuant to this Paragraph without the mutual consent of the Parties; provided, however, that the foregoing

shall not be construed to excuse any delay in the performance of either party's monetary obligations hereunder, including but not limited to, Purchaser's payment of the Purchase Price.

## ARTICLE XV

## Joint Publicity

15.1   **Press Release and Release of Other Information.**   Publicity and other releases concerning the transaction contemplated by this Agreement shall be jointly planned and coordinated between Purchaser and Seller.   Neither Party shall act unilaterally in this regard without the prior approval of the other Party provided, however, that such approval shall not be unreasonably withheld.   Subject to each Party's confidentiality obligations hereunder, nothing herein contained shall prevent either Party from furnishing information to any governmental agency or from furnishing information to comply with applicable laws or regulations, provided the party furnishing such information shall give reasonable prior written notice to the Party not furnishing such information.

## ARTICLE XVI

## Assignment

16.1   **Assignment.**   This Agreement may not be assigned, in whole or in part, by Purchaser without the prior written consent of Seller, which consent may be withheld for any reason.

## ARTICLE XVII

## Option to Repurchase Properties; Liquidated Damages; Right of First Refusal; Subsequent Conveyance Fee

17.1   **Repurchase of Properties by Exxonmobil Oil Corporation.**

A.   **Option to Repurchase Properties; Liquidated Damages.**  If at any time within ten (10) years after Closing, Purchaser or its PMPA franchisees or Purchaser's successors and assigns shall determine that the service station on the Property will sell motor fuel and petroleum products under a trademark or brand other than "Mobil " or "Exxon" during the term of the Supply Agreement ("Brand Conversion"), Purchaser (or Purchaser's successors and assigns) shall notify Seller and Exxonmobil Oil Corporation ("Option Notice") of such decision at least one hundred eighty (180) days prior to implementing such Brand Conversion. Seller and/or Exxonmobil Oil Corporation shall have the option to repurchase the Property ("Repurchase Option") on the terms set forth in Exhibit "J" attached hereto and made a part hereof.  The Repurchase Option will not apply to the Property if Purchaser following Closing no longer offers for sale or stores motor fuel or petroleum products under a trademark or brand owned by Exxonmobil Oil Corporation or otherwise on such Property. In such event, Purchaser hereby agrees to record, in the land records of the county and/or city in which such Property is located, within thirty (30) days after Closing, a restriction against the sale or storage of motor fuels on such property for a period of twenty (20) years beginning on the date motor fuel is no longer stored or offered for sale on such Property, and to pay Seller the sum of $100,000.

18

In the event Seller and/or Exxonmobil Oil Corporation does not exercise its repurchase option hereunder and Purchaser completes such rebranding to a brand other than Mobil, Purchaser will pay as liquidated damages to Seller the sum of 3.0 cents per gallon on the under-lifted contract volume for the rebranded Property within thirty (30) days of such rebranding. For purposes of this provision "contract volume" shall mean actual motor fuel gallons delivered to such Property during the calendar year 2005 (as detailed in Exhibit "A" attached hereto) multiplied by the number of years (including any partial year) remaining in the term of the Supply Agreement. The term "under-lifted volume" means the number of gallons below the required contract volume which were actually sold at the Property. A provision substantially similar to this Section 17.1.A. shall be included in the Supply Agreement.

      **B.**   <u>**Restriction Running with Land**</u>. Purchaser agrees to record or consents to the recording of a restriction running with the land prohibiting for fifteen (15) years following Closing the sale of any motor fuel other than Mobil or Exxon branded motor fuel from the Property. In the event such restriction is violated for any period of time or times, Purchaser shall, upon demand from Exxonmobil Oil Corporation or Seller, pay Exxonmobil Oil Corporation or Seller liquidated damages of 3.0 cents per gallon multiplied by the volume shown on Exhibit "A" for such Property for the calendar year 2005, multiplied by the number of years remaining in term of the Supply Agreement.

      **C.**   <u>**Subsequent Conveyance Fee**</u>. If Purchaser sells or conveys any interest (legal or equitable) in the Property to any other individual or entity within five (5) years of Closing, Purchaser shall pay Seller the sum of $123,500.00, in addition to any other payment obligations hereunder.

**ARTICLE XVIII**

<u>Miscellaneous</u>

**18.1**   <u>**Entire Agreement.**</u> This Agreement embodies the entire agreement between the Parties relating to the transactions contemplated by this Agreement and cannot be varied except by the written agreement of the Parties. In the event of any conflict between the terms and conditions of this Agreement with respect to the transactions contemplated by this Agreement, and any of the terms and conditions of the Supply Agreement, the terms and conditions of this Agreement shall govern.

**18.2**   <u>**Notices.**</u> Any notice, demand, request, consent, approval, or other communication which a Party hereto is required or desires to give, make or communicate to the other shall be effective and valid only when in writing and shall be deemed duly given when received if such notice is mailed by registered or certified mail, return receipt requested, or sent by personal delivery or sent by a nationally recognized overnight carrier, return receipt requested, or sent by facsimile, all charges prepaid, addressed in the case of Seller to:

        Esquire Petroleum, LLC
        One Magnificent Mile
        980 North Michigan Avenue, Suite 1400
        Chicago, IL 60611

19

Attention: Ulice Payne, Jr.
Facsimile: (262)-784-0098

With copy to:

Robert M. Riffle
Elias, Meginnes, Riffle & Seghetti, P.C.
416 Main Street, Suite 1400
Peoria, IL 61602
Facsimile: (309) 637-8514

and in the case of Exxon Mobil to:

Exxon Mobil Corporation
3225 Gallows Road
Fairfax VA 22037
Attention: Real Estate Manager
Facsimile: (703) 846-4511

and in the case of Purchaser to:

South Side Gas, Inc.
Attn: Ahmad Zahdan
4000 Southwest Highway
Hometown, Illinois
Facsimile:_____

With a copy to:

John J. Conway, Esq.
Sullivan Hincks & Conway
120 W. 22nd Street, Suite 100
Oak Brook, IL 60523
Facsimile: (630) 573-5130

or in either case at such other address as may have last been specified by notice given as provided by the Party addressed.

**18.3   Construction.** Words of any gender used in this Agreement shall be construed to include any other gender, and words in the singular number shall include the plural, and vice versa, unless the context requires otherwise.

**18.4   Captions.** The captions used in connection with the Articles and Sections of this Agreement are for convenience only and shall not be deemed to enlarge, limit or otherwise modify the meaning or interpretation of the language of this Agreement. Any references to "Articles", "Sections", "Subsections" and "Exhibits" are to Articles, Sections, Subsections, Exhibits, Riders and Addenda of this Agreement.

**18.5   Survival.** The provisions of Article I, Article II, Sections 4.2 and 4.3, Articles V and VI, Sections 7.1 and 7.2, Articles VIII, IX, X, and XI, XIII, XIV, XV, XVI, XVII, and XVIII shall survive the Closing of the transaction under this Agreement and shall not be deemed to have merged therewith. All other provisions hereof not included or incorporated in any document to be executed and delivered on the Closing Date shall not survive the Closing.

**18.6    Effective Date.** All time limits provided for herein which are measured by the number of days "from the date hereof" (rather than being designated by specific date) shall run from the Effective Date, rather than the date or dates of execution by the Parties.

**18.7    Further Assurances.** Following the Closing Date, for no further consideration, Seller and Purchaser shall perform such other acts and shall execute, acknowledge and deliver such additional documents as the other Party may reasonably request to vest in Purchaser all of Seller's right, title, interest, and enjoyment of the Property and other assets and rights conveyed under this Agreement, to carry out the transactions contemplated by this Agreement and to protect each Party's rights under this Agreement.

**18.8    Successors and Assigns.** This Agreement shall bind and inure to the benefit of the Parties hereto and their respective successors and assigns.

**18.9    Expenses.** Except as otherwise specifically provided for herein, each Party hereto shall bear all expenses incurred by it in connection with this Agreement, including, without limitation, the charges of its counsel, accountants, consultants, and other experts.

**18.10    Time of the Essence.** Unless otherwise expressly provided, time is of the essence in the performance of all obligations set forth herein.

**18.11    Authority to Bind.** The persons executing this Agreement warrant that they have authority to bind the respective Parties to this Agreement.

**18.12    Counterparts.** This Agreement may be executed by the Parties in counterparts; each of which shall be deemed an original, but such counterparts together shall constitute one and the same instrument.

**18.13    Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois, without giving effect to its rules on conflicts of law. Purchaser and Seller agree that any claim or litigation arising out of this Agreement or the transaction contemplated hereby, shall be brought in the Circuit Court located in McHenry County, in the State of Illinois.

**18.14    No Third Party Beneficiary.** Except as otherwise provided herein with respect to Exxonmobil Oil Corporation, nothing herein shall be deemed to express any intent to create third party beneficiary rights in favor of any person or entity. Seller and Purchaser specifically state and agree that no such intent exists.

**18.15    No Recording of this Agreement.** Prior to the Closing, neither Party shall record this Agreement with any County Clerk or other governmental office. If either Party records this Agreement, it shall, at the option of the other Party, be ipso facto null and void and of no further force.

**18.16    1031 Exchange.** Seller may require Purchaser, pursuant to Section 1031 of the Internal Revenue Code of 1986, as amended, to pay the Purchase Price to a trust or intermediary party designated by Seller, in order that Seller may participate in a tax-deferred exchange of like-kind property. Such election shall be made, if at all, by notice to Purchaser not later than ten (10)

days prior to the Closing Date.   The Parties agree to execute such agreements and other documents as may be necessary to complete and otherwise effectuate Seller's tax-deferred exchange, provided that (a) Purchaser's obligations hereunder shall not be increased; (b) such documents shall not modify Purchaser's representations, warranties or obligations hereunder; (c) the Purchase Price paid by Purchaser shall not be different from that which Purchaser would have paid pursuant to Section 3.1, (d) Purchaser shall incur no additional cost, expense or liability as a result of its cooperation in such exchange; and (e) Seller shall indemnify and hold harmless Purchaser for additional expenses, including, but not limited to, taxes and closing costs, and any cost or expense (including reasonable counsel fees) which Purchaser may suffer, sustain or become subject to as a result of the Purchase Price being paid to a trust or intermediary party rather than to Seller and the trust's or intermediary's subsequent use of the Purchase Price.

**18.17   Severability.**  If any provision in this Agreement shall for any reason be adjudged by any court of competent jurisdiction to be invalid or unenforceable, such judgment shall not affect, impair or invalidate the remainder of this Agreement, but shall be confined in its operation to the provision of this Agreement directly involved in the controversy in which such judgment shall have been rendered.

**18.18   Waiver.**  Any of the terms and conditions of this Agreement may be waived at any time and from time to time, in writing, by such Parties as are entitled to the benefit of such terms and conditions; provided, however, that except as otherwise specifically provided in this Agreement, no failure or delay on the part of either Party in exercising any of its respective rights under this Agreement upon any failure by the other Party to perform or observe any condition, covenant or provision of this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any such rights preclude any other or further exercise thereof or the exercise of any other rights under this Agreement.  No waiver or release of any of the terms, conditions, or provisions of this Agreement shall be valid or asserted or relied upon by either Party or offered in any judicial proceeding or otherwise, unless the same is in writing, and duly executed by the waiving or releasing Party.

**18.19   Rules of Construction.**  The provisions of this Agreement are to be construed as a whole according to their common meaning to achieve the objectives and purposes of this Agreement. Each of the parties represents that it and its respective counsel have reviewed this Agreement. The rule of construction that any ambiguities are to be resolved against the drafting party will not be employed in interpreting this Agreement as both Purchaser and Seller are considered to have equal bargaining power.

**18.20   Waiver of Jury Trial.**  Seller and Purchaser waive trial by jury in any action, proceeding or counterclaim brought by either of them against the other on any matter arising out of or in any way connected with this Agreement.

**18.21   Imaging.**  Purchaser shall complete "imaging" or "re-imaging" of the Property to current Mobil Imaging Standards, on or before the earlier of Closing or March 1, 2008.  So long as Purchaser is in full compliance with its obligations hereunder, all rebates provided by Mobil with respect to any such imaging or re-imaging shall be retained by Purchaser, to help offset the costs of imaging or re-imaging.  If Purchaser breaches its obligations pursuant to this Section, Seller shall have the right, but not the obligation, to perform such imaging or re-imaging, and to recover any amounts expended in such endeavors from Purchaser, through any and all available means.

**IN WITNESS WHEREOF,** this Agreement has been executed by Seller and Purchaser on the dates set forth below, but effective as of the Effective Date.

**SOUTH SIDE GAS, INC.**

By: _____
Name: Ahmad Zahdan
Title: President
Date: 2-15-07 / 2-16-08

**ESQUIRE PETROLEUM, LLC**
**an Illinois limited liability company**

By: _____
    Name: Ulice Payne, Jr.
Title: Managing Member
Date: _____, 2007

**ESQUIRE PETROLEUM, LLC**
**an Illinois limited liability company**

By: _____
Name: George Athans
Title: Member
Date: _____, 2007

607-0105

23

# APPENDIX OF EXHIBITS

Exhibit "A"     -          Property and Base Volume

Exhibit "B"     -

Exhibit "C"     -          Allocation of Purchase Price

Exhibit "D"     -          Letter of Credit Escrow Agreement

Exhibit "E"     -          Permitted Exceptions

Exhibit "F"     -          Special Warranty Deed

Exhibit "G"     -          Bill of Sale

Exhibit "H"     -          Assignment And Assumption Of Non-Petroleum Lease

Exhibit "I"     -          Supply Agreement

Exhibit "J"     -          Option to Repurchase Property

## EXHIBIT "A"

## <u>PROPERTY</u>

| <u>Address</u> | <u>City</u> | <u>State</u> | 2005<br><u>Volume</u><br><u>(thousands)</u> |
|---|---|---|---|
| 4000 Southwest Highway | Hometown | IL | 1083 |

EXHIBIT "B"

[INTENTIONALLY LEFT BLANK]

## EXHIBIT "C"

## <u>ALLOCATION OF PURCHASE PRICE</u>

<u>Real Property</u>                    <u>Personal Property and Equipment</u>

[To Come]

EXHIBIT "D"

## ESCROW AGREEMENT

To:    Stewart Title Guaranty Company

South Side Gas, Inc. ("Purchaser") herein deposits Twenty Five Thousand and 00/100 Dollars ($25,000.00) in favor of Esquire Petroleum, LLC (the "Earnest Money Deposit"), as the earnest money deposit required to be deposited by Purchaser pursuant to the terms of that certain Agreement of Purchase and Sale dated _____, 2007 ("Agreement of Purchase and Sale") by and between Esquire Petroleum, LLC ("Esquire") and Purchaser, which deposit is to be held by Stewart Title Guaranty Company ("Stewart Title") as "Escrow Agent", and disbursed in accordance with these Escrow Instructions. Stewart Title, by its signature below, acknowledges receipt of the Earnest Money Deposit.

Stewart Title is not a party to the Agreement of Purchase and Sale, and does not assume or have any liability for performance or non-performance of any party to the Agreement of Purchase and Sale.

Stewart Title agrees that the Earnest Money Deposit is to be released to Esquire upon certification to Stewart Title by Esquire that the Closing (as such term is defined in the Agreement of Purchase and Sale) has occurred or that Purchaser has defaulted under the terms of the Agreement of Purchase and Sale.

In the event that the Closing has not occurred within one year from the date hereof, Stewart Title, at its option, may interplead the Earnest Money Deposit into the registry of Court (as defined below), unless the one year escrow period is extended by additional written instructions from Esquire and Purchaser prior to expiration of the one year period.

Should any dispute arise between Esquire and Purchaser in connection with the release of the Earnest Money Deposit, Stewart Title shall have the option to not release the Earnest Money Deposit to any party or, join or commence a court action, or interplead the money and documents into the registry of Court, whereupon Stewart Title will be relieved of further responsibility in connection therewith.   Venue shall be in the District Court of Cook County, Illinois (the "Court").

In the event of any suit or claim made against Stewart Title by any parties to the Agreement of the Purchase and Sale, the party commencing the suit or claim shall be required to pay Stewart Title all expenses, costs and reasonable attorney's fees in connection therewith, unless such party prevails in such suit or claim, in which case Stewart Title shall bear it's own expenses, costs and attorneys fees.

Dated this _____ day of _____, 2007.

Stewart Title Guaranty Company

BY:_____

Esquire Petroleum, LLC

BY: _____
      Ulice Payne, Jr.

South Side Gas, Inc.

BY:_____
      Ahmad Zahdan

SOCIAL SECURITY NUMBER: _____or

FEDERAL TAX ID NUMBER: _____

EXHIBIT "E"

## PERMITTED EXCEPTIONS

1.   GENERAL REAL ESTATE TAXES FOR THE YEARS 2005 SECOND INSTALLMENT AND 2006 TAXES ARE NOT YET DUE OR PAYABLE.

2.   COVENANTS, CONDITIONS AND RESTRICTIONS CONTAINED IN DECLARATION OF PROTECTIVE COVENANTS DATED JANUARY 31, 1950 AS DOCUMENT NO. 14725502, RELATING TO AMONG OTHER THINGS; USE AND OCCUPANCY OF THE LAND AND IMPROVEMENTS; USE, TYPE, AND CHARACTER OF BUILDINGS; PROHIBITIONS AGAINST ANIMALS, LIVESTOCK AND POULTRY; PROHIBITION AGAINST MANUFACTURING OR INDUSTRIAL USES OF ANY KIND; AND PROHIBITIONS AGAINST USE OF THE LAND FOR TRAILER CAMPS OR COMMERCIAL PARKING LOTS, TOURIST CAMPS, MOTELS, DRIVE-IN THEATERS, GOLF DRIVING RANGES OR AMUSEMENT CENTERS OF THE CARNIVAL TYPED AND ANY OTHER USES OF A SIMILAR NATURE WHICH MIGHT PROVE TO BE A NUISANCE OR SERVE TO DEPRECIATE THE VALUES CREATED BY THE DEVELOPMENT OF THE SUBDIVISION AND OTHER PROPERTY PRIMARILY FOR RESIDENTIAL PURPOSES.
NOTE: SAID COVENANTS, CONDITIONS AND RESTRICTIONS DO NOT CONTAIN A REVERSIONARY OR FORFEITURE CLAUSE.

3.   RIGHTS AND EASEMENTS CREATED AND GRANTED BY AGREEMENT DATED JULY 30, 1955 FILED SEPTEMBER 21, 1955 AS DOCUMENT NO. LR1621990, TO PERMIT TENANTS AND CUSTOMERS TO PARK AUTOMOBILES ON THOSE PARTS OF THE LAND AND OTHER PROPERTY PACED WITH BLACK TOP WITH FULL RIGHTS OF INGRESS AND EGRESS, AND TO THE TERMS, PROVISIONS AND CONDITIONS THEREIN.

4.   EASEMENT FOR THE PURPOSE OF INGRESS AND EGRESS OVER THE LAND, FOR THE PURPOSE OF VEHICULAR PARKING FACILITIES, AND AS MAY BE NEEDED FOR USE OF THE DEMISED PROPERTY (PART OF LOT 879) BY LESSEE OR LESSEE'S SUBLESSEES AND CUSTOMERS, OVER AND ACROSS THE PARKING LOTS, SIDEWALKS, AND COMMON AREAS OF THE HOMETOWN SHOPPING CENTER (OF WHICH COMPLEX THE SUBJECT PREMISES IS A PART), AS GRANTED TO THE LESSEE AND ITS ASSIGNS IN THE LEASE AGREEMENT DATED AUGUST 15, 1978 AND RESTATEMENT OF GROUND LEASE DATED DECEMBER 13, 1982 AND FILED DECEMBER 15, 1982 AS DOCUMENT NO. LR3286486 BY AND BETWEEN CHICAGO TITLE AND TRUST COMPANY, AS TRUSTEE UNDER TRUST NUMBER 53053, LESSOR, AND JANE LONG, AS TRUSTEE OF THE THOMAS F. SEAY TRUST NUMBER 1 DATED JANUARY 2, 1960, AND JANE LONG INDIVIDUALLY, AS LESSEE.

5. TERMS, PROVISIONS, CONDITIONS, RESTRICTIONS AND REGULATIONS CONTAINED IN ORDINANCE OF THE CITY OF HOMETOWN AND AGREEMENT BY AND BETWEEN THE CITY OF HOMETOWN AND CHICAGO TITLE AND TRUST COMPANY AS TRUSTEE UNDER TRUST NUMBER 53053 DATED DECEMBER 28, 1971 RECORDED JANUARY 19, 1972 AS DOCUMENT NO. 21781004.

6. TERMS, PROVISIONS, CONDITIONS, RESTRICTIONS, AND REGULATIONS CONTAINED AND RIGHTS AND OBLIGATIONS CREATED BY AGREEMENT DATED JULY 8, 1966 RECORDED JULY 13, 1967 AS DOCUMENT NO. 20196085 WITH THE CITY OF CHICAGO FOR SEWER SERVICE CONNECTION AND SEWER SERVICE. (AFFECTS THAT PART OF LOT 875 DESCRIBED AS FOLLOWS: BEGINNING AT A POINT ON THE SOUTHEASTERLY LINE OF SAID LOT 875, SAID POINT BEING 88 FEET SOUTHWESTERLY OF THE NORTHEASTERLY CORNER OF SAID LOT; AND RUNNING THENCE SOUTHWESTERLY ALONG SAID SOUTHEASTERLY LINE OF LOT 875, A DISTANCE OF 264.83 FEET TO THE SOUTHWESTERLY CORNER OF SAID LOT; THENCE NORTH ALONG THE WEST LINE OF SAID LOT 875, A DISTANCE OF 250 FEET TO THE NORTHWEST CORNER OF SAID LOT; THENCE EAST ALONG THE NORTH LINE OF SAID LOT 875, A DISTANCE OF 166 FEET; THENCE SOUTHWESTERLY, A DISTANCE OF 45.70 FEET TO A POINT 42 FEET SOUTH OF SAID NORTH LINE AND 148 FEET EAST OF SAID WEST LINE OF LOT 875; THENCE SOUTH EASTERLY A DISTANCE OF 43.88 FEET TO THE POINT OF BEGINNING).

7. SHOPPING CENTER SIGN LOCATED ON THE SUBJECT PREMISES; AND RELATIVE THERETO WE ALSO NOTE THE RIGHTS OF THE OWNER(S), OPERATOR(S), AND/OR LESSEE(S) OF SAID SHOPPING SIGN, IN AND TO THE USE, OPERATION, MAINTENANCE, REPAIR AND ALTERATION OF OR ADDITION TO SAID SIGN AND TO THE OWNERSHIP OF SAID SIGN AND THE LAND THEREUNDER, AND ALSO AS TO ANY EASEMENTS OR RIGHTS RELATIVE THERETO.

8. NO FURTHER REMEDIATION LETTER RECORDED DECEMBER 20, 2001 AS DOCUMENT NUMBER 0011214253.

9. Those matters as shown on Survey prepared by BALSAMO OLSON ENG. Dated November 9, 2006 as B&C Project No. 20061321/Site 11:
   (a)  1.73 feet curb encroachment on North corner of subject property.
   (b)  0.16 feet curb encroachment along the West property line.

## EXHIBIT "F"

## SPECIAL WARRANTY DEED

KNOW ALL MEN BY THESE PRESENTS: That ESQUIRE PETROLEUM, LLC, an Illinois limited liability company, having an office at One Magnificent Mile, 980 North Michigan Avenue, Suite 1400, Chicago, Illinois 60611 ("Grantor"), Convey(s) and Warrant(s) to South Side Gas, Inc., having an office at 4000 Southwest Highway, Hometown, Illinois, ("Grantee"), for the sum of $10.00 and other good and valuable consideration, with Special Warranty covenants, the land together with the buildings, structures, fixtures and improvements located thereon, at 4000 Southwest Highway, Hometown, Illinois, in Cook County, Illinois, and more particularly described on Exhibit "A" attached hereto and incorporated herein by this reference (the "Property"), free and clear of all liens, encumbrances, conditions, easements, assessments, and restrictions, except for the following (collectively, the "Permitted Encumbrances"):

A.    The lien for real property taxes for the current year, and any liens for special assessments which as of the Effective Date (as defined below) hereof are not due and payable:

B.    building and zoning ordinances, laws and regulations;

C.    matters that would be shown in a current survey of the Property;

D.    rights of any subtenant or licensee of Grantor occupying the Property at the Effective Date; and

E.    those valid and subsisting easements, rights-of-way, conditions, covenants, restrictions, reservations and exceptions of record that are set forth on Exhibit "B" attached hereto and incorporated herein by this reference.

TO HAVE AND TO HOLD the above described premises, together with all and singular the rights, easements, grants of rights, ways, waters, privileges, and appurtenances thereto or in anywise belonging; and together with all right, title and interest, if any, of Grantor in and to any land lying in the bed of any street, avenue or alley adjoining the premises above described to the center line thereof unto the said Grantee, its successors and/or assigns forever, and Grantor does hereby bind Grantor, Grantor's heirs, executors, administrators, successors and/or assigns to WARRANT AND DEFEND all and singular the said premises unto the said Grantee, its successors and/or assigns, against every person whomsoever claiming or to claim the same or any part thereof, by, through or under Grantor, but not otherwise.

1.    Maintenance of Records    Grantee and all Grantee-Related Parties shall maintain inventory and tank and line maintenance records for the Property as required to comply with all applicable laws, rules and regulations. Grantee shall deliver legible copies of such records to Grantor or ExxonMobil Oil Corporation ("Exxon") within ten (10) days of Grantor's or Exxon's request for such records. Grantor and/or Exxon shall have the right to

review these records as Grantor or Exxon deems necessary so as to be assured of the integrity of underground storage tanks and lines systems at the Property. Within thirty (30) days after Grantor's or Exxon's request, Grantee shall deliver to Grantor or Exxon legible copies of surveys or construction plans which show the location of any underground storage tanks and lines, any underground piping or other improvements installed or constructed by Grantee. Following the Effective Date, Grantee agrees to continue to use, maintain, repair and keep in good order the existing remote monitoring system (e.g. a Veeder-Root system) for the tanks and lines located on the Property. Grantee shall impose obligations identical to this Section 1 on all of its successors and assigns.

2.    Prohibited Uses. The Property herein conveyed cannot be used for:

A.    Any purpose involving residence of any type (including a bed & breakfast establishment, rooming house, or long term care facility,) or any other type of use where individuals are on the Property for more than a normal work day;

B.    A place of worship (including Churches and synagogues), hospital, nursing home, child care, playground, recreational area, school (including any other type of educational facility or use), care facility (including but not limited to day, night or extended care for children, the elderly or the infirm), or farm (including any other type of agricultural use); or

C.    Below grade living, working, storage or parking.

3. Zoning. Grantee and Grantee-Related Parties shall not at any time apply to the relevant authorities to amend the zoning of the Property, or support any change in zoning of the Property which would allow any use prohibited by this Deed, whether on an "as of right" basis or on any other basis whatsoever. Neither Grantee nor any Grantee-Related Party shall at any time seek to take advantage of any non-conforming user rights or exceptions to use including special use permits.

4. Exxon's Option to Repurchase. If Grantee, Grantee-Related Parties, or any subsequent owner, user or occupier of the Property uses or plans to use the Property in manner contrary to this Deed or attempts in any way to change zoning or make use of non-conforming user rights or exceptions, or otherwise materially violates the provisions of this Deed, Exxon may seek to enforce such provisions or at its option may, but is not obligated to, repurchase the affected Property in the manner hereinafter provided. Exxon may at any time notify Grantee that Exxon desires to repurchase Property.

A.    Repurchase Price. The repurchase price shall be equal to the lesser of:

1) The purchase price paid by Grantor for the Property, or

2) The fair market value of the Property.

B.    Fair Market Value. The fair market value of the Property (hereinafter "Fair Market Value") determined by an MAI appraiser who shall be hired by Exxon,

33

must be located in the City or county where the Property is located, must be a member in good standing of the American Institute of Appraisers, and must have been engaged, as his or her primary livelihood, in the business of appraising commercial real estate in the State of Illinois for a period of at least ten (10) years prior to the date of selection. Exxon shall pay the appraisal costs.

C.    Closing for a Repurchase. The closing for any repurchase transaction will occur at the offices of Exxon's title company, thirty (30) days following Exxon's receipt of the Fair Market Value from the appraiser. At the closing, Grantee shall deliver to Exxon a valid special warranty deed (or its statutory equivalent in the jurisdiction where the Property at which the violation occurred are located), in recordable form and a bill of sale for any personal property of Grantee that Grantee does not remove from the Property prior to the Effective Date, both conveying good and marketable title, free and clear of all liens and encumbrances, except for any easements and restrictions set forth in this Deed. Grantee shall be responsible for all fees for recording the deed for the Property being repurchased to Exxon, including, without limitation, all transfer taxes and any documentary or other fees payable in connection with the recording of such deed and any similar charges imposed in connection with the repurchase of the Property by Exxon.

5.    Construction Work. If Grantee or any Grantee-Related Party encounters and excavates or removes soil or groundwater containing Contamination on the Property while conducting construction, remodeling, or demolish-and-rebuild work on the Property, Grantee or a Grantee-Related Party will solely bear the costs of removing, recycling or disposing of such Contamination. Grantee shall report all Contamination existing in any soil and groundwater excavated, removed, recycled or disposed of by Grantee, to the appropriate governmental authorities if required to do so by the Environmental Laws. Grantee shall sign, as Generator, all manifests for transportation and disposal of any waste whether or not containing Contamination. Grantee shall bear the cost of clean fill required for any excavation caused by construction work on the Property.

6.    Grantee's Grant of Continuing Access. Grantee and all Grantee-Related Parties hereby grant Grantor and Exxon, Grantor's and Exxon's employees, officers, heirs assigns, consultants, contractors, the state, federal and local governmental agency or agencies having jurisdiction over remediation activities at the Property, and all other Persons identified by Grantor or Exxon any and all access that may be requested by Grantor or Exxon to the Property after the Effective Date for any and all of the following purposes: tank testing and removal, taking groundwater, soil or other samples, drilling wells and borings, reviewing records, excavation, removal, disposal, treatment of the soil, groundwater or other equipment, property or media. There will be no cost or charge for such access. Grantor and/or Exxon shall use good faith and reasonable diligence to minimize disruption of the activities of Grantee or any Grantee-Related Parties on the property. If Grantor's or Exxon's activities on the Property, in Grantee's belief, have or may have a material adverse impact on Grantee's activities, Grantor and/or Exxon, as the case may be, shall make commercially reasonable efforts to modify its activities to eliminate the adverse impact on Grantee's activities. Consistent with the foregoing, Grantee shall cooperate with Grantor and Exxon and Grantor's and Exxon's employees, officers, heirs,

assigns, consultants, and contractors can reasonably complete their activity without incurring additional costs or expenses. Grantee and Grantee-Related Parties release Grantor and Exxon from any claims related to such access and inspection other than those resulting, directly or indirectly, from Grantor's or Exxon's willful misconduct.

7.    Grantor's Obligations. Grantor or Exxon shall restore the surface and existing structures, if any, on the Property to a condition substantially similar to that at the time immediately prior to the action taken by Grantor or Exxon and shall replace or repair damage to Grantee's equipment and personal property on the Property caused by Grantor or Exxon or its contractors. Neither Grantor nor Exxon shall have any liability to anyone, including Grantee, for business disruption, lost profits, incidental, punitive or consequential damages arising from such actions or access.

8.    Notice of Access. Grantor and/or Exxon or its contractors shall provide Grantee advance notice, if practical, of all disruptive or intrusive activities to be undertaken on the Property. The notice may, but need not be in the form of a periodic written schedule of activities delivered from time to time. No advance notice shall be required for non-disruptive activities.

9.    Engineering Controls. Grantee agrees that in developing the Property it will, at its sole cost and expense, adopt and use appropriate Engineering Controls, which at minimum, shall include the following.

A.    Slab on Grade. All buildings constructed on the Property shall be constructed slab on grade and shall have no living, working, storage or parking areas below grade. Notwithstanding the foregoing, below grade utilities and foundations are permitted, provided that they are protected from vapor or liquid intrusion by installing a vapor ventilation system and vapor/liquid barrier which shall be maintained by Grantee or a subsequent Grantee-Related Party.

B.    No Water Wells. No Property will be used for the purpose of obtaining from beneath the surface of the Property any water for any reason whatsoever from any ground water table or similar water basin accessed from the Property, except for environmental sampling that may be required by a governmental authority.

C.    Cessation of Use of Existing Wells. Grantee shall permanently cap, disable, and seal in accordance with all applicable Environmental Laws and industry standards all existing bore-water or groundwater wells used for obtaining water from the Property.

D.    Impervious Liner. All new foundations for buildings must have an impervious liner under them to act as an effective vapor barrier. Grantor does not require that existing foundations be retrofitted with an impervious liner. Impervious liner shall be installed by a licensed contractor experienced in the installation of such liners, and shall be maintained by Grantee or a Grantee-Related Party. The liner shall be of the appropriate strength and quality and resistant to hydrocarbons and shall be installed at an appropriate level beneath ground level. The installation shall be

performed in accordance with all applicable laws and in accordance with the highest industry standards to protect human health and safety.

10.   Covenants Running with the Land.   The conditions, covenants and other provisions set out in this Deed shall be covenants running with the land and shall be binding upon and (except as expressly provided otherwise) shall inure to the benefit of the parties, their subsidiaries, Affiliates, legal representatives, heirs, successors and assigns, as applicable.

11.   Pro-ration of Taxes.  Ad valorem taxes and special assessments, if any, against the Property for the year in which the Effective Date occurs will be pro-rated between Grantor and Grantee as of the Effective Date, and Grantee hereby assumes and agrees to pay same.

12.   Definitions.  The following definitions are used in this Deed:

A.   Affiliate(s).  The term Affiliate(s) means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such Person.  For purposes of this definition, the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of any Person, whether through the ownership of voting securities or by contract or otherwise.  "Person" means an individual, partnership (whether general or limited), limited liability company, corporation, trust, estate, unincorporated association, nominee, joint venture or other entity.

B.   Grantee-Related Parties.  The term Grantee-Related Parties means Grantee's parent, subsidiaries, and Affiliates and their respective owners, officers, employees, attorneys, agents, consultants, contractors, invitees, servants, representatives, successors and assigns, and all Persons who acquire an ownership interest, the right to occupy or use the Property, or any other interest in the Property from or through Grantee or another Grantee-Related Party. Grantee-Related Party shall include heirs and legal representatives if Grantee is a natural person.

C.   "Contamination" shall mean the presence at, on, under or originating from the Property of any chemical, compound, material, substance or other matter that (i) is flammable, explosive, hazardous, a waste, a toxic substance, or a related injurious or potentially injurious material, whether injurious or potentially injurious by itself or in combination with other materials; (ii) is controlled, designated in or governed by any Environmental Law (as herein defined); and (iii) gives rise to any reporting, notice or publication requirements, or remediation under any Environmental Law.

D.   "Engineering Controls" shall mean structural modifications to the Property or buildings, personal property or equipment on the Property which may be required or recommended by the state, federal and local governmental agency or agencies having jurisdiction over Remediation Activities at the Property, applicable laws,

rules and regulations or by environmental consultants to prevent human exposure to vapors and/or liquids containing hazardous materials and to prevent the migration of vapors and/or liquids containing hazardous materials into any buildings, underground utilities or storm water retention/detention ponds, including without limitation, vapor extraction systems, vapor barriers, sealed sumps and storm pond liners.

E.   "Environmental Laws" shall mean any and all federal, state, county or local laws, ordinances, rules, decrees, orders, regulations or court decisions relating to hazardous substances, hazardous materials, hazardous waste, toxic substances, environmental conditions on, under or about the Property, or soil and groundwater conditions, including, but not limited to, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 24 U.S.C. §9601, et seq., The Resource Conservation and Recovery Act, 42 U.S.C. §1801, et seq., the Illinois Environmental Protection Act, 415 ILCS §5/1 et. seq., any amendments to the foregoing, and any similar federal, state or local laws, ordinances, rules, decrees, orders or regulations.

F.   "Person" or "Persons" shall mean an individual, partnership (whether general or limited), limited liability company, corporation, trust, estate, unincorporated association, nominee, joint venture or other entity.

**TO HAVE AND TO HOLD the Property, together with the appurtenances, estate, title and interest thereto, unto Grantee, Grantee's successors, heirs and assigns, forever, subject to the provisions hereof, and in lieu of all other warranties, express or implied, Grantor does hereby bind itself, its successors and assigns, to warrant and forever defend the title to the Property unto Grantee, Grantee's successors, heirs and assigns, against every person whomsoever lawfully claiming or to claim the same or any part thereof, by, through or under Grantor, but not otherwise.**

The provisions of this Deed including, without limitation, the restrictive covenants set forth above shall survive the Effective Date and shall continue for the period(s) specified herein.

IN WITNESS WHEREOF, Grantor has signed this deed this _____ day of _____, 2007, but EFFECTIVE as of this _____ day of _____, 2007, ("Effective Date")

GRANTOR:

South Side Gas, Inc.

ESQUIRE PETROLEUM, LLC
an Illinois limited liability company

ATTEST:

By:_____

By:_____

Name:_____

Name:_____

Title:_____

Title:_____

Date:_____

Date:_____


WITNESSES:

WITNESSES:

_____

_____

Print
Name:_____

Print
Name:_____

_____

_____

Print
Name:_____

Print
Name:_____

38

IN WITNESS WHEREOF, Grantee has signed this deed this _____ day of
_____, 2007, but EFFECTIVE as of this _____ day of
_____, 2007 ("Effective Date").

GRANTEE:

ATTEST:                           South Side Gas, Inc.

By:_____        By:_____

Name:_____        Name: Ahmad Zahdan

Title:_____      Title:_____

Date:_____        Date:_____

WITNESSES:                        WITNESSES:

_____         _____

Print                             Print
Name:_____        Name:_____

_____         _____

Print                             Print
Name:_____        Name:_____

STATE OF ILLINOIS         §
                               §
COUNTY OF _____ §

On _____, before me, personally appeared _____ personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s), whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.


Signature _____
                   Notary Public

STATE OF _____ §
                           §
COUNTY OF _____ §


On _____, before me, personally appeared Ahmad Zahdan personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s), whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.


Signature _____
                Notary Public


Prepared by:
Robert M. Riffle
Elias, Meginnes, Riffle & Seghetti, P.C.
416 Main Street, Suite 1400
Peoria, Illinois 61602-1153

## EXHIBIT "A"

## (LEGAL DESCRIPTION)

Part of Lots 875 and 877 in J.E. Merrion and Co's Hometown Unit No. 3, being a subdivision of part of the NE ¼ of Section 3, and part of the East ½ of the NE ¼ of Section 3 Township 37 North Range 13 East of the Third Principal Meridian, per Document 1370408, described as follows:

Beginning at the SW corner of said Lot 877; thence North 00 degrees 26 minutes 00 seconds east along the West line of said Lot 877, 96.00 feet; thence North 44 degrees 34 minutes 00 seconds West 35.36 feet; thence North 00 degrees 26 minutes 00 seconds West 55.00 feet; thence North 45 degrees 26 minutes 00 seconds East 35.36; thence North 00 degrees 26 minutes 00 seconds East 48.96 feet; thence South 89 degrees 35 minutes 22 seconds East 195.97 feet; thence South 69 degrees 56 minutes 09 seconds East 14.87 feet; thence South 22 seconds, 08 minutes, 27 seconds East 20.68 feet; thence South 25 degrees 39 minutes 15 second West 14.87 feet; thence South 45 degrees 18 minutes 28 seconds West 299.87 feet to the point of beginning; in Cook County, Illinois.

Commonly known as:          4000 Southwest Highway, Hometown, IL 60456

PIN:    24-03-201-026
        24-03-201-025

## EXHIBIT "B"

### (PERMITTED ENCUMBRANCES)

1.  GENERAL REAL ESTATE TAXES FOR THE YEARS 2005 SECOND INSTALLMENT AND 2006 TAXES ARE NOT YET DUE OR PAYABLE.

2.  COVENANTS, CONDITIONS AND RESTRICTIONS CONTAINED IN DECLARATION OF PROTECTIVE COVENANTS DATED JANUARY 31, 1950 AS DOCUMENT NO. 14725502, RELATING TO AMONG OTHER THINGS; USE AND OCCUPANCY OF THE LAND AND IMPROVEMENTS; USE, TYPE, AND CHARACTER OF BUILDINGS; PROHIBITIONS AGAINST ANIMALS, LIVESTOCK AND POULTRY; PROHIBITION AGAINST MANUFACTURING OR INDUSTRIAL USES OF ANY KIND; AND PROHIBITIONS AGAINST USE OF THE LAND FOR TRAILER CAMPS OR COMMERCIAL PARKING LOTS, TOURIST CAMPS, MOTELS, DRIVE-IN THEATERS, GOLF DRIVING RANGES OR AMUSEMENT CENTERS OF THE CARNIVAL TYPED AND ANY OTHER USES OF A SIMILAR NATURE WHICH MIGHT PROVE TO BE A NUISANCE OR SERVE TO DEPRECIATE THE VALUES CREATED BY THE DEVELOPMENT OF THE SUBDIVISION AND OTHER PROPERTY PRIMARILY FOR RESIDENTIAL PURPOSES.

NOTE: SAID COVENANTS, CONDITIONS AND RESTRICTIONS DO NOT CONTAIN A REVERSIONARY OR FORFEITURE CLAUSE.

3.  RIGHTS AND EASEMENTS CREATED AND GRANTED BY AGREEMENT DATED JULY 30, 1955 FILED SEPTEMBER 21, 1955 AS DOCUMENT NO. LR1621990, TO PERMIT TENANTS AND CUSTOMERS TO PARK AUTOMOBILES ON THOSE PARTS OF THE LAND AND OTHER PROPERTY PACED WITH BLACK TOP WITH FULL RIGHTS OF INGRESS AND EGRESS, AND TO THE TERMS, PROVISIONS AND CONDITIONS THEREIN.

4.  EASEMENT FOR THE PURPOSE OF INGRESS AND EGRESS OVER THE LAND, FOR THE PURPOSE OF VEHICULAR PARKING FACILITIES, AND AS MAY BE NEEDED FOR USE OF THE DEMISED PROPERTY (PART OF LOT 879) BY LESSEE OR LESSEE'S SUBLESSEES AND CUSTOMERS, OVER AND ACROSS THE PARKING LOTS, SIDEWALKS, AND COMMON AREAS OF THE HOMETOWN SHOPPING CENTER (OF WHICH COMPLEX THE SUBJECT PREMISES IS A PART), AS GRANTED TO THE LESSEE AND ITS ASSIGNS IN THE LEASE AGREEMENT DATED AUGUST 15, 1978 AND RESTATEMENT OF GROUND LEASE DATED DECEMBER 13, 1982 AND FILED DECEMBER 15, 1982 AS DOCUMENT NO. LR3286486 BY AND BETWEEN CHICAGO TITLE AND

TRUST COMPANY, AS TRUSTEE UNDER TRUST NUMBER 53053, LESSOR, AND JANE LONG, AS TRUSTEE OF THE THOMAS F. SEAY TRUST NUMBER 1 DATED JANUARY 2, 1960, AND JANE LONG INDIVIDUALLY, AS LESSEE.

5.     TERMS, PROVISIONS, CONDITIONS, RESTRICTIONS AND REGULATIONS CONTAINED IN ORDINANCE OF THE CITY OF HOMETOWN AND AGREEMENT BY AND BETWEEN THE CITY OF HOMETOWN AND CHICAGO TITLE AND TRUST COMPANY AS TRUSTEE UNDER TRUST NUMBER 53053 DATED DECEMBER 28, 1971 RECORDED JANUARY 19, 1972 AS DOCUMENT NO. 21781004.

6.     TERMS, PROVISIONS, CONDITIONS, RESTRICTIONS, AND REGULATIONS CONTAINED AND RIGHTS AND OBLIGATIONS CREATED BY AGREEMENT DATED JULY 8, 1966 RECORDED JULY 13, 1967 AS DOCUMENT NO. 20196085 WITH THE CITY OF CHICAGO FOR SEWER SERVICE CONNECTION AND SEWER SERVICE. (AFFECTS THAT PART OF LOT 875 DESCRIBED AS FOLLOWS: BEGINNING AT A POINT ON THE SOUTHEASTERLY LINE OF SAID LOT 875, SAID POINT BEING 88 FEET SOUTHWESTERLY OF THE NORTHEASTERLY CORNER OF SAID LOT; AND RUNNING THENCE SOUTHWESTERLY ALONG SAID SOUTHEASTERLY LINE OF LOT 875, A DISTANCE OF 264.83 FEET TO THE SOUTHWESTERLY CORNER OF SAID LOT; THENCE NORTH ALONG THE WEST LINE OF SAID LOT 875, A DISTANCE OF 250 FEET TO THE NORTHWEST CORNER OF SAID LOT; THENCE EAST ALONG THE NORTH LINE OF SAID LOT 875, A DISTANCE OF 166 FEET; THENCE SOUTHWESTERLY, A DISTANCE OF 45.70 FEET TO A POINT 42 FEET SOUTH OF SAID NORTH LINE AND 148 FEET EAST OF SAID WEST LINE OF LOT 875; THENCE SOUTH EASTERLY A DISTANCE OF 43.88 FEET TO THE POINT OF BEGINNING).

7.     SHOPPING CENTER SIGN LOCATED ON THE SUBJECT PREMISES; AND RELATIVE THERETO WE ALSO NOTE THE RIGHTS OF THE OWNER(S), OPERATOR(S), AND/OR LESSEE(S) OF SAID SHOPPING SIGN, IN AND TO THE USE, OPERATION, MAINTENANCE, REPAIR AND ALTERATION OF OR ADDITION TO SAID SIGN AND TO THE OWNERSHIP OF SAID SIGN AND THE LAND THEREUNDER, AND ALSO AS TO ANY EASEMENTS OR RIGHTS RELATIVE THERETO.

8.     NO FURTHER REMEDIATION LETTER RECORDED DECEMBER 20, 2001 AS DOCUMENT NUMBER 0011214253.

9.     Those matters as shown on Survey prepared by BALSAMO OLSON ENG. Dated November 9, 2006 as B&C Project No. 20061321/Site 11:
    (a)     1.73 feet curb encroachment on North corner of subject property.
    (b)     0.16 feet curb encroachment along the West property line.

EXHIBIT "G"

## BILL OF SALE

**THIS BILL OF SALE** (this "Bill of Sale") is effective as of _____, ____, between Esquire Petroleum, LLC, an Illinois limited liability company (hereinafter "Seller"), and South Side Gas, Inc. (hereinafter "Purchaser").

In consideration of the covenants contained in this Bill of Sale and in the Agreement of Purchase and Sale dated _____, 2006, between Seller and Purchaser (the "Purchase Agreement"), and, for other valuable consideration received from Purchaser, Seller does hereby sell, convey, transfer and deliver to Purchaser the property ("Property"), which is listed and located as shown on attached Schedule A.

Seller warrants and covenants with Purchaser that: Seller is the lawful owner of the Property and has the right to sell and transfer the same; the Property is free of liens and encumbrances; and Seller will warrant and defend the title thereto against the claims of all persons whomsoever.

All Property is transferred in "as is" condition without representations or warranties of any kind, expressed or implied, of merchantability, fitness for a particular purpose, condition, design operation, capacity or otherwise.

This Bill of Sale shall be governed by and construed in accordance with the laws of the State of Illinois, without giving effect to its rules on the conflicts of law.

This Bill of Sale shall become effective between Seller and Purchaser on the date first above written.

This Bill of Sale shall bind and inure to the benefit of Seller and Purchaser and their respective successors and assigns.

**IN WITNESS WHEREOF,** Seller and Purchaser have caused this Bill of Sale to be duly executed as of the day and year first written above.

Attest:                                         **ESQUIRE PETROLEUM, LLC**


By: _____                       By: _____
Name: _____                     Name: _____
                                                Title: _____


Attest:                                         **SOUTH SIDE GAS, INC.**


By: _____                       By: _____
Name: _____                     Name: Ahmad Zahdan
                                                Title: _____

45

**SCHEDULE A**
**TO BILL OF SALE**

## DESCRIPTION OF PROPERTY

[To Come]

EXHIBIT "H"

## ASSIGNMENT AND ASSUMPTION OF NON-PETROLEUM LEASE

THIS ASSIGNMENT AND ASSUMPTION OF NON-PETROLEUM LEASES (this "Assignment") is effective as of _____, 2007 between Esquire Petroleum, LLC, an Illinois limited liability company (hereinafter "Assignor") and South Side Gas, Inc. (hereinafter "Assignee").

Whereas, Assignor and Assignee entered into an Agreement of Purchase and Sale dated , as amended (the "Purchase Agreement"); and

Whereas, Assignor has agreed to assign to Assignee and Assignee has agreed to accept assignment of the Lease as hereinafter defined.

Now, therefore, in consideration of the foregoing, the Purchase Agreement and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged by the parties hereto, Assignor does hereby grant, bargain, convey, assign, transfer and deliver to Assignee all of Assignor's right, title, and interest (including any options) in, to, and under the leases described on Schedule A attached to this Assignment (collectively, the "Lease").

Assignee hereby: (a) accepts this Assignment; (b) assumes and agrees to faithfully perform and observe all Assignor's obligations arising out of such Lease after the date of this Assignment in accordance with and subject to all the terms, covenants and conditions of the Lease and all applicable laws; and (c) indemnify and hold Assignor, its affiliates, agents and employees harmless from and against each and every loss, cost, claim, obligation, damage, liability, payment, fine, penalty cause of action, judgment (including court costs, expert witness fees and attorneys' fees awarded to any franchisees as part of a judgment), lien or expense, including, but not limited to, reasonable attorneys' fees and other litigation expenses that arise under, or are incurred on account of any breach or claim of breach of lessee's obligations under said Lease arising from acts or omissions occurring subsequent to the effective date of this Assignment.

Assignee hereby further agrees that in the event that after the date hereof, Assignee further assigns its interest in the Lease, Assignor shall have access to such property at no expense to Assignor for the purpose of carrying out Assignor's obligations under the Purchase Agreement.

This Assignment shall be governed by and construed in accordance with the laws of the State of Illinois, without giving effect to its rules on the conflicts of law.

This Assignment shall become effective between Assignor and Assignee on the date first above written.

This Assignment shall bind and inure to the benefit of, Assignor and Assignee and their respective successors and assigns. Assignee is executing this Assignment to acknowledge its consent to such assignment.

**IN WITNESS WHEREOF,** Assignor, and Assignee have caused this Assignment to be duly executed as of the day and year first written above.

ESQUIRE PETROLEUM, LLC

Witness/Attest:

_____

By: _____
Name: _____
Title: _____


SOUTH SIDE GAS, INC.

Witness/Attest:

_____

By: _____
Name:  Ahmad Zahdan

Title: _____

48

## SCHEDULE A

## NON-PETROLEUM LEASE(S)

[To Come]

EXHIBIT "I"

SUPPLY AGREEMENT

EXHIBIT "J"

## OPTION TO REPURCHASE PROPERTY

If ExxonMobil Oil Corporation ("Exxon") or Esquire Petroleum, LLC (Esquire) wishes to exercise the Repurchase Option, it shall do so by giving written notice to Purchaser ("Exercise Notice") within sixty (60) days after Exxon and/or Esquire receives the Option Notice.

If the Repurchase Option is exercised, the purchase price of the Property (the "Repurchase Price") shall be determined and paid in the following manner:

1.    Exxon shall obtain promptly an appraisal of the Property by an M.A.I. appraiser to establish current fair market value of the Property. Purchaser shall have the right to obtain a separate M.A.I. appraisal of each Property.

2.    Within fifteen (15) days after receipt of the Exercise Notice, Purchaser shall notify Exxon that (a) Purchaser will transfer and convey the Property to at the price established by Exxon's appraisal, which appraisal shall be included with the Exercise Notice, or (b) it will obtain a separate M.A.I. appraisal of the Property. In the latter event, Purchaser shall provide its M.A.I. appraisal to Exxon within thirty (30) days after receipt of the Exercise Notice. If Purchaser fails to notify Exxon within such fifteen (15) days of its intention to obtain an appraisal, or if Purchaser fails to obtain such appraisal within such thirty (30) day period, Exxon's appraisal shall be the basis for determining the Repurchase Price of the Property.

3.    Each M.A.I. appraisal referred to in paragraph 2 above shall set forth a dollar amount representing the fair market value of the Property. The Repurchase Price of the Property shall be the greater of:  (a) the fair market value of the Property set forth in Exxon's appraisal if Purchaser does not elect to obtain a separate appraisal or (b) the average of the fair market values in Exxon's appraisal and Purchaser's appraisal, if Purchaser elects to obtain a separate appraisal.

4.    The appraisals shall value the equipment, fixtures, and the underground storage tanks and lines on each Property.

If the Repurchase Option is exercised with respect to the Property, the Repurchase Price shall be paid by wire transfer of immediately available funds at closing ("Repurchase Date").

The Repurchase Date shall be no later than ninety (90) days after the Exercise Notice, unless extended to a later date by mutual agreement of the Parties. On the Repurchase Date, Purchaser shall convey the Property/Properties to Exxon by limited warranty deed, transferring and conveying marketable title to Purchaser's interests the Property, free and clear of all liens and encumbrances, provided that in no event shall a lender be obligated to discharge its mortgage on such Property unless the entire Repurchase Price is paid to the lender for application to the debt. In the event such entire Repurchase Price is paid to a lender for application of the debt, the lender shall discharge its mortgage on such Property upon Exxon's request. On the Repurchase

Date, Purchaser shall assign to Exxon the Franchise Agreements and any Amortization Agreements applicable to the Property repurchased by Exxon.

The actions, procedures, and covenants set forth in Articles IV and V of the Agreement concerning surveys, title insurance commitments, title policies, and closing documents shall apply to Exxon's repurchase of the Property as if set forth in this Exhibit "J" except that Purchaser will provide and pay for all title insurance and tank tests.

607-0105

# EXHIBIT 6

## ESQUIRE PETROLEUM, LLC
## PMPA SUPPLY AGREEMENT

This PMPA Supply Agreement (the "Contract") made and entered into between Esquire Petroleum, LLC ("Seller" or "Supplier"), with a business address of One Magnificent Mile, 980 North Michigan, Suite 1400, Chicago, IL 60606, and South Side Gas, Inc.("Purchaser" or "Franchisee"), with a business address of 4000 Southwest Highway, Hometown, Illinois.

### WITNESSETH:

In consideration of the mutual promises herein contained, Seller shall sell and deliver to Purchaser at the premises located at 4000 Southwest Highway, Hometown, Illinois, (the "Premises"), and Purchaser shall purchase, receive and pay for, branded product(s) under the "Exxon" or "Mobil" trademarks, service marks, trade names, brand names, trade dress, logos, color patterns, color schemes, design schemes, insignia, image standards or other brand identifications of Seller's supplier of such branded products (the "Proprietary Marks"), and other products, of the kind and in the quantities and under the terms and conditions specifically set forth in Commodity Schedule(s) annexed hereto and made a part hereof. Seller's supplier of such branded products under the Proprietary Marks is Esquire Petroleum, LLC, and such supplier and its successor(s) are referred to hereinafter as the "Supplier".

1.  Duration.    (a) This Contract shall be for a term of fifteen (15) years from the date Purchaser takes possession of the Premises, or from the date Purchaser acquires an ownership interest the premises, whichever period is longer (the "Term"). The Contract shall become effective on the date of execution; and (b) Seller shall have the right but not the obligation to grant temporary extensions of this Contract of up to 180 days per extension. Any such extension shall not be considered a renewal of this Contract. Purchaser's rights pursuant to this Contract shall terminate on the date that it no longer has a possessory right to the Premises.

2.  Products. The Commodity Schedule attached hereto as Exhibit A forms a part of this Contract, and is incorporated by reference herein. By mutual agreement, this Contract may be amended from time to time by adding other or additional schedules, substituting revised schedules or by deleting one or more items or provisions from any Commodity Schedule(s) listed hereinabove. Additional and revised schedules shall be so marked and initialed by an authorized representative of Seller and by Purchaser and shall be affixed to and become a part of this Contract from and after the date appearing on such additional or revised schedule(s). Under no circumstances, during the term of this contract and any extensions hereof, without Seller's express written approval, shall Purchaser purchase any fuel from any other vendor for sale at the Premises.

3.  Quantity. Seller shall sell to Purchaser and Purchaser shall purchase from Seller all of the product(s) covered by this Contract in the quantities shown on the applicable Commodity Schedule(s). Seller has the right, but not the obligation, to monitor fuel inventory electronically, and/or to deliver the product on a "keep full" basis. However, during any period of this Contract for which the amount of any such product(s) that Seller is required to deliver to Purchaser is prescribed by government rules, regulations or orders, or becomes subject to an allocation by Supplier, the quantity of such product(s) covered by this Contract shall be the quantity so prescribed or allocated instead of the quantity shown on the applicable Commodity Schedule(s). For purposes of the Commodity Schedule(s), the "contract quantity" for any period shall be the quantity of product(s) which Seller is obligated to sell and Purchaser is obligated to buy under this Contract during that period whether prescribed by the attached Commodity Schedule(s) or by government rules, regulations or orders. In addition, if Supplier reduces its allocation of products to Seller, then the quantity of products that Seller is obligated to deliver and sell to Purchaser under the applicable Commodity Schedule(s) shall be reduced in the same proportion as Supplier's reduction of its allocation to Seller for the same product and grade. It is specifically agreed and understood that any purchase or sale in excess of the volumes

1

described above shall not in any way be considered to modify this Contract as regards quantities to be delivered.

4. Price/Method of Payment. (a) The price of the product(s) covered by this Contract shall be as stated in the applicable Commodity Schedule(s). Purchaser shall pay cash (or at Seller's option, certified or cashier's check, money order, wire transfer prior to delivery, Electronic Funds Transfer ("EFT"), Automated Direct Debit System, or other means approved by Seller) for all goods delivered to Purchaser by Seller under the terms of this Contract except deliveries for which credit has been previously arranged in writing with Seller. Payment shall be made at the time of delivery. Purchases made and not paid for on delivery shall be payable at Seller's principal office unless otherwise specified by Seller.

(b) Where Seller requires payment via EFT, Purchaser will establish a commercial account with a financial institution that provides EFT services and will authorize Seller to initiate transfers of funds between Purchaser's account and Seller's accounts for payment of all amounts due to Seller under this Contract for the entire Term, including renewal periods. Purchaser shall not use, or permit to be used, said commercial account for personal, family, or household purposes. Purchaser will provide Seller with all information and authorization necessary to debit and credit Purchaser's account. Purchaser shall maintain at all times funds in its account sufficient to make payments to Seller at the time of the EFT transaction. Should any EFT transaction be rejected by Purchaser's financial institution for Purchaser's failure to maintain sufficient funds in Purchaser's account, in addition to any rights Seller may have under this Contract or the law, Seller may collect a service charge for each occurrence of such rejection by the financial institution, whether or not payment is subsequently paid by Purchaser. Seller may, at its sole discretion, require that subsequent payments be made by means of cash, certified or cashier's check, money order, or other means satisfactory to Seller. Purchaser shall indemnify, defend and hold Seller harmless for any losses, costs, or damages arising out of any breach or violation of this subparagraph 4(b).

(c) If at any time the financial responsibility of Purchaser shall become impaired or unsatisfactory to Seller, or should Purchaser be in arrears in his accounts with Seller, Seller may require, as a condition of making further deliveries under this Contract, payment by Purchaser of all past due accounts and cash payment for all future deliveries.

(d) Any situation where Purchaser's Facility is either "New to Industry," "raise and rebuild," and/or converting to ExxonMobil brand may, on a case by case basis, make Purchaser eligible for portions of available rebates, which will be handled by agreement by separate addendum to this Contract. Any special allowances, special programs, "TVA", or "TCA", which may be credited to Seller by Supplier with respect to the specific facility operated by Purchaser will be handled on a case by case basis at Seller's discretion.

5. Relationship of the Parties. (a) By this Agreement, Seller and Purchaser establish a "Franchise" and "Franchise Relationship" as defined by the Petroleum Marketing Practices Act, 15 U.S.C. §2801, *et seq.* (the "PMPA"). Purchaser acknowledges that its franchise relationship is exclusively with Seller. Nothing in this Contract may be construed as creating a direct franchise relationship between Purchaser and Supplier.

(b) Purchaser is an independent business with the exclusive right to direct and control the business operation at the Premises, including the establishment of the prices at which products and merchandise are sold. Seller reserves no control over the business at the Premises, except as set forth herein. Purchaser has no authority to employ anyone as an employee or agent of Seller for any purpose.

(c) Purchaser shall represent itself to the public as an independent and local business entity operating at the Premises under a franchise from Seller and/or ExxonMobil. Purchaser shall take necessary action to effect this representation, including placing a notice of Purchaser's status in a conspicuous place on the Premises and on stationery and written or graphic materials, the content, placement and form of which Supplier shall specify from time to time.

6. Liability and Indemnity. Neither Seller nor Supplier shall be liable to Purchaser or to any other person for any damage to or loss of property, or for injury to or death of persons or for the violation by Purchaser

or any other person of any governmental statute, law, regulation, rule, or ordinance, arising from the operation or activities of Purchaser or any other person pursuant to this Contract. Purchaser shall indemnify, protect, defend, and save Seller and Supplier harmless from and against any and all losses, claims, liabilities, environmental cleanup costs, fines, penalties, suits and actions, judgments and costs, including attorneys' fees and the costs of litigation, which shall arise from or grow out of any injury to or death of persons, or damage to or loss of property, or violation by Purchaser or any other person of any governmental statute, law, regulation, rule, or ordinance, directly or indirectly arising out of, or resulting from, or in any way connected with (i) Purchaser's performance of this Contract, (ii) operation of Purchaser, or activities of any other person, at the Premises, or (iii) the condition of the Premises or of the adjoining streets, sidewalks or ways, irrespective of whether such injury, death, damage or loss is sustained by Purchaser or any other person, firm or corporation which may seek to hold Seller or Supplier liable. The existence or non-existence of any insurance that may be required under this Contract will not limit Purchaser's indemnity or other obligations under this Contract. This indemnity shall survive the termination or nonrenewal of this Contract.

7. Credit/Security Interest/Mortgage.
    (a) While nothing herein shall be construed as obligating Seller to extend any credit to Purchaser, in the event Seller in its sole determination does elect to extend credit to Purchaser, such extension of credit shall only be made in writing. If credit is so extended it shall be extended on the following terms and conditions:
    (1) In the event payment is not made on or before the due date, a late payment charge in an amount established by Seller from time to time, not to exceed the maximum allowed by law, may be imposed for each month (and any part thereof) which elapses from due date to the date payment is received by Seller. Seller's right to collect a late payment charge does not operate as a waiver against Seller's right of termination of this Contract or of any other right that Seller may have at law or in equity for Purchaser's failure to pay sums owed when due.
    (2) Seller will furnish to Purchaser statements of Purchaser's account upon Purchaser's request, but in no event more frequently than on a monthly basis. Payment of any such bills shall not prejudice the right of Purchaser to question the correctness thereof; provided, however, all bills and statements rendered to Purchaser by Seller during any month shall conclusively be presumed to be true and correct after thirty (30) days following the end of any such month, unless within said thirty (30) day period Purchaser delivers to Seller's accounting office issuing said statement written exception thereto setting forth. the item or items questioned and the basis therefor. Time is of the essence in complying with this provision.
    (3) In the event there are additional business transactions between Purchaser and Seller, including without limitation those relating to credit sales of products other than those identified herein, promissory notes, or real estate, unless it is clearly indicated in writing by Purchaser as to how payments received by Seller from Purchaser are to be applied, then such payments shall be applied by Seller in the following order or priority: (i) trade accounts, (ii) promissory notes, (iii) rentals or other amounts due under any other agreement or transactions.
    (4) Seller reserves the right to withdraw such credit immediately at any time on giving to Purchaser notice thereof. In the event credit is withdrawn, all amounts then due and owing shall become payable, and all future sales by Seller to Purchaser shall be for cash (or at Seller's option certified or cashier's check, money order or other means approved by Seller).
    (5) Seller shall have the right but not the obligation to offset any indebtedness owed by Seller to Purchaser against any indebtedness owed by Purchaser to Seller, whether arising from the sale of goods or product(s) under this Contract, or from any other business transaction described in paragraph 7(c) above.
    (b) In order to secure payment of all Purchaser's present and future indebtedness owed by Purchaser to Seller at any time during the Term of this Contract, including renewal periods, or upon its termination or expiration, Purchaser hereby grants to Seller a security interest and/or a purchase money security interest in (i) all of Purchaser's inventory of petroleum products and tires, batteries and accessories ("TBA") purchased

from Seller, regardless of when purchased, (ii) all accounts receivable owing to Purchaser regardless of when or how incurred, (iii) all of Purchaser's equipment and trade fixtures, and (iv) all proceeds of Purchaser's inventory, accounts receivable and equipment and trade fixtures. Purchaser shall sign all financing statements and renewals as necessary to provide public record of this security interest. In the event of insolvency of Purchaser, assignment for benefit of creditors, the institution of bankruptcy, insolvency, reorganization, receivership, debt adjustment, or liquidation proceedings, by or against Purchaser, or failure of Purchaser to perform any of the obligations of payment in accordance with the terms of payment established by Seller from time to time, Seller shall have the option without notice or demand upon Purchaser to declare an event of default under the Uniform Commercial Code, and upon any such default, Seller may declare all of Purchaser's indebtedness to Seller immediately due and payable. Thereafter Seller may proceed to enforce payment and may exercise any and all rights available to it. **Seller reserves the right to require from Purchaser from time to time a security deposit, personal guaranty and/or other forms of security acceptable to Seller to secure Purchaser's obligations under this Contract or any other contract or agreement between Seller and Purchaser.**

(c)  In addition to the security interest provided for in the preceding paragraph, Purchaser shall execute a mortgage in the form attached hereto to further secure Purchaser's performance of each and every obligation and covenant hereunder, which shall be subordinate only to Purchaser's first mortgage lender's mortgage.

(d)  Purchaser agrees to provide to Seller an irrevocable letter of credit (the "LOC") from a lending institution acceptable to Seller in Seller's reasonable discretion in the amount of $15,000 to further support Purchaser's obligations under this Contract. Such LOC shall: (1) permit partial draws, (2) contain a so-called "evergreen" provision whereby such LOC will automatically renew on an annual basis unless the issuer delivers sixty (60) days' prior written notice of cancellation to Seller and Purchaser, and (3) have an initial expiry date not sooner than one year following the date of this Contract. At least thirty (30) days prior to the expiry date (both the initial expiry date and each subsequent expiry date), Purchaser shall deliver a renewal or replacement LOC. Such LOC shall be payable to Seller on sight in partial or full draws and shall be assignable by Seller to a beneficiary other than Seller at Seller's request without cost therefor to Seller. Any and all fees or cost charged by the issuer in connection with the LOC shall be paid by Purchaser.

8. <u>Credit Cards</u>.

(a) As long as Seller elects to accept specified credit cards, credit identifications, fleet cards, debit cards, pre-paid cards or other similar transaction authorization cards (collectively "Transaction Cards"), Purchaser shall accept and honor all Transaction Cards identified in Supplier's Transaction Card guide and other similar manuals and guidelines, whether in written or electronic form (such guide, manuals, and other guidelines referred to as the "Card Guide") for the purchase of authorized products and services. Purchaser shall account for and process all such transactions in strict compliance with the terms set forth in the Card Guide. Purchaser shall pay any Transaction Card processing fee that may be assessed for providing such services.

(b) Seller shall accept from Purchaser all transactions generated as a result of purchases made with authorized Transaction Cards and shall process such purchases in accordance with the terms in the Card Guide.  At Seller's option, Seller shall pay the amount of the transactions to Purchaser, after deducting any processing fee in effect under Supplier's then current Card Guide, by: (i) check to Purchaser; (ii) a credit to Purchaser's bank account by EFT; or (iii) setting off the amount against Purchaser's account with Seller. Purchaser hereby grants Seller a security interest in Purchaser's rights to credit card payments to the full extent of the amounts owed by Purchaser to Seller at any and all times.

(c) For each transaction not authorized, disputed by a customer, or otherwise subject to charge back under the Card Guide, Seller may either charge the amount to Purchaser's account or require Purchaser to make immediate refund to Seller, including refund by draft or EFT initiated by Seller, without any deduction for any processing fee.

(d) Purchaser acknowledges receipt of a copy of the Card Guide and shall comply fully with the operating rules, terms and conditions thereof. Without limiting any rights or remedies available to Seller, if Purchaser fails to comply with this paragraph or the Card Guide, Seller may limit or terminate Purchaser's right to participate in Supplier's Transaction Card program. Further, Supplier or Seller may alter, modify, amend, or terminate the Transaction Card program at any time upon notice to Purchaser.

(e) Seller and Supplier shall have the right to charge back sales transaction amounts. Manual credit card transactions must be submitted within five (5) business days. Purchaser shall maintain a record of each sales transaction (including the actual draft generated by the sale) for a period of no less than six (6) months from the date of the transaction. Any credit card transactions that are charged back because of failure to comply with the then-current instructions and policies in the Card Guide or because of customer dispute will be the responsibility of the Purchaser. Purchaser shall be responsible for imprinters lent to it. In the event an imprinter is lost, stolen or damaged beyond repair, Purchaser shall reimburse Seller in full for the cost thereof.

(f) Purchaser and Seller agree that all Transaction Card sales at the Premises shall be made pursuant to Supplier's point of sale ("POS") system for processing Transaction Cards. Purchaser shall lease the POS machine and other associated equipment from Seller during the initial Term and any renewal of this Contract and comply with Supplier's POS policies and guidelines, as amended from time to time. Purchaser shall pay to Seller rent and other fees associated with the operation of the POS. Said rent and fees shall be the same as those charged to Seller by Supplier. Payment shall be due and payable at the time and place designated by Seller from time to time. Seller reserves the right to increase the rental and/or fee amount charged for the POS machine if Supplier increases the amount charged to Seller for use of the machine. Purchaser understands that Supplier's software or firmware may be installed in the POS machine for use at the Premises and that such software or firmware are proprietary products of Supplier. In such event, Purchaser understands and agrees that it has no right, title, or ownership interest in such software or firmware and agrees that it will not attempt to reverse engineer, decompile, disassemble or otherwise attempt to derive the source code of such software or firmware.

9. <u>Delivery</u>. Delivery of the product(s) covered by this Contract and passage of title and risk of loss shall occur when any product reaches the premises.

10. <u>Taxes</u>. It is agreed that any duty, tax, fee or other charge which Seller may be required to collect or pay under any municipal, state, federal or other laws now in effect or hereafter enacted with respect to the production, manufacture, inspection, transportation, storage, sale, delivery or use of the product(s) covered by this Contract shall be added to the prices to be paid by Purchaser for product(s) purchased hereunder.

11. <u>Failure To Perform</u>.

(a) Any delays in or failure of performance of either party hereto shall not constitute default hereunder or give rise to any claims for damages if and to the extent that such delay or failure is caused by occurrences including, but not limited to, acts of God or the public enemy; expropriation or confiscation of facilities; compliance with any order or request of any governmental authority; acts of war, rebellion or sabotage or damage resulting therefrom; embargoes or other import or export restrictions; fires, floods, explosions, accidents, or breakdowns; riots; strikes or other concerted acts of workers, whether direct or indirect; or any other causes whether or not of the same class or kind as those specifically above named which are not within the control of the party affected and which, by the exercise of reasonable diligence, said party is unable to prevent or provide against. A party whose performance is affected by any of the causes set forth in the preceding sentence shall give prompt written notice thereof to the other party.

(b) Seller shall be under no obligation to make deliveries hereunder at any time when in Seller's sole judgment it has reason to believe that Purchaser lacks capacity to pay for such product.

(c) Seller shall not be required to make up deliveries omitted on account of any of the causes set forth in this paragraph.

(d) Nothing in this paragraph shall excuse Purchaser from making payment when due for deliveries made under the Contract.

12. <u>Determination of Quantity and Quality</u>. The quantity and quality of product(s) sold hereunder shall be for all purposes conclusively deemed to be the quantity and quality set forth in Seller's document of delivery unless, within twenty-four (24) hours of the time of delivery, Purchaser delivers to Seller written notice of any claimed shortage in quantity or claimed deviation in quality, or where discovery of any such shortage or deviation could not reasonably have been discovered by careful inspection at the time of delivery, within three (3) days after discovery. Time is of the essence in complying with this provision.

13. <u>Trademarks</u>.
(a) Subject to the approval of Seller and Supplier, Seller grants to Purchaser the non-exclusive right to use Supplier's Proprietary Marks at the Premises in connection with the advertising, marketing, and resale of the petroleum products purchased from Seller under this Contract. Purchaser agrees that petroleum products of others will not be sold by Purchaser under the Proprietary Marks. Purchaser understands and agrees that Supplier retains the right, subject to requirements of law, to withdraw the right to use such Proprietary Marks from Purchaser at any time, notwithstanding any request or demand by Seller to the contrary. Purchaser understands, acknowledges, and agrees that Supplier may promulgate from time to time standards, policies, guidelines, procedures, programs, requirements, specifications, standards, strategies, and instructions ("Image and Operations Guidelines") regarding image, appearance, station operations, promotions, advertising, the size and location of signs, the wearing of uniforms, and other matters related to the sale of motor fuels under the Proprietary Marks. Purchaser agrees that such Image and Operations Guidelines may be promulgated by any means, including without limitation Seller's and/or Supplier's marketing website, email or other electronic means. Irrespective of the means in which such Image and Operations Guidelines are promulgated, Purchaser shall comply fully with the Image and Operations Guidelines as they exist from time to time and cause its employees to do the same. Failure on the part of Purchaser or Purchaser's employees to comply fully with the requirements set forth in the Image and Operations Guidelines shall be grounds for termination of this Contract.
(b) It is further expressly understood and agreed that Seller shall have the right to substitute the trademarks, service marks, trade names, brand names, trade dress, logos, color patterns, color schemes, design schemes, insignia, image standards and/or other brand identifications owned or controlled by a supplier other than Supplier for the Proprietary Marks. In the event of such substitution, all references to the Supplier in this Contract shall be deemed to refer to the substituted supplier and all references to the Proprietary Marks herein shall be deemed to refer to the trademarks, service marks, trade names, brand names, trade dress, logos, color patterns, color schemes, design schemes, insignia, image standards and/or other brand identifications of said substituted supplier.
(c) Upon termination or expiration of this Contract or prior thereto upon demand by Seller or Supplier, Purchaser shall discontinue the posting, mounting, display or other use of said Proprietary Marks except only to the extent they appear as labels or identification of products manufactured or sold by Seller and are still in the containers or packages designed or furnished by Seller. In the event that Purchaser fails to do so to the satisfaction of Seller or Supplier, subject to applicable law, Seller and Supplier (i) shall have the right to cause any and all signage, placards, and other displays bearing the Proprietary Marks to be removed from the Premises; and (ii) shall have the right to use any means necessary to remove, cover or obliterate the Proprietary Marks, including entry to the Premises, to do so. In the event the Seller or Supplier take any such action hereunder, Purchaser shall bear all costs and expenses thereof, including without limitation the costs of removing, obliterating, or covering the Proprietary Marks, attorney fees, and other legal costs and expenses. Purchaser shall provide, upon Seller's request, a list of all signage bearing the Proprietary Marks at the Premises. Under no circumstances will Purchaser display signage bearing the Proprietary Marks at the Premises without the prior written approval of Seller.
(d) Purchaser acknowledges and understands that it is not Supplier's licensee of the Proprietary Marks. Purchaser shall not shall not mix, commingle, blend, adulterate, or otherwise change the composition

of any of the product(s) purchased hereunder and resold by Purchaser under said Proprietary Marks with other products or substances in any manner.

(e) Seller and Supplier are hereby given the right to enter the station Premises and to examine at any time, and from time to time, the contents of Purchaser's tanks or containers in which said product(s) purchased hereunder are stored and to take samples therefrom and, if in the opinion of Seller or Supplier, any samples thus taken are not said product(s) and in the condition in which delivered by Seller to Purchaser then Seller may at its option cancel and terminate this Contract.

(f) If there shall be posted, mounted, or otherwise displayed on or in connection with the Premises any Proprietary Marks or any other sign, poster, placard, plate, device or form of advertising matter whether or not received from Seller, consisting in whole or in part of the name of Supplier or Seller owned or used by Supplier or Seller in its business, Purchaser agrees at all times to display same in compliance with the standards, guidelines and instructions of Supplier and Seller and to discontinue the posting, mounting or display of same immediately upon Purchaser's ceasing to sell motor fuels (or other products of Supplier) under the Proprietary Marks or, in any event, upon demand by Seller or Supplier. Purchaser shall take no action, or otherwise do anything or fail to do anything, that will diminish, reduce, injure, dilute, or otherwise damage the value of the Proprietary Marks or other trademarks or identifications of Supplier.

(g) While using the Proprietary Marks, Purchaser shall: (i) operate the Premises responsibly, with due care, prudence, good judgment, and skill; (ii)  not engage in dishonest, fraudulent, or scare-selling practices; (iii)  promote diligently the sale of motor fuel from the Premises; (iv)  perform all services in a good, workmanlike manner; (v)  keep the Premises, the driveways, parking spaces, and sidewalks neat, clean and in good repair; (vi) keep the yards, lawns, shrubs and other plantings neat and clean and free from weeds, debris, snow, ice, and rubbish; (vii) comply with all laws, ordinances, rules and regulations of constituted public authority governing the use and occupancy of the Premises and the conduct of Purchaser's business at the Premises; (viii) ensure that no material in any form of a pornographic or sexually explicit nature are displayed, used, stored, offered, rented or sold at the Premises; and (ix) prohibit the consumption of alcoholic beverages and the sale and use of illegal drugs or drug paraphernalia at the Premises.

(h) Purchaser understands that Supplier may require retail service station dealers operating under the Proprietary Marks and their employees to attend and complete Supplier conducted or sponsored training programs from time to time. Purchaser shall attend and complete such training, or where Purchaser is not an individual, cause its employees to attend and complete such training as may be required by Supplier. Seller shall be under no obligation to bear any costs or expenses associated with the attendance of Purchaser or Purchaser's employees at such training.

(i) Purchaser shall participate in Supplier's image evaluation program, or any other similar program, conducted or sponsored by Supplier. Purchaser shall promptly take corrective action as required by Supplier to bring the Premises into compliance with the Image and Operations Guidelines. Purchaser understands and agrees that Purchaser's failure to comply with any such program shall be a material breach of this Contract.

(j) Purchaser understands and acknowledges that Seller may install, or has installed, certain signage at the Premises for the purpose of displaying the Proprietary Marks. Unless the parties hereto have agreed otherwise, Purchaser agrees that said signage shall remain the property of Seller and that said signage may not be removed, transferred, sold, or otherwise disposed of without the prior written consent of Seller.

(k) While using the Proprietary Marks at the Premises, Purchaser shall conduct only such businesses or activities at the Premises that are approved in writing by Seller. Except as otherwise permitted, Purchaser shall not use the Proprietary Marks or Supplier's name as part of Purchaser's corporate name or other name.

(l)  At no time may Purchaser use any trademarks, trade dress, logo types, or names confusingly similar to the Proprietary Marks.

14. Inspection of Records; Audit.  Purchaser acknowledges and agrees that Seller and Supplier have a right to inspect Purchaser's operation of the businesses conducted at the Premises, and in particular have a right to verify that Purchaser is complying with (a) all its contractual obligations contained in this Contract, including but not limited to Purchaser's use of the Proprietary Marks, and (b) all federal, state and local laws and regulations pertaining to the environmental protection and trademark use. In order that they may exercise the

aforementioned rights, Seller and Supplier shall have the right, and Purchaser shall permit Seller and Supplier, to enter the Premises unimpeded to review and audit all station records including, but not limited to, all records of deliveries, sales and inventory reconciliation, to take samples of motor fuels stored at the Premises, and to inspect equipment. Seller shall also have the right to electronically monitor inventory levels.

15. <u>Customer Service and Complaints</u>. While using Proprietary Marks, Purchaser agrees: (a) to render appropriate, prompt, efficient, courteous service at the Premises to Purchaser's customers for such product(s) and to respond expeditiously to all complaints of such customers, making fair adjustment when appropriate, (b) to conduct Purchaser's business in a fair and ethical manner and maintain the Premises' facilities, all in a manner which will foster customer acceptance of and desire for the product(s) sold by Seller to Purchaser; (c) to provide sufficiently qualified and neatly dressed attendants, uniformed as appropriate, to render first-class service to customers; (d) to maintain the restrooms in a clean, orderly, sanitary, and well lighted condition and adequately provided with necessary supplies; (e) not to employ or permit any illegal, unethical, coercive, deceptive or unfair practices in the operation of the Premises; and (f) not to store or sell illegal or prescription drugs or permit the same to be used or consumed at the Premises; (g) not to display, use, store, offer for sale, or rent any item of a pornographic nature at the Premises (such items shall include, without limitation, pornographic, sexually explicit, or so-called "adult": magazines, videotapes, compact disks, digital video disks, or other like items); (h) to prohibit the sale or storage of intoxicating beverages at the Premises unless otherwise permitted by Seller, in which event, Purchaser shall keep a valid beer and wine license for the sale thereof at the Premises; (i) to offer three (3) grades of gasoline products branded under the Proprietary Marks for sale to the public; (j) to assist in maintaining a high level of customer acceptance of the Proprietary Marks by keeping the Premises open for dispensing of product(s) associated with such Proprietary Marks for such hours each day and days each week as follows, unless prohibited by state law, in which event the Premises shall be kept open for at least 120 hours each week

These are the minimum hours of operation and they do not preclude the Purchaser from opening the facility at other times.

16. <u>Quality, Specification or Name of Product</u>. Seller shall have the right at its sole discretion at any time during the life of this Contract to (a) change or alter the quality, grade, or specifications of any product(s) covered by this Contract or (b) discontinue the availability of any such product(s) if such change or discontinuation is effected by Supplier. Any such change or discontinuation shall not affect the minimum purchase requirements set forth in the Commodity Schedule(s) attached hereto. Seller shall give Purchaser written notice of discontinuance of the manufacture of any product(s) covered by this Contract. The Contract shall terminate as to such product(s) when such notice is effective.

17. <u>Assignment/Sale/Abandonment</u>. (a) Purchaser's interest in this Contract shall not be transferred or assigned by Purchaser in whole or in part, directly or indirectly, without the prior written consent of Seller. As a condition for Seller's consent to the transfer or assignment of Purchaser's interests under this Contract, Seller shall have the right, to the extent permissible by law, to require the proposed transferee or assignee to execute a mutual termination agreement terminating this Contract and enter into a trial franchise motor fuel supply agreement, as the term "trial franchise" is defined in the PMPA. Nothing contained in the foregoing sentence shall limit Seller's right to impose other conditions or requirements for its consent under this paragraph.

(b) If Seller consent to a transfer or assignment of the Contract by Purchaser, Purchaser shall sign and deliver to Seller a general release in form and substance satisfactory to Seller, of any and all claims against Seller and its affiliates and their respective officers, directors, shareholders, employees, and agents, in their corporate and individual capacities.

(c) In the event of any proposed sale of Purchaser's assets during the Term of this Contract, Seller shall have a right of first refusal to purchase any and all of Purchaser's assets at the same price and on the same terms as those proposed.

8

(d) If, during the Term of this Contract, Purchaser ceases operation of a retail gasoline service station at the Premises for any period of time in excess of five (5) days, Seller shall have the right to declare that Purchaser has abandoned the Premises. In such event, Seller shall have the right to foreclose its mortgage and security interests, in addition to any and all other remedies at law or in equity.

(e) Seller may assign this Contract in whole or in part upon five (5) days' prior written notice to Purchaser.

18. Waiver. No waiver by either party of any breach of any of the covenants or conditions herein contained to be performed by the other party shall be construed as a waiver of any succeeding breach of the same or any other covenant or condition.

19. Environmental Compliance

(a) Purchaser shall become informed about and comply with all local, state and federal laws, statutes, regulations and ordinances related to environmental protection or compliance relevant to Purchaser's operations at the Premises, whether currently in effect or which may come into effect in the future.

(b) Purchaser shall comply with all applicable local, state and federal underground storage tank ("UST") compliance requirements, whether currently in effect or which may come into effect in the future, including, but not limited to: (i) required inspections of any release detection equipment for USTs and product lines; (ii) required inspections of any automatic tank gauging equipment; and (iii) maintenance and required inspections of any vapor recovery equipment. Purchaser shall maintain written records of all maintenance and inspections of UST equipment. Purchaser will maintain such records at the Premises for at least twelve (12) months, or longer, if required by law.

(c) Purchaser shall make accurate daily physical measurement of all products stored in USTs and perform accurate daily and monthly reconciliation of such measurements with metered sales and product deliveries in accordance with Seller, state, local and federal requirements. Purchaser shall develop and maintain accurate written records of the daily physical product measurements and daily and monthly reconciliation. Purchaser will maintain such records at the Premises for at least twelve (12) months, or longer if required by law. Purchaser shall immediately notify Seller and any appropriate local, state or federal governmental agency after discovery of any inventory loss or other condition which may be the result of a leaking UST or other equipment failure. Seller shall immediately investigate and undertake all appropriate initial abatement and other emergency measures to contain, treat, mitigate and/or remediate a discharge, spill, or release of motor fuels or other petroleum products at the Premises. Purchaser shall cooperate at all times with Seller during any such investigation or remedial activity.

(d) Purchaser shall become informed about and comply with all applicable local, state and federal requirements related to the generation, handling, transportation, treatment, storage and/or disposal of solid or hazardous wastes. Purchaser also shall implement appropriate recycling, waste management and waste minimization practices and procedures as necessary to remain in compliance with all applicable local, state and federal environmental protection and compliance requirements.

(e) Purchaser agrees that representatives of Seller and /or Supplier shall be permitted to enter upon the Premises from time to time to perform physical measurements and reconciliation of product stored in USTs and to inspect and/or test any equipment and records used for complying with any local, state, or federal environmental protection or environmental compliance requirements, including, but not limited to, Purchaser's reconciliation and inspection records. However, Seller is not obligated to make any such inspections or tests.

(f) Purchaser shall, if requested by Seller, cooperate in all current and future environmental protection programs established by Seller and/or Supplier.

(g) Purchaser shall properly maintain all USTs, hoses, connections, and associated equipment at the Premises. Seller may, without liability to Purchaser, refuse to make delivery of products covered under this Contract if Seller believes any UST, hose, connection, or associated equipment is not safely maintained or in compliance with applicable safety standards.

9

(h) Purchaser shall indemnify, defend, protect and hold Seller, its employees, officers, directors, shareholders, agents and affiliates harmless from and against any and all liabilities, losses, obligations, claims, damages (consequential or otherwise), penalties, suits, actions, judgments, costs and expenses (including attorneys' fees) of whatever nature for personal injury (including death) of persons (including, without limitation, agents and employees of Seller or Purchaser) or property damage (including, without limitation, damage to the property of Seller or Purchaser), which may be imposed on, incurred by or asserted against Seller directly or indirectly, (i) caused in whole or in part by Purchaser's failure to comply with the terms of this paragraph 20 or with any local, state or federal law, statute, regulation or ordinance, whether currently in effect or which may come into effect, related to environmental protection or environmental compliance or (ii) for any releases or discharges of petroleum products into the environment caused, in whole or in part, by the acts or omissions of Purchaser, its employees, agents, contractors, customers, licensees, or invitees. This indemnity in no way limits and is intended to be within the scope of the general indemnity set forth in paragraph 6 hereof. The terms and provisions of this paragraph 20 shall survive the expiration or termination of this Contract.

20. <u>Notices</u>. All written notices required or permitted to be given by this Contract shall be deemed to be duly given if delivered personally or sent by certified or overnight mail to Seller or to Purchaser, as the case may be, at the address set forth above or to such other address as may be furnished by either party to the other in writing in accordance with the provisions of this paragraph. The date of mailing shall be deemed the date of giving such notice, except for notice of change of address, which must be received to be effective.

21. <u>Termination</u>.
(a) This Contract shall terminate upon expiration of the Term of this Contract.
(b) This Contract may be terminated by Seller: (i) if Purchaser makes any material false or misleading statement or representation which induces Seller to enter into this Contract, or which is relevant to the relationship between the parties hereto; (ii) if Purchaser becomes insolvent or commits an act of bankruptcy or takes advantage of any law for the benefit of debtors or Purchaser's creditors, or if a receiver is appointed for Purchaser; (iii) if possession of the business location(s) of the Purchaser is interrupted by act of any government or agency thereof; (iv) if Purchaser fails to pay in a timely manner any sums when due hereunder; (v) if Purchaser defaults in any of its obligations under this Contract; (vi) if Purchaser is declared incompetent to manage his property or affairs by any court, or if Purchaser is mentally or physically disabled for three (3) months or more to the extent that Purchaser is unable to provide for the continued proper operation of the business of the Purchaser; (vii) under the circumstances described as causes for termination by Seller elsewhere in this Contract; (viii) if Purchaser dies; (ix) if Purchaser engages in fraud or criminal misconduct relevant to the operation of the business of the Purchaser; (x) if Purchaser is convicted of a felony or of misdemeanor involving fraud, moral turpitude or commercial dishonesty, whether or not the crime arose from the operation of the business of the Purchaser; (xi) if Purchaser fails to purchase the minimum monthly gallonage requirements outlined in paragraph 1 of the attached Commodity Schedule(s); (xii) if Purchaser fails to maintain an inventory of any one or more grades of motor fuel covered by this Contract in an amount adequate to meet customer demand; (xiii) if there occurs any other circumstance under which termination of a franchise is permitted under the provisions of the Petroleum Marketing Practices Act (P.L. 95-297); or (xiv) upon assignment of the Contract by Purchaser contrary to the terms of this Contract.
(c) Upon loss of Seller's right to grant the use of the Supplier's Proprietary Marks, Seller may terminate this Contract. Seller will not be liable for the consequences of such loss unless they result from an act by Seller taken in bad faith for the purpose of causing the loss of Seller's right to grant the right to use the Proprietary Marks.
(d) Purchaser agrees not to engage in or permit any illegal or improper act or conduct, on or about the Premises, which act or conduct is detrimental to Seller or any member of the public. Subject to any other requirements of law, at the option of Seller, this Contract may be terminated without further notice, (i) upon the failure of Purchaser to desist from any such further acts or conduct after written notice from Seller to do

so, or (ii) upon Purchaser's failure to pay any amount when and as due, and no forbearance, course of dealing, or prior payment shall affect these rights of termination.

(e) Termination of this Contract shall be accompanied by such notice from Seller as may be required by law.

(f) Upon the expiration of the Term hereof or upon termination hereof, Seller shall have the right, at its option, to enter upon the Premises and to remove, paint out, or obliterate any signs, symbols or colors on said Premises or on the buildings or equipment thereof which in Seller's opinion would lead a patron to believe that Seller's products are being offered for sale at the Premises.

(g) Termination of this Contract by either party for any reason shall not relieve the parties of any obligation theretofore accrued under this Contract.

22.  Accord.  The parties to this Contract have discussed the provisions herein and find them fair and mutually satisfactory and further agree that in all respects the provisions are reasonable and of material significance to the relationship of the parties hereunder, and that any breach of a provision by   either party hereto or a failure to carry out said provisions in good faith shall conclusively be deemed to be substantial.

23.  Purchaser's Insurance Requirements.
(a)  Purchaser shall, at its sole expense, obtain insurance from a reputable insurance carrier authorized to do business in the State in which the Premises are located providing full and continuous coverage for the full term of this Contract and all renewal periods thereof equivalent to the following: (i) Garagekeeper's Legal Liability Insurance covering fire, theft or an entire automobile, and collision, with a minimum limit of Fifty Thousand Dollars ($50,000.00) each occurrence, if Purchaser has service bays or a car wash (otherwise garagekeeper's legal liability insurance is not required); (ii) Commercial/Comprehensive General Liability Insurance covering all operations at the Premises and the Premises, complete operations and products liability and contractual liability with minimum bodily injury limits of One Million Dollars ($1,000,000) each person, Three Million Dollars ($3,000,000) each occurrence, and a minimum property damage limit of Three Million Dollars ($3,000,000) each occurrence.

(b)  All the insurance will name Seller and Supplier as an additional insureds and will be primary as to any other existing, valid and collectible insurance.  The foregoing requirements are minimum insurance requirements only and may or may not adequately meet the entire insurance needs of Purchaser.  Seller may require Purchaser to carry additional types and amounts of insurance coverage, including modifications to existing insurance under this paragraph 26.  Each policy or policies shall provide that the liability coverage afforded applies separately to each insured against whom a claim is brought as though a separate policy had been issued to each insured.  If Seller so requires, Purchaser shall furnish Seller with certificates of such insurance that provide that coverage will not be canceled or materially changed prior to 30 days' advance written notice to Seller.  The insurance required hereunder in no way limits or restricts Purchaser's obligations under the law or this Contract as to indemnification of Seller.

24.  Nature of Agreement.  In consideration of the granting and execution of this Contract, it is understood and agreed that there shall be no contractual obligation to extend or renew the period or terms of this Contract in any way, and the parties agree that this Contract shall not be considered or deemed to be any form of "joint venture" or "partnership" at the Premises of Purchaser or elsewhere. This Contract shall bind the executors, administrators, personal representatives, assigns, and successors of the respective parties.

25.  Compliance with Laws. (a) Purchaser shall comply with all laws, statutes, regulations, ordinances, and rules of all applicable governmental authorities with respect to the operation of its business at the Premises, including without limitation all applicable laws and regulations regarding weights and measures.

(b) Both parties expressly agree that it is the intention of neither party to violate statutory or common law and that if any section, sentence, paragraph, clause or combination of same is in violation of any law, such sentences, paragraphs, clauses or combination of same shall be inoperative and the remainder of this Contract shall remain binding upon the parties hereto.

26. Express Warranties. Seller warrants that the product(s) supplied hereunder will conform to the promises and affirmations of fact made in Seller's current technical literature and printed advertisements, if any, related specifically to such product(s); that it will convey good title to the product(s) supplied hereunder, free of all liens, and that the product(s) supplied hereunder meet such specifications as have been expressly made a part of this Contract. THE FOREGOING WARRANTIES ARE EXCLUSIVE AND ARE IN LIEU OF ALL OTHER WARRANTIES, WHETHER WRITTEN, ORAL OR IMPLIED. THE WARRANTY OF MERCHANTABILITY, IN OTHER RESPECTS THAN EXPRESSLY SET FORTH HEREIN, AND WARRANTY OF FITNESS FOR PARTICULAR PURPOSE, IN OTHER RESPECTS THAN EXPRESSLY SET FORTH HEREIN, ARE EXPRESSLY EXCLUDED AND DISCLAIMED.

27. Non-Exclusive Territory. Nothing in this Contract grants Purchaser an exclusive territory to market or resell any petroleum products purchased from Seller hereunder. Seller reserves the right to market or sell, and authorize others to market or sell, petroleum products in any manner Seller chooses, including through its own retail outlets or through designated wholesalers or other retailers.

28. Confidential Information.
    (a) Purchaser acknowledges that Seller and/or Supplier may be disclosing and transmitting to it certain confidential and proprietary information of Seller and/or Supplier, including without limitation guidelines, manuals, methods, policies, procedures, programs, software, firmware, specifications, standards (both operational and visual), strategies, and other related information ("Confidential Information") in connection with Purchaser's operation of the Premises. Except where otherwise required by law, during the Term of this Contract and any renewal periods thereof, Purchaser shall: (i) treat and maintain Confidential Information as confidential; (ii) use Confidential Information only for the operation of the Premises under this Contract; and (iii) restrict disclosure of Confidential Information only to Purchaser and its officers, directors employees, contractors or agents who are directly connected with the performance of work and require knowledge of the Confidential Information.
    (b) Purchaser may not use, or cause or permit to be used by, or disclose to, or cause or permit to be disclosed to, third parties any Confidential Information for purposes other than operating the Premises under this Contract.
    (c) Purchaser acknowledges that any failure to comply with the requirements of this paragraph will cause Seller or Supplier irreparable injury. The provisions of this paragraph will survive the termination or expiration of this Contract and apply to all Confidential Information disclosed or transmitted to Purchaser during the franchise relationship, whether prior to, during or after the expiration, termination, or nonrenewal of this Contract.

29. Entire Agreement; Modifications. This Contract cancels and supersedes all prior written and unwritten agreements, attachments, schedules, appendices, amendments, promises, and understandings between the parties pertaining to the matters covered under this Contract, except any indebtedness owed to Seller by Purchaser, and is a final, complete and exclusive statement of the agreement between Seller and Purchaser. THERE ARE NO ORAL UNDERSTANDINGS, REPRESENTATIONS OR WARRANTIES AFFECTING IT. No amendment, deletion, modification, or alteration to this Contract shall have any effect unless and until made in writing and signed by an authorized representative of Seller and by Purchaser. EXECUTION OF THIS CONTRACT BY PURCHASER IS AN ACKNOWLEDGEMENT THAT NO REPRESENTATIONS NOT SET FORTH IN WRITING HEREIN HAVE BEEN MADE OR RELIED UPON BY PURCHASER.

30. Damages. In the event Seller terminates this Contract due to Purchaser's default, Seller will suffer substantial damages which are anticipated to be difficult and time consuming to prove with exactitude. Furthermore, both parties are desirous of avoiding what they believe will be the disproportionate cost of possible litigation and legal fees which a future dispute over the magnitude of such damages would endanger. The parties, therefore, have determined that if this Contract is terminated as aforesaid,

Purchaser must pay to Seller as liquidated damages, and not as a penalty, within thirty (30) days of demand a sum to be determined in the following manner:

> The monthly average of the total number of gallons of Products purchased by Purchaser from Seller during the number of whole calendar months from the Effective Date until the effective date of the termination will first be determined. This monthly gallon average will be multiplied by $0.01 (one cent). The resulting amount will be multiplied by the number of whole months remaining between the effective date of the termination and the Expiration Date. Both Seller and Purchaser agree that such a calculation of damages will yield liquidated damages, which are reasonable in light of the anticipated or actual harm to Seller whenever during the Term, a termination as aforesaid may occur.

Purchaser shall additionally reimburse Seller for all Brand Imaging Expenses, Upfront Funds, and Supplier Rebates.

EXCEPT AS PROVIDED IN THIS PARAGRAPH, NO CLAIM SHALL BE MADE UNDER THIS CONTRACT FOR SPECIAL, PUNITIVE, OR CONSEQUENTIAL DAMAGES, EXCEPT AS PROVIDED OTHERWISE BY LAW.

31. Commencement. This Contract or any modification thereof shall not be binding upon Seller until signed on its behalf by an authorized representative of Seller. Commencement of performance hereunder prior to signing as above stipulated in no case shall be construed as a waiver by Seller of this requirement.

32. Key Person Rider. If Purchaser is any form of business entity other than a sole proprietor, upon Seller's request, Purchaser shall execute a "Key Person Rider" in the form attached hereto, which executed Key Person Rider shall then be annexed hereto and made a part hereof.

33. Survivorship. To the extent, but only to the extent, that state law may require that this Contract shall contain provisions governing the succession of the rights and obligations contained herein to a designated family member, such provisions are incorporated herein by reference.

34. Joint and Several Obligations. All acknowledgments, representations, warranties, debts, and obligations of performance of Purchaser under this Contract are made, and binding on, all those signing this Contract jointly and severally as the Purchaser.

35. Seller's Equitable Remedies/Attorneys' Fees.
(a) Purchaser agrees that money damages may not be a sufficient remedy for the breach of this Contract and that, therefore, in addition to all remedies available at law, Seller shall be entitled to specific performance, injunctive relief, declaratory judgment and/or other equitable remedies, as appropriate. Purchaser shall waive any requirement for the posting of bond in conjunction with Seller's effort to seek equitable remedies.
(b) It is hereby agreed to and understood by the parties to this Contract that Seller shall be entitled to recover from Purchaser all reasonable attorneys' fees and other legal costs incurred by Seller to secure or protect its rights under this Contract or to enforce the terms thereof, whether at law or in equity. Seller shall also be entitled to reimbursement by Purchaser for all attorney's fees and litigation expenses incurred to enforce any termination of this Contract.
(c) Seller's termination of this Contract shall not prejudice Seller's right to seek monetary damages or equitable relief against Purchaser. All powers and remedies available at law and in equity, including the right to terminate this Contract under the PMPA, shall be cumulative and not exclusive of any other powers and remedies available by virtue of this Contract, and no delay or omission of Seller in

13

exercising any right or power accruing upon any breach of, or default under any provision of this Contract shall impair any other or subsequent breach or impair any rights or remedies consequent thereto.

36. <u>Covenants to Run with the Land</u>.  Purchaser's covenants and obligations hereunder shall run with the land. Seller shall be entitled to file a Memorandum of Agreement with the Recorder of Deeds in the County in which the Premises is located, placing the public on notice of Seller's rights hereunder.  Any sale of Purchaser's business and/or assets and/or real estate shall be subject to Seller's rights hereunder.

37. <u>Compliance with Mobil Distributor Agreement</u>.  In addition to any and all other obligations hereunder, Purchaser hereby undertakes and agrees to fully comply with any and all obligations of Seller pursuant to the Distributor PMPA Franchise Agreement between Seller and ExxonMobil Corporation which relate to the Premises and/or the sale of fuel from the Premises, (a copy of which is attached hereto), and to indemnify and hold Seller harmless from any claims, losses, or suits (including attorneys' fees) arising out of or relating to the breach of such agreement.

Executed this the _15th_ day of _February_, 2007.

SELLER:                                      PURCHASER:
Esquire Petroleum, LLC                       South Side Gas, Inc.
One Magnificent Mile
980 North Michigan Ave., Suite 1400
Chicago, IL 60606

By: _____              By: _____
                                                Ahmad Zahdan

                                            Title: _OWNER_____

Witness: _____              Witness: _____

607-0106

14

## COMMODITY SCHEDULE (MOTOR FUEL SALES TO PURCHASER)

This Commodity Schedule is attached to and made a part of a certain supply agreement (the "Contract") between Purchaser and Seller of even date herewith. Unless otherwise indicated, the capitalized terms used in this Commodity Schedule shall have the same meaning used in the Contract.

1. Quantity. Except as otherwise provided in the Contract, the quantity of petroleum products covered by the Contract shall be all Purchaser's requirements, but in no case less than a minimum of 1,083,000 gallons on an annual basis.

2. Price. The price per gallon to be paid by Purchaser shall be Esquire's Supplier's posted wholesale distributor or "rack" price for fuel, plus all applicable taxes and all fees and charges incurred by Seller, including but not limited to State loading and environmental fees, if any, and the cost of transportation, diversion fees, plus $.01 (1¢) per gallon. Except as specifically agreed upon in writing, Seller shall retain all incentives and rebates. The price per gallon is based upon the delivery of a full transport truckload of product. The $.01 (1¢) component of the purchase price may be adjusted (at Esquire's discretion) (but never decreased below $.01 (1¢)) annually based upon changes in the Consumer's Price Index for All Urban Consumers, 1982-84 = 100, U.S. city average, All Items Component, nonseasonally adjusted, published by the Bureau of Labor Statistics of the U.S. Department of Labor, hereinafter referred to as the "Price Index." Delivery of product of less than a full transport truckload shall be subject to an additional delivery charge. All prices charged by Seller are subject to the provisions of applicable law.

3. Delivery. Where delivery is made to Purchaser's business location, delivery shall be complete on unloading of the tank wagon or transport truck. The carrier for all fuel deliveries shall be at the sole discretion of Seller. Where delivery is made into equipment furnished by Purchaser, delivery shall be complete at the point of loading of such equipment.

4. Title. Title to product covered under the Contract shall pass to Purchaser upon delivery of product.

5. Inspection. Purchaser shall have the right, at its expense, to have an inspection made at delivery point, provided such inspection shall not delay shipment. Should Purchaser fail to make inspection, it shall accept Seller's inspection and measurement.

ACCEPTED:

SELLER:  Esquire Petroleum, LLC

By: _____
        Ulice Payne, Jr., President

Date: _____2-15-07_____


ACCEPTED:

PURCHASER: South Side Gas, Inc.

By: _____
        Ahmad Zahdan

Date: _____2-15-2007_____


15

**KEY PERSON RIDER**
**(The "Key Person Rider")**

1.    Purchaser states that the following named person(s), Ahmad Zahdan (each such person referred to as the "Owner"), has (have) an ownership interest in Purchaser. The parties hereto agree that, should Owner, or any one of the Owners, relinquish, convey, or otherwise transfer, directly or indirectly, in whole or in part, his or her ownership interest in the Purchaser, or die, the accompanying supply agreement ("Supply Agreement") between Purchaser and Seller, which Supply Agreement constitutes a franchise under the Petroleum Marketing Practices Act (the "Act"), 15 U.S.C. §2801, *et seq.,* may be terminated or nonrenewed by Seller.  In the case of death, the Supply Agreement shall not be terminated or non-renewed if the remaining Owners are acceptable to Seller.

2.    (a)    It is understood and agreed that Ahmad Zahdan is designated the "Key Person," which designation is deemed by the parties hereto to be a reasonable and material provision of the franchise. The Key Person shall personally operate on a daily basis the business of Purchaser at the Premises covered by the Supply Agreement. The phrase "to operate on a daily basis the business covered by this Supply Agreement" shall mean that the Key Person must (i) manage the business and (ii) have authority to make all business decisions that an unincorporated retail service station dealer normally makes concerning operations of a retail service station business. Purchaser represents that the Key Person has the authority to buy and sell motor fuel, to enter into financing agreements on behalf of Purchaser, and to authorize merchandising and/or cooperative advertising programs.
        (b)    The parties hereto agree that failure of the Key Person to operate on a daily basis Purchaser's business covered by the Supply Agreement is an "event that is relevant to the franchise relationship," under the Act. Such failure shall be grounds for the termination or nonrenewal, as applicable, of the Supply Agreement by the Seller.

3.    Purchaser may seek Seller's consent to add, modify, or delete, by amendment, one or more of the names listed above in paragraph 1 or 2(a) by making a written request at least 45 days prior to any change. Such request shall include such information as Seller may designate as necessary to determine the qualifications of the new person. Seller will consider and respond to Purchaser's request within thirty (30) days following receipt of Purchaser's written request. Such request for amendment may be denied at Seller's reasonable discretion.

4.    These covenants are attached to and incorporated into the Supply Agreement between Purchaser and Seller and may be enforced as if set forth in said Supply Agreement. This Key Person Rider cancels and supersedes any pre-existing Key Person Rider of the underlying Supply Agreement.

ACCEPTED:                                              ACCEPTED:

PURCHASER:                                             SELLER:

South Side Gas, Inc.                                   Esquire Petroleum, LLC

By: _____ Ahmad K.                         By: _____
                       Zahdan
Title: __OWNER__                                       Title: __President__
Date: __2-15-07__                                      Date: __2-15-07__

16

## SECURITY AGREEMENT

This security agreement (referred to hereinafter as the "Security Agreement") is dated as of _____, 2007 between South Side Gas, Inc. ("Debtor"), and Esquire Petroleum, LLC., an Illinois corporation ("Secured Party"):

1.    Description of Collateral. Debtor hereby grants to Secured Party a security interest in the following described assets and any and all additions, accessions and substitutions thereto or therefor (collectively referred to as the "Collateral").

  a.    All equipment, machinery, furniture, furnishings, and any and all other tangible personal property, and all additions, accessions and substitutions thereto or therefor now owned or hereafter acquired by the Debtor (collectively referred to as "Equipment");

  b.    All accounts receivable, contract rights, chattel paper, documents, instruments, general intangibles, as such term is defined in the Illinois Uniform Commercial Code (810 ILCS 5/1-101 *et. seq.*) as in effect from time to time, all accounts, as such term is defined in the Illinois Uniform Commercial Code as in effect from time to time, and other forms of obligation and other rights to the payment of money, now owned or which may hereafter arise in favor of the Debtor (hereinafter called "Accounts");

  c.    All of the Debtor's inventory, including all goods, merchandise, materials, raw materials, work in process, finished goods and other tangible personal property now owned or hereafter acquired and held for sale or lease or furnished or to be furnished under contracts of services or used or consumed in the Debtor's business, and any documents of title representing any thereof (hereinafter called "Inventory");

  d.    All fixtures, fittings, appliances, apparatus, equipment, machinery, furniture and furnishings, and all other personal property now owned or hereafter acquired or at any time hereafter annexed, affixed or attached to any of the real property commonly known as 4000 Southwest Highway, Hometown, Illinois (hereinafter called "Fixtures");

  e.    All deposit accounts of Debtor with Secured Party; and

  f.    All proceeds, including insurance proceeds, and products of (a), (b), (c), (d) and (e) above.

2.    Obligations. This Security Agreement is given to secure (a) the performance by the Debtor of the covenants and agreements contained herein; (b) the performance and payments by the Debtor under the covenants and agreements contained in the Supply Agreement (the "Contract") executed concurrently herewith and hereby expressly made a part hereof; or (c) any and all other indebtedness or obligations of Debtor to Secured Party of every kind and description, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising (such performance, payments, and/or obligations hereinafter collectively referred to as "Obligations"). This Security Agreement shall also secure any and all renewals or extensions of the whole or any part of the Obligations, however evidenced, with interest, if necessary, at such lawful rate as may be agreed upon, and any such renewals or extensions or any change in the terms shall not impair in any manner the validity of or the priority of this Security Agreement, nor release the Debtor from liability for the Obligations.

2.    Warranties. Debtor represents and warrants as follows:

a.     Debtor is duly organized and existing under the laws of the State of Illinois and is duly qualified and in good standing in every other state in which it is doing business. The exact name of Debtor is correctly stated in the first paragraph of this Agreement.

b.     The execution, delivery and performance hereof are within Debtor's corporate powers, have been duly authorized, are not in contravention of law or the terms of Debtor's organizational documents, or of any indenture, agreement or undertaking to which Debtor is a party or by which it is bound.

c.     Debtor's (i) sole place of business (or its chief executive office, if it has more than one place of business); and (ii) the office where it keeps its records concerning the Collateral is at the address stated on the last page of this Agreement.

d.     The Debtor is the sole and absolute owner of the Collateral free and clear of liens and encumbrances of every kind and nature except only the lien and encumbrance hereby granted and created, other liens and encumbrances to Secured Party and other liens and encumbrances disclosed in writing to Secured Party by Debtor.

e.     The Debtor has signed no financing statements covering the above-described property, except the financing statements signed with respect to this Security Agreement, other financing statements in favor of Secured Party and the other financing statements disclosed in writing to Secured Party by Debtor.

f.     The officers of the Debtor executing this Security Agreement have been duly elected and qualified and have been duly authorized and empowered so to execute and deliver this Security Agreement on behalf of the Debtor.

4.     Records. Debtor will at all reasonable times and from time to time allow Secured Party by or through any of its officers, agents, employees, attorneys or accountants, to examine and inspect and make extracts or copies from Debtor's books and other records to arrange for verification of the Collateral, directly with account debtors or by other methods. Debtor will furnish to Secured Party upon request statements of any account, together with all notes or other papers evidencing the same and any guaranties, securities or other documents and information relating thereto; and generally at all times and from time to time furnish to Secured Party such statements and information as it may reasonably request.

5.     Covenants. At the request of Secured Party, Debtor shall execute one or more financing statements pursuant to the Illinois Uniform Commercial Code in a form satisfactory to Secured Party and will pay the cost of filing the same in all public offices wherever filing is deemed by Secured Party to be necessary or desirable. Without the written consent of Secured Party, Debtor will not allow any financing statement covering any Collateral, proceeds thereof or any of Debtor's inventory to be on file in any public office. The Debtor will pay all costs of filing any financing, continuation or termination statements with respect to the security interest created by this Security Agreement.

6.     The Debtor hereby covenants and agrees with Secured Party that so long as the Debtor shall owe any amounts under any of the Obligations to Secured Party, the Debtor will:

a.     Maintain the Collateral in good working order, condition and repair;

b.     Keep the Collateral in its possession and control, and within the continental United States;

18

c.    Provide to Secured Party from time to time, upon the request of Secured Party, a listing of the Collateral specifying the physical location and the then condition of each item thereof;

d.    From time to time at the request of Secured Party, do, make, execute and deliver all such additional and further acts, things, deeds, assurances and instruments as Secured Party may require, to more completely vest in and assure to Secured Party its rights hereunder and in or to the Collateral and the proceeds thereof;

e.    Immediately notify Secured Party in writing of the opening of any new office or place of business or the closing of any of its existing offices or places of business and of any change in the location of its chief executive office or the places where its records concerning the Collateral are kept; and

f.    Maintain the existence of Debtor as described in Section 3a above, and not change any of the matters stated in said Section without the written consent of Secured Party.

7.    <u>Accounts</u>.

a.    Secured Party authorizes Debtor to collect any and all amounts owing on all Accounts subject to this agreement, and Debtor shall use its best efforts to effect the prompt collection of such Accounts. Secured Party may, at its election, notify any account debtor on any Account of the assignment thereof and effect collection of any Account directly from the account debtor obligated thereon. Secured Party shall have full power to collect, compromise, endorse, sell or otherwise deal with the accounts or proceeds thereof in its own name or that of Debtor.

b.    Debtor hereby irrevocably appoints Secured Party, or any person designated by Secured Party, its attorney in fact to receive, open and dispose of all mail addressed to Debtor, to endorse the name of Debtor on any notes, acceptances, checks, drafts, money orders or other remittances, to endorse the name of Debtor on any invoice, freight or express bill or bill of lading, storage receipt, warehouse receipt or other instrument or document in respect to any account subject to this agreement, to sign the name of Debtor to drafts against account debtors, assignments or verifications of Accounts subject to this agreement and notices to account debtors, and to do all other acts and things necessary to carry out the intent of this Security Agreement. The authority granted Secured Party shall remain in full force and effect until all Accounts subject to this Security Agreement have been paid in full.

c.    Upon request of Secured Party at any time after the occurrence of an event of default, Debtor will notify such account debtors and will indicate on all billings to such account debtors that the Accounts are payable to Secured Party. Any proceeds of Accounts thereafter received by Debtor shall be turned over to Secured Party daily in the exact form in which they are received.

d.    After the occurrence of an event of default, the Debtor will not, without the written consent of Secured Party, grant any extension of the time of payment of the Accounts, compromise, compound and settle the same for less than the full amount thereof, release, wholly or partly, any person liable for the payment thereof or allow any credit or discount whatsoever thereon, other than trade discounts specifically noted at the time of assignment.

e.    Upon the request of Secured Party at any time after the occurrence of an event of default, the Debtor will deliver to Secured Party all original and other documents evidencing, and relating to, the sale and delivery of merchandise or the performance of labor or services which

created the Accounts, including, but not limited to, all original orders, invoices and shipping receipts.

       f.     Secured Party shall have the right, at the Debtor's expense, to make test verifications of all Accounts in any manner and through any medium Secured Party considers advisable, and the Debtor agrees to furnish all such assistance and information as Secured Party may require in connection therewith.

       g.     The Debtor will furnish to Secured Party, at the Debtor's expense, the following reports: reconciliation of all Accounts; an aging of all Accounts; trial balances; a test verification of all Accounts; and such other reports and information relating to the Accounts as Secured Party may request. All reports shall be in form satisfactory to Secured Party and shall be furnished to Secured Party at such times as Secured Party may request.

       h.     The Debtor will stamp, in form and manner satisfactory to Secured Party, the Debtor's accounts ledger and other books and records pertaining to the Accounts with an appropriate reference to the fact that the Accounts and the proceeds thereof have been assigned to Secured Party.

8.     <u>Inventory</u>. After the occurrence of an event of default, Secured Party shall have the right to immediate possession of all Inventory and its products and proceeds. Secured Party shall have the right at all times to inspect the Inventory and the Debtor's records pertaining thereto. None of the Inventory shall be removed or disposed without Secured Party's written consent, except to bona fide purchasers thereof in the ordinary course of the Debtor's business. Upon Secured Party's request, after the occurrence of an event of default, the Debtor will:

       a.     From time to time, at the Debtor's expense, pledge and deliver the Inventory to Secured Party or to a third party as Secured Party's bailee; to hold the same in trust for Secured Party's account; or store the same in a warehouse or warehouses in Secured Party's name; or deliver to Secured Party documents of title representing the same; or evidence Secured Party's security interest in the Inventory and the proceeds and products thereof in such other manner as may be acceptable to Secured Party.

       b.     Remove or dispose of Inventory (whether or not to bona fide purchasers in the ordinary course of the Debtor's business) only on orders approved by Secured Party in writing.

       c.     Report all sales of Inventory to Secured Party in a form satisfactory to Secured Party at such times as Secured Party may request.

9.     <u>Insurance</u>. The Debtor shall insure at its expense, and keep insured by solvent insurers, all Collateral in such amounts as similar goods are usually insured by companies similarly situated, against loss or damage of the kinds usually insured against by companies similarly situated, and upon Secured Party's request, the policies evidencing such insurance shall be duly endorsed in Secured Party's favor and certificates evidencing such insurance shall be provided to Secured Party. If the Debtor defaults in this regard, Secured Party shall have the right to insure and charge the cost to the Debtor. Secured Party assumes no risk or responsibility in connection with the payment or non-payment of losses, the only responsibility of Secured Party being to credit the Debtor with any insurable payments received on account of losses.

10.    <u>Taxes</u>. All taxes that may be assessed upon or paid by Secured Party with respect to any of the Collateral shall be charged to and paid by Debtor, who agrees to indemnify Secured Party against loss by reason of any such taxes. Debtor will make due and timely payment or deposit of all federal, state

and local taxes, assessments or contributions required of Debtor by law, and will execute and deliver to Secured Party, on demand, appropriate certificates attesting to the payment or deposit thereof.

11.    Proceeds.  The proceeds from the sale or other disposition of the Collateral that are delivered by Debtor to Secured Party, or the net sums collected directly by Secured Party, after first deducting all costs of collection, shall be credited against the amount owed by Debtor.

12.    Default.  The occurrence of any one of the following events shall constitute an "Event of Default" under this Security Agreement:

a.    The failure of Debtor to pay when due to Secured Party any amount payable on any Obligations, or failure of Debtor to observe or perform any of the covenants and warranties in this Security Agreement or in any other document evidencing, securing or otherwise executed in connection with the Obligations.

b.    The discovery that any statement, representation or warranty at any time furnished by the Debtor to the Secured Party is untrue in any material respect as of the date made.

c.    Death, insolvency, failure in business, general assignment for the benefit of creditors, filing of a petition in bankruptcy or for relief under the U.S. Bankruptcy Code of, by, or against Debtor, or the commencement of any other proceeding against the Debtor alleging that such Debtor is insolvent or unable to pay debts as they mature;

d.    The loss, theft, substantial damage, destruction, sale assignment or encumbrance to or of all or any portion of the Collateral or the making of any levy, seizure, or attachment thereof or thereon;

e.    Dissolution, merger or consolidation, or transfer of a substantial portion of the stock or assets of the Debtor corporation;

f.    Deterioration or impairment of the Collateral, or any portion thereof, or the decline or depreciation in the value or market price thereof which causes said Collateral, in the sole judgment of Secured Party, to become unsatisfactory as to the character or value of same; or

g.    Failure to perform any term, provision, or covenant of this Security Agreement

13.    Remedies.  On any such default or election by Secured Party under this Security Agreement, and at any time thereafter:

a.    Secured Party may declare all Obligations secured under this Security Agreement immediately due and payable and may proceed to enforce payment and exercise any and all of the rights and remedies provided by the Illinois Commercial Code, as well as any and all other rights and remedies possessed by Secured Party.

b.    Secured Party shall have the right to take immediate possession of the Collateral, and for that purpose may pursue the same wherever the Collateral may be found, and may enter upon any of the premises of Debtor with or without force or process of law, wherever the Collateral may be or may be supposed to be, and search for the same, and, if found, take possession of and remove the Collateral, or any part thereof. Debtor shall, upon Secured Party's request, assemble the Collateral and make the Collateral available to Secured Party at any place designated by Secured Party which is reasonably convenient to Debtor.

e.    Secured Party may sell at public or private sale, for such price as Secured Party may deem fair, any and all of the Collateral and any other security or property held by Secured Party.  Secured Party may be the purchaser of the Collateral or other property or security so sold and may hold the Collateral thereafter in its own right absolutely against any claims of Debtor or right of redemption.

21

f.      In the case of public sale, notice shall be deemed to be adequate and reasonable if such notice appears three (3) times in a newspaper published in the City or County wherein the sale is to be held, the first such publication being at least ten (10) days before such sale. In the case of a private sale, notice shall be deemed to be adequate and reasonable if such notice is mailed to Debtor at its last known address at least ten (10) days before such sale.

g.      Unless otherwise prohibited by law, Secured Party shall apply the proceeds from the sale of Collateral and sums received or collected from or on account of the Collateral to: (i) the payment of expenses incurred in connection with the sale, transfer, or delivery of the Collateral; (ii) the payment of other costs, charges, attorneys fees and legal expenses herein aforementioned; (iii) the payment of Obligations in the order and manner to be determined by Secured Party, in Secured Party's discretion; (iv) any other indebtedness of Debtor to Secured Party; (v) the balance to Debtor or the person entitled to up upon proper demand. Debtor shall forthwith pay to Secured Party any deficiency on demand of Secured Party. Demand of performance, advertisement, and presence of the Collateral at sale are hereby waived by Debtor. All demands and presentments of every kind or nature are expressly waived by Debtor.

h.      Secured Party may require Debtor to assemble the Collateral at a place mutually convenient to Secured Party and Debtor at the expense of Debtor.

14.    Expenses. Debtor shall pay to Secured Party on demand any and all expenses, including legal expenses and reasonable attorneys' fees, reasonably incurred or expended by Secured Party in the recovery and sale or attempted recovery and sale of Collateral and in protecting and enforcing the Obligations and other rights of Secured Party hereunder.

15.    Termination. This Security Agreement shall be terminable only by the filing of a termination statement in accordance with applicable provisions of the Illinois Commercial Code. Until terminated, the security interest created hereunder shall continue in full force and effect and shall secure and be applicable to all advances now or hereafter made by Secured Party to Debtor, whether or not Debtor is indebted to Secured Party immediately prior to the time of any such advance. Any termination of this Security Agreement by either party shall not affect the obligation of Debtor or Secured Party with respect to accounts assigned by Debtor to Secured Party prior to such termination.

16.    Applicable Law.

a.      The validity of this Security Agreement and any provision hereof shall be determined under and shall be construed according to the Illinois Commercial Code and other applicable laws of the State of Illinois, and all duties of the parties created under this Security Agreement are performable in the State of Illinois.

b.      Unless otherwise defined, all terms used in this Security Agreement that are defined in the Illinois Commercial Code shall have the same meaning in this Security Agreement as therein defined.

17.    This Security Agreement shall be binding upon and inure to the benefit of the Debtor, the Secured Party, and each of their respective successors, assigns, heirs, executors and administrators.

18.    In the event any one or more of the provisions contained herein, or in the Contract shall be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.

19.     Debtor waives (a) its right to require Secured Party to proceed against any person, proceed against or exhaust any collateral, or pursue any other remedy available to Secured Party and (b) any defense arising any reason.

17.     The forbearance, failure, or delay of Secured Party in exercising any rights, powers, or remedies available to it hereunder or under applicable law shall not be a waiver of such right, power, or remedy, nor shall the exercise of such right, power, or remedy preclude its further exercise. Every right, power, and remedy available to Secured Party shall continue in full force and effect until expressly waived by a written instrument executed by an authorized representative of Secured Party.

18.     All acknowledgments, representations, warranties, debts, and obligations of performance of Debtor under this Security Agreement are made, and binding on, all those signing this Security Agreement jointly and severally as the Debtor.

19.     This Security Agreement expresses the entire understanding of the parties and may not be altered or amended except with the written consent of each of the parties and except as provided in any other written document signed and delivered by Debtor to Secured Party.

The Debtor has caused this Security Agreement to be executed as of this 15th day of February, 2007.

DEBTOR:     South Side Gas, Inc.
ADDRESS:    4000 Southwest Highway
            Hometown, Illinois

BY:

            Ahmad Zahdan

23

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR | 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any | NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR | 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR | 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

4. This FINANCING STATEMENT covers the following collateral:

| 5. ALTERNATIVE DESIGNATION [if applicable]: | LESSEE/LESSOR | CONSIGNEE/CONSIGNOR | BAILEE/BAILOR | SELLER/BUYER | AG. LIEN | NON-UCC FILING |
|---|---|---|---|---|---|---|

| 6. This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | All Debtors | Debtor 1 | Debtor 2 |

8. OPTIONAL FILER REFERENCE DATA

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

## COLLATERAL DESCRIPTION

(A) ALL EQUIPMENT, MACHINERY, FURNITURE, FURNISHINGS AND ANY AND ALL OTHER TANGIBLE PERSONAL PROPERTY, AND ALL ADDITIONS, ACCESSIONS AND SUBSTITUTIONS THERETO OR THEREFOR NOW OWNED OR HEREAFTER ACQUIRED BY THE DEBTOR; (B) ALL ACCOUNTS RECEIVABLE, CONTRACT RIGHTS, CHATTEL PAPER, DOCUMENTS, INSTRUMENTS, GENERAL INTANGIBLES, AS SUCH TERM IS DEFINED IN THE ILLINOIS UNIFORM COMMERCIAL CODE (810 ILCS 5/1-101 ET SEQ.) AS IN EFFECT FROM TIME TO TIME, ALL ACCOUNTS, AS SUCH TERM IS DEFINED IN THE ILLINOIS UNIFORM COMMERCIAL CODE AS IN EFFECT FROM TIME TO TIME, AND OTHER FORMS OF OBLIGATION AND OTHER RIGHTS TO THE PAYMENT OF MONEY, NOW OWNED OR WHICH MAY HEREAFTER ARISE IN FAVOR OF THE DEBTOR; (C) ALL OF THE DEBTOR'S INVENTORY, INCLUDING ALL GOODS, MERCHANDISE, MATERIALS, RAW MATERIALS, WORK IN PROCESS, FINISHED GOODS AND OTHER TANGIBLE PERSONAL PROPERTY NOW OWNED OR HEREAFTER ACQUIRED AND HELD FOR SALE OR LEASE OR FURNISHED OR TO BE FURNISHED UNDER CONTRACTS OF SERVICES OR USED OR CONSUMED IN THE DEBTOR'S BUSINESS, AND ANY DOCUMENTS OF TITLE REPRESENTING ANY THEREOF; (D) ALL FIXTURES, FITTINGS, APPLIANCES, APPARATUS, EQUIPMENT, MACHINERY, FURNITURE AND FURNISHINGS, AND ALL OTHER PERSONAL PROPERTY NOW OWNED OR HEREAFTER ACQUIRED OR AT ANY TIME HEREAFTER ANNEXED, AFFIXED OR ATTACHED TO ANY OF THE REAL PROPERTY COMMONLY KNOWN AS 1306 SE THIRD STREET, ALEDO, ILLINOIS 61231; (E) ALL DEPOSIT ACCOUNTS OF DEBTOR WITH SECURED PARTY; AND (F) ALL PROCEEDS, INCLUDING INSURANCE PROCEEDS, AND PRODUCTS OF (A), (B), (C), (D) AND (E) ABOVE.

## UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

9. NAME OF FIRST DEBTOR (1a or 1b) ON RELATED FINANCING STATEMENT

| | 9a. ORGANIZATION'S NAME | | |
|---|---|---|---|
| OR | | | |
| | 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME,SUFFIX |

10. MISCELLANEOUS:

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

11. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one name (11a or 11b) - do not abbreviate or combine names

| | 11a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | | | | |
| | 11b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

| 11d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 11e. TYPE OF ORGANIZATION | 11f. JURISDICTION OF ORGANIZATION | 11g. ORGANIZATIONAL ID #, if any | ☐ NONE |
|---|---|---|---|---|---|

12. ☐ ADDITIONAL SECURED PARTY'S  or  ☐ ASSIGNOR S/P'S  NAME - insert only one name (12a or 12b)

| | 12a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | | | | |
| | 12b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

| 12c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

13. This FINANCING STATEMENT covers ☐ timber to be cut or ☐ as-extracted collateral, or is filed as a ☑ fixture filing.

14. Description of real estate:

16. Additional collateral description:

15. Name and address of a RECORD OWNER of above-described real estate (if Debtor does not have a record interest):

17. Check only if applicable and check only one box.
Debtor is a ☐ Trust  or  ☐ Trustee acting with respect to property held in trust  or  ☐ Decedent's Estate

18. Check only if applicable and check only one box.
☐ Debtor is a TRANSMITTING UTILITY
☐ Filed in connection with a Manufactured-Home Transaction — effective 30 years
☐ Filed in connection with a Public-Finance Transaction — effective 30 years

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (FORM UCC1Ad) (REV. 05/22/02)

26

*Prepared By:*

Robert M. Riffle
Elias, Meginnes, Riffle
  & Seghetti, P.C.
416 Main Street, Suite 1400
Peoria, Illinois 61602

*After recording return to:*

Robert M. Riffle
Elias, Meginnes, Riffle
  & Seghetti, P.C.
416 Main Street, Suite 1400
Peoria, Illinois 61602

## MORTGAGE

THIS MORTGAGE is made this *15th* day of *February* 2007, between the undersigned, South Side Gas, Inc., with a business address of 4000 Southwest Highway, Hometown, Illinois (the "Mortgagee"), and Esquire Petroleum, LLC, with a business address of One Magnificent Mile, 980 North Michigan, Suite 1400, Chicago, IL 60606 ("Mortgagor").

Mortgagee hereby warrants, covenants and agrees that:

    1.    This Mortgage is to cover all of Mortgagee's interest in the real estate (referred to hereinafter as the "Real Estate") legally described in Exhibit A, attached hereto and made a part hereof.

    2.    This Mortgage is given to secure (a) the performance by the Mortgagee of the covenants and agreements contained herein; (b) the performance and payments by the Mortgagee under the covenants and agreements contained in the Supply Agreement (the "Contract") executed concurrently herewith and hereby expressly made a part hereof; or (c) any and all other indebtedness or obligations now or hereafter incurred or arising pursuant to the provisions of this Mortgage, the Contract, or any other agreement or contract between Mortgagee and Mortgagor (such performance, payments, and/or obligations hereinafter collectively referred to as "Obligations"). This Mortgage shall also secure any and all renewals or extensions of the whole or any part of the Obligations, however evidenced, with interest, if necessary, at such lawful rate as may be agreed upon, and any such renewals or extensions or any change in the terms shall not impair in any manner the validity of or the priority of this Mortgage, nor release the Mortgagee from liability for the Obligations.

    3.    Mortgagee will, at all times, maintain, preserve and keep the Real Estate in good condition and will not commit or suffer any waste thereof. Mortgagee will pay promptly when due all taxes, charges, and assessments upon the Real Estate.

    4.    The occurrence of any one of the following events shall constitute an "Event of Default" under this Mortgage:

a.    Nonpayment when due of any obligation hereby secured or failure to perform any duty or obligation set forth herein or incorporated by reference herein;

b.    The discovery that any statement, representation or warranty at any time furnished by the Mortgagee to the Mortgagor is untrue in any material respect as of the date made.

c.    Death, insolvency, failure in business, general assignment for the benefit of creditors, filing of a petition in bankruptcy or for relief under the U.S. Bankruptcy Code of, by, or against Mortgagee, or the commencement of any other proceeding against the Mortgagee alleging that such Mortgagee is insolvent or unable to pay debts as they mature;

d.    The loss, substantial damage, destruction, sale, assignment or encumbrance to or of all or any portion of the Real Estate or the making of any levy, seizure, or attachment thereof or thereon;

e.    Dissolution, merger or consolidation, or transfer of a substantial portion of the stock or assets of the Mortgagee;

f.    Deterioration or impairment of the Real Estate, or any portion thereof, or the decline or depreciation in the value or market price thereof which causes said Real Estate, in the sole judgment of Mortgagor, to become unsatisfactory as to the character or value of same; or

g.    Failure to perform any term, provision, or covenant of this Mortgage.

5.    Upon the occurrence of an Event of Default, Mortgagor shall provide Mortgagee with written notice thereof. Mortgagee shall have ten (10) days after the receipt of such notice to cure the Event of Default. If Mortgagee has not cured such Event of Default within said ten-day period, Mortgagor may, at its option, and without notice or demand, declare all Obligations due and payable in full immediately, and the Mortgagor may exercise any rights and remedies of a Mortgagor under applicable law. If Mortgagee fails to cure any Event of Default as set forth herein, Mortgagee will make the Real Estate available to the Mortgagor in all respects. Without limiting the generality of the foregoing, and in conjunction with or in addition thereto, Mortgagor, at its reasonable discretion, may also use any one or more of the following remedies with respect to the Real Estate encumbered hereunder:

a.    Enter the premises and take possession of said Real Estate;

b.    Incur reasonable attorneys' fees and reasonable expenses in exercising any of its rights and remedies upon Mortgagee's default, which shall become part of its reasonable expense of taking, holding, and preparing for sale, the Real Estate secured hereby.

c.    Pursue any remedy set forth in the Contract or in any other agreement or contract, the performance of which is secured by this Mortgage.

6.    If any notification of disposition of all or any portion of the Real Estate is required by law, such notification shall be deemed reasonably and properly given if mailed at least ten (10) days prior to such disposition, postage pre-paid to the Mortgagee at its latest address appearing on the records of the Mortgagor.

7.    Unless otherwise prohibited by law, Mortgagor shall apply the proceeds from the sale of Real Estate and sums received or collected from or on account of the Real Estate to:

a.    The payment of expenses incurred in connection with the sale or transfer of the Real Estate;

b.    The payment of other costs, charges, attorneys fees and legal expenses herein aforementioned;

       c.     The payment of Obligations in the order and manner to be determined by Mortgagor, in Mortgagor's discretion;

       d.     The balance to Mortgagee or the person entitled to up upon proper demand.

    8.    Mortgagee waives (a) its right to require Mortgagor to proceed against any person, proceed against or exhaust any Real Estate, or pursue any other remedy available to Mortgagor and (b) any defense arising for any reason.

    9.    Until all Obligations covered under this Mortgage are paid and/or performed, the power of sale and all other rights, powers, and remedies available to Mortgagor shall continue to exist and may be exercised at any time, irrespective of the fact that the Obligations or any part thereof may have become barred by statute of limitations.

    10.    This Mortgage shall be binding upon and inure to the benefit of the Mortgagee, the Mortgagor, and each of their respective successors, assigns, heirs, executors and administrators. In the event any one or more of the provisions contained herein, or in the Contract shall be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby. The rights, powers, and remedies given to the Mortgagor hereunder are in addition to any rights, powers, and remedies available to Mortgagor under applicable law. The forbearance, failure, or delay of Mortgagor in exercising any rights, powers, or remedies available to it hereunder or under applicable law shall not be a waiver of such right, power, or remedy, nor shall the exercise of such right, power, or remedy preclude its further exercise. Every right, power, and remedy available to Mortgagor shall continue in full force and effect until expressly waived by a written instrument executed by an authorized representative of Mortgagor. All acknowledgments, representations, warranties, debts, and obligations of performance of Mortgagee under this Mortgage are made, and binding on, all those signing this Mortgage jointly and severally as the Mortgagee. This Mortgage is to be filed for record in the real estate records office of the County Recorder where the Real Estate is situated.

    The Mortgagee has caused this Mortgage to be executed as of this _15_ day of _February_____, 2007.

MORTGAGEE:  South Side Gas, Inc.

ADDRESS:    4000 Southwest Highway

              Hometown, Illinois

BY:                                                

              Ahmad Zahdan

STATE OF ILLINOIS       )
                                 ) SS.

COUNTY OF _____)

     I, the undersigned, a Notary Public in and for said County and State aforesaid, DO HEREBY CERTIFY that Ahmad Zahdan, personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he signed, sealed and delivered the said instrument as his free and voluntary act as such  and as the free and voluntary act of said corporation for the uses and purposes therein set forth; and on his oath stated that he was duly authorized to execute said instrument.

     Given under my hand and notarial seal this _____ day of _____, 2007.


                                                 _____
                                                      Notary Public

EXHIBIT "A"
REAL ESTATE

Part of Lots 875 and 877 in J.E. Merrion and Co's Hometown Unit No. 3, being a subdivision of part of the NE ¼ of Section 3, and part of the East ½ of the NE ¼ of Section 3 Township 37 North Range 13 East of the Third Principal Meridian, per Document 1370408, described as follows:

Beginning at the SW corner of said Lot 877; thence North 00 degrees 26 minutes 00 seconds east along the West line of said Lot 877, 96.00 feet; thence North 44 degrees 34 minutes 00 seconds West 35.36 feet; thence North 00 degrees 26 minutes 00 seconds West 55.00 feet; thence North 45 degrees 26 minutes 00 seconds East 35.36; thence North 00 degrees 26 minutes 00 seconds East 48.96 feet; thence South 89 degrees 35 minutes 22 seconds East 195.97 feet; thence South 69 degrees 56 minutes 09 seconds East 14.87 feet; thence South 22 seconds, 08 minutes, 27 seconds East 20.68 feet; thence South 25 degrees 39 minutes 15 second West 14.87 feet; thence South 45 degrees 18 minutes 28 seconds West 299.87 feet to the point of beginning; in Cook County, Illinois.

Commonly known as:          4000 Southwest Highway, Hometown, IL 60456

PIN:    24-03-201-026
        24-03-201-025

## PERSONAL GUARANTY OF PERFORMANCE

This Personal Guaranty of Performance, made this _15th_ day of _February_, 2007, between Esquire Petroleum, LLC (hereinafter "Supplier") and Ahmad Zahdan (hereinafter "Guarantor(s)").

NOW THEREFORE, it is agreed between the parties as follows:

To induce Supplier to enter into the attached Supply Agreement (the "Agreement"), dated _2-15-07_, with South Side Gas, Inc., ("Dealer"), having a place of business at 4000 Southwest Highway, Hometown, Illinois, and in consideration thereof, the Guarantor(s) hereby, jointly and severally, unconditionally and irrevocably guarantee Dealer's performance of all the terms and conditions of said Agreement. The undersigned Guarantor(s) hereby jointly and severally agree to indemnify and hold Supplier and its successors and assigns harmless from and against all liability and expense, including but not limited to, reasonable attorney's fees sustained by Supplier by reason of the failure of Dealer fully to perform and comply with the terms and conditions of said Agreement.

SUPPLIER:                                          GUARANTOR:

Esquire Petroleum, LLC                             _Ahmad Zahdan_

By: _____                        Ahmad Zahdan

Title: _President_

607-0106

32

# EXHIBIT 7

# Greenberg Traurig

Jeffery S. Torosian
Tel. (312) 476-5046
Fax (312) 456-8435
torossianj@gtlaw.com

April 10, 2008

<u>**VIA FACSIMILE AND FEDERAL EXPRESS**</u>

John J. Conway, Esq.
Sullivan, Hincks & Conway
120 W. 22nd Street
Suite 100
Oak Brook, IL 60523

      Re:    **South Side Gas, Inc. and Property Located at 4000 Southwest Highway, Hometown, IL**

Dear Mr. Conway:

     As you know, Greenberg Traurig, LLP represents Esquire Petroleum, LLC ("Esquire") in connection with its various agreements with your client, South Side Gas, Inc. ("South Side"). We have received South Side's February 18, 2008 written notice of exercise of the purchase option contained in Section 2.2 of the Real Estate Lease/Option dated February 15, 2007 ("Lease/Option"). We have also received your letter to Amy Kurson dated March 24, 2008, in which you assert that, once a valid option is exercised, the lease extinguishes and there exists no legal basis for not closing a transaction such as the one contemplated by the Agreement of Purchase and Sale (the "Purchase Agreement"). We strongly disagree with the assessments contained in your March 24, 2008 letter, your position that the option was effective, or that Esquire is under any obligation to transfer the property given your client's actions and omissions and material defaults of several of its obligations contained in the parties' respective agreements.

     Your client, as you are aware, has engaged in unlawful conduct by making false and misleading statements to Esquire and consumers generally through the sale of non-Exxon Mobil branded fuel at an Exxon Mobil gas station in violation of applicable law and in material violation of the Supply Agreement, the existence of which is also a condition precedent to the closing of the sale contemplated by the Purchase Agreement. This conduct by South Side, verified by independent third-party testing commissioned by Exxon Mobil, not only subjects your client to substantial liabilities, but has also triggered Exxon Mobil's

ALBANY
AMSTERDAM
ATLANTA
BOCA RATON
BOSTON
BRUSSELS*
CHICAGO
DALLAS
DELAWARE
DENVER
FORT LAUDERDALE
HOUSTON
LAS VEGAS
LONDON*
LOS ANGELES
MIAMI
MILAN*
NEW JERSEY
NEW YORK
ORANGE COUNTY
ORLANDO
PHILADELPHIA
PHOENIX
ROME*
SACRAMENTO
SILICON VALLEY
TALLAHASSEE
TAMPA
TOKYO*
TYSONS CORNER
WASHINGTON, D.C.
WEST PALM BEACH
ZURICH
*Strategic Alliance

John J. Conway, Esq.
April 10, 2008
Page 2

involvement in order to protect its valuable trademarks and goodwill and potentially could
lead to the termination of our franchise relationship with Exxon Mobil and the exercise of
Exxon Mobil's right to repurchase the property.    Esquire will hold your client fully
responsible for any and all damage caused by your client's deception and other unlawful
actions in improperly selling non-branded fuel. It is also clear that in addition to violating
applicable law and numerous provisions of the Supply Agreement, South Side's false
statements made in relation to the sale of non-branded fuel also violate Section 4(b) of the
parties' Mortgage Agreement dated February 17, 2007, and Section 12(b) of the parties'
Security Agreement, for which notice of default is also hereby given.

Your letter also ignores, among other things, South Side's failure to comply with other
provisions under the Purchase Agreement. Section 18.21 provides, "Purchaser shall complete
'imaging' or 're-imaging' of the Property to current Mobil Imaging Standards, on or before
the earlier of Closing or March 1, 2008." This is the same obligation that exists under Section
6.4 of the Lease/Option. South Side has failed to 'image' or 're-image' the Property by the
March 1, 2008 deadline and, therefore, has breached its obligations under these sections. This
failure constitutes a "Default" under Section 11.1 of the Purchase Agreement, for which no
notice is required and no cure is allowed. Pursuant to Section 11.1A of the Purchase
Agreement, and in addition to the other conduct mentioned above, Seller exercises its sole
option to terminate the Purchase Agreement and retain the Purchaser's Earnest Money
Deposit. As a result, and consistent with your assertion that South Side's lease has expired
due to its exercise of the purchase option, South Side is currently in wrongful possession of
the Property. Your client should quit the Property immediately. Effective today, Esquire will
immediately cease supplying your client with fuel under the terms of the Supply Agreement
and as a result of the termination of the Lease/Option pursuant to Section 2.4 therein.

It has also come to our attention that your client has been cited for health code
violations by the Mayor of Hometown for allowing unsanitary conditions to exist at the
property and for violations by the Illinois State Fire Marshall. We also know that your client
has failed to provide proof of insurance with respect to the property. In addition to the above,
these actions by South Side, *inter alia*, further warrant the termination of the Supply
Agreement pursuant to Sections 19, 21, and 23. Had the Lease/Option still been in effect,
these actions would also violate Sections 6.1, 8.1, and 18 of the Lease/Option. To the extent
Esquire is held accountable for any damages, directly or indirectly, or suffers any loss as a
result of any of those actions or omissions, Esquire will seek full recovery from your client in
accordance with applicable law.

We expect your client's complete and total cooperation to ensure that the immediate
transfer of possession of the property takes place without incident and in a manner that avoids
further damage to the Exxon Mobil brand. To effectuate this transition, we have assembled a
management team and other personnel that will arrive on the property today, April 10, 2008,

John J. Conway, Esq.
April 10, 2008
Page 3

at 3:00 p.m. for the purpose of taking over the business operations at the site and performing
the accounting and other functions necessary for an orderly transition.

    Please contact me if you have any questions.

                                    Very truly yours,

                                    GREENBERG TRAURIG, LLP

                                    Jeffrey S. Torosian/dmb
                                    Jeffrey S. Torosian

cc:    Ahmad Zahdan (via Federal Express)

# EXHIBIT 8

# Greenberg
# Traurig

**Transmittal Cover Sheet**

| From: | Tel: | E-Mail: |
|---|---|---|
| Jeffrey S. Torosian | 312.476.5046 | torosianj@gtlaw.com |

| To: | Fax No: | Company: | Phone No.: |
|---|---|---|---|
| John J. Conway, Esq. | (630) 573-5130 | Sullivan, Hincks & Conway | (630) 573-5021 |

**File No.:**    109409.010600

**Re:**    **South Side Gas, Inc. and Property Located at 4000 Southwest Highway, Hometown, Illinois**

**Date:**    April 10, 2008

**No. Pages:**    Including Cover Sheet   4

If you do not receive all pages properly, please call The sender.

The information contained in this transmission is attorney privileged and confidential. It is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone collect and return the original message to us at the address below via the U.S. Postal Service. We will reimburse you for your postage. Thank you.

77 West Wacker Drive, Suite 2500, Chicago, Illinois   Phone: 312.456.8400  Fax: 312.456.8435

# Greenberg Traurig

## Transmittal Cover Sheet

| From: | Tel: | E-Mail: |
|---|---|---|
| Jeffrey S. Torosian | 312.476.5046 | torosianj@gtlaw.com |

| To: | Fax No: | Company: | Phone No.: |
|---|---|---|---|
| John J. Conway, Esq. | (630) 573-5130 | Sullivan, Hincks & Conway | (630) 573-5021 |

**File No.:**  109409.010600

**Re:**  **Letter of Credit from United Trust Bank in the Amount of $25,000 as Earnest Money Deposit for Sale of Property Located at 4000 Southwest Highway, Hometown, Illinois from Esquire Petroleum, LLC to South Side Gas, Inc.**

**Date:**  April 10, 2008

**No. Pages:**  Including Cover Sheet    5

<u>If you do not receive all pages properly, please call The sender.</u>

The information contained in this transmission is attorney privileged and confidential. It is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone collect and return the original message to us at the address below via the U.S. Postal Service. We will reimburse you for your postage. Thank you.

CHI 57,152,217v1     77 West Wacker Drive, Suite 2500, Chicago, Illinois   Phone: 312.456.8400   Fax: 312.456.8435

# Greenberg Traurig

Jeffery S. Torosian
Tel. (312) 476-5046
Fax (312) 456-8435
torosianj@gtlaw.com

April 10, 2008

**VIA FACSIMILE AND FEDERAL EXPRESS**

Fran Whalum, Escrow Officer
Stewart Title Guaranty Company NTS
2 North LaSalle Street
Suite 1400
Chicago, IL 60602

Re:   **Letter of Credit from United Trust Bank in the Amount of $25,000 as
        Earnest Money Deposit for Sale of Property Located at 4000 Southwest
        Highway, Hometown, Illinois from Esquire Petroleum, LLC to South
        Side Gas, Inc.**

Dear Ms. Whalum:

Greenberg Traurig, LLP represents Esquire Petroleum, LLC ("Esquire") in connection with its sale of property located at 4000 Southwest Highway, Hometown, Illinois to South Side Gas, Inc. ("South Side") pursuant to the parties' Agreement of Purchase and Sale ("Purchase Agreement"). South Side has defaulted on its obligations under the Purchase Agreement and, as a result, Esquire has terminated that Purchase Agreement pursuant to Section 11.1A. Although notice is not required, a copy of Esquire's notice of termination is also enclosed. Accordingly, Esquire hereby demands the turnover of the Letter of Credit referenced above so that it may draw down the full amount thereof pursuant to Esquire's rights.

Please contact me if you have any questions.

Very truly yours,

GREENBERG TRAURIG, LLP

Jeffrey S. Torosian

JIT/cs
cc:   John J. Conway, Esq. (via facsimile)

ALBANY
AMSTERDAM
ATLANTA
BOCA RATON
BOSTON
BRUSSELS*
CHICAGO
DALLAS
DELAWARE
DENVER
FORT LAUDERDALE
HOUSTON
LAS VEGAS
LONDON*
LOS ANGELES
MIAMI
MILAN*
NEW JERSEY
NEW YORK
ORANGE COUNTY
ORLANDO
PHILADELPHIA
PHOENIX
ROME*
SACRAMENTO
SILICON VALLEY
TALLAHASSEE
TAMPA
TOKYO*
TYSONS CORNER
WASHINGTON, D.C.
WEST PALM BEACH
ZURICH
*Strategic Alliance

# EXHIBIT 9

Law Offices Of

# SULLIVAN HINCKS & CONWAY

A PARTNERSHIP OF PROFESSIONAL CORPORATIONS

120 WEST 22nd STREET, SUITE 100

OAK BROOK, ILLINOIS 60523

JOHN J. CONWAY
johnconway@shlawfirm.com

TEL (630) 573-5021

FAX (630) 573-5130

www.shlawfirm.com

**Via e-mail and Overnight Mail**

August 27, 2007

Robert M. Riffle, Esq.

Elias, Meginnes, Riffle & Seghetti

416 Main Street

Peoria, IL 61602-1611

Re:    Ahmad Zahdan – 4000 Southwest Highway, Hometown, IL
       South Side Gas, Inc.

Dear Bob:

This letter is in further response to your letter dated August 2, 2007, my response thereto in writing and our subsequent phone conversations regarding the subject matter of your letter. I called you on Tuesday August 21, 2007 to further discuss this matter but have not yet heard back from you. I understand that Mr. Payne has met with Ahmad Zahdan and continues to demand certain documentation. Mr. Zahdan continues to maintain that during his tenure of receiving Mobil fuel deliveries through Esquire that he has sold only gasoline as delivered to him by Esquire. Mr. Zahdan presumes that all the fuel delivered to his station via Klemm was Mobil fuel. Mr. Zahdan is aware of a product sample taken by a Mobil representative on June 28, 2007. They took a sample of his regular and premium gas at approximately 9:00 a.m. Earlier that morning at approximately 5:30 a.m., Esquire, via Klemm Tank Lines, delivered 8000 gallons of fuel to Mr. Zahdan's station consisting of approximately 6,000 gallons of regular and 1,000 gallons each of mid-grade and premium. The documents evidencing this delivery are included within the documents I am enclosing with this letter. The documents are segregated by month. Mr. Zahdan has been operating as a Mobil dealer at this location since 1989 and has never before had any such problems with Mobil.

Enclosed with this letter are the monthly records of gas deliveries and gas sales for Mr. Zahdan's station as reported to the IEPA and IDOR as required on their standard forms. The forms include the handwritten records as well as the computerized records. The documents cover the time period from February of 2007 through July of 2007. One obvious error that I would like to point out as an initial matter is evidenced by the March documentation. Your client's PST form shows only 46,003

1

SULLIVAN HINCKS & CONWAY

gallons delivered to my client. However, my client shows that 53,003 were delivered and this amount is corroborated by the Klemm delivery tickets that match this amount. All of the delivery tickets from Klemm indicate that the deliveries were through Esquire. Another issue with respect to your client's documentation is shown by comparing the documents from your client's duration of the distributorship to the documents when Mobil was delivering. During Mobil's tenure, the Klemm delivery tickets included Mr. Zahdan's address to show where the deliveries were made to. During your client's tenure, the Klemm delivery tickets no longer include this reference and in most instances no longer contain the time the truck arrives at Mr. Zahdan's station and the time the delivery is complete. This information had always been provided before. Also, during Mobil's tenure, Mr. Zahdan was on a "keep full" basis where Mobil simply monitored the level of fuel in Mr. Zahdan's tanks via the Veeder Root system and automatically made the deliveries without any need on the part of Mr. Zahdan to call in an order for fuel delivery. In contrast, after your client commenced operations, the Veeder Root was disengaged and Mr. Zahdan was then forced to call in orders whenever his gas supplies were low.

  With respect to the documents that are included with this letter, I have supplied the same documents for each month and which documents will reconcile the gas delivered to the gas sold. The following is a summation of what the documents show.

**February.**

| Total Gallons Delivered | Total Pumped | Start/End Inventory Diff | Over/Short |
|---|---|---|---|
| 40,621 | 44,874 | 4,257 | -11 |

**March**

| Total Gallons Delivered | Total Pumped | Start/End Inventory Diff | Over/Short |
|---|---|---|---|
| 53,003 | 53,517 | 557 | -43 |

**April**

| Total Gallons Delivered | Total Pumped | Start/End Inventory Diff | Over/Short |
|---|---|---|---|
| 53,003 | 50,648 | 2,462 | -13 |

2

SULLIVAN HINCKS & CONWAY

**May**

| Total Gallons Delivered | Total Pumped | Start/End Inventory Diff | Over/Short |
|---|---|---|---|
| 48,104 | 50,249 | 2,145 | -70 |

**June**

| Total Gallons Delivered | Total Pumped | Start/End Inventory Diff | Over/Short |
|---|---|---|---|
| 47,810 | 51,203 | 3,393 | -34 |

**July**

| Total Gallons Delivered | Total Pumped | Start/End Inventory Diff | Over/Short |
|---|---|---|---|
| 64,005 | 56,498 | 7,481 | -26 |

Given Mr. Zahdan's long history at this station as a Mobil dealer with no prior incidents or allegations such as the one now tendered by Esquire, coupled with the documents as provided with this letter, it is clear that there was some error that involved persons or incidents other than Mr. Zahdan. I hope this now puts this matter to rest. If you have any questions please call.

Very truly yours,
Sullivan Hincks & Conway

By: John J. Conway

JJC/le
encl.

3

# ELIAS, MEGINNES, RIFFLE & SEGHETTI, P.C.
### ATTORNEYS AT LAW

| | | |
|---|---|---|
| JOHN S. ELIAS | 416 MAIN STREET, SUITE 1400 | DAVID N. SCHELLENBERG |
| BRIAN J. MEGINNES | PEORIA, ILLINOIS 61602-1611 | JANAKI NAIR |
| ROBERT M. RIFFLE | TELEPHONE: (309) 637-6000 | SONYA A. PASQUINI |
| MICHAEL R. SEGHETTI | FACSIMILE: (309) 637-8514 | LANE G. ALSTER |
| TROY N. PUDIK | www.emrslaw.com | CYNTHIA L. ELIAS, OF COUNSEL |

File No.: 31522-002

**_VIA E-MAIL ONLY_**
Mr. John J. Conway
Sullivan Hincks & Conway
120 West 22nd Street, Suite 100
Oak Brook, IL 60523

Re:    Ahmad Zahdan – Hometown, Illinois

Dear John:

Thank you for your August 27, 2007 letter and enclosure.

Please supplement those submissions with sales documentation for the same time period, including both credit card and cash motor fuel sales records.

Thank you in advance for your attention to this request.

Very truly yours,

*ROBERT M. RIFFLE*

Robert M. Riffle

RMR:tlj
cc:    Mr. George Athans
       Mr. Ulice Payne
607-0651

**John J. Conway**

| | |
|---|---|
| **From:** | Tricia L. Jennings [TJennings@emrslaw.com] |
| **Sent:** | 09/05/2007 1:13 PM |
| **To:** | John J. Conway |
| **Subject:** | RE: Ahmad Zahdan |

Sorry; Bob has been out of the office; his wife had surgery last week; Ulice was going to
take care of it. I will forward this e-mail to him.
Thanks.


Tricia L. Jennings
Legal Assistant to Robert M. Riffle
Elias, Meginnes, Riffle & Seghetti, P.C.
416 Main Street, Suite 1400
Peoria, IL 61602
(309) 637-6000


*Confidentiality Notice*

This message, together with any attachments, is intended only for the use of the
individual or entity to which it is addressed and may contain information that is legally
privileged, confidential and exempt from disclosure. If you are not the intended
recipient, you are hereby notified that any dissemination, distribution, or copying of
this message, or any attachment, is strictly prohibited. If you have received this message
in error, please notify the original sender immediately by telephone (309) 637-6000 or by
return E-mail and delete this message, along with any attachments, from your computer.
Thank you.


-----Original Message-----
From: John J. Conway [mailto:johnconway@shlawfirm.com]
Sent: Wednesday, September 05, 2007 1:13 PM
To: Tricia L. Jennings
Subject: Ahmad Zahdan

Bob,

        Although you have not responded to my previous e-mail as to the specific documents
that your client is still requesting, I have obtained documents from Mr. Zahdan's
accounting firm. I am attaching the sales records prepared by the accounting firm

John J. Conway
Sullivan, Hincks & Conway
120 West 22nd Street
Suite 100
Oak Brook, IL  60523
(630) 573-5021
(630) 573-5130 (fax)
**********************************************************************
****
*******
CONFIDENTIALITY NOTICE:  This e-mail and any files transmitted with it are confidential
and may contain information which is legally privileged or otherwise exempt from
disclosure.  They are intended solely for the use of the individual or entity to whom this
e-mail is addressed.  If you are not one of the named recipients or otherwise have reason
to believe that you have received this message in error, please immediately notify the
sender and delete this message immediately from your computer.  Any other use, retention,
dissemination, forwarding, printing, or copying of this e-mail is strictly prohibited.

IRS CIRCULAR 230 NOTICE:  Internal Revenue Service regulations generally provide that, for
the purpose of avoiding federal tax penalties, a taxpayer may rely only on formal written

advice meeting specific requirements. Any tax advice in this message, or in any
attachment to this message, does not meet those requirements. Accordingly, any such tax
advice was not intended or written to be used, and it cannot be used, for the purpose of
avoiding federal tax penalties that may be imposed on you or for the purpose of promoting,
marketing or recommending to another party any tax-related matters.


-----Original Message-----
From: John J. Conway [mailto:johnconway@shlawfirm.com]
Sent: Friday, August 31, 2007 3:13 PM
To: 'Tricia L. Jennings'
Subject: FW: Harwood Heights - Emailing: 607-0651.doc

Bob,

      I am still waiting to hear from you as to what documents you need.

John J. Conway
Sullivan, Hincks & Conway
120 West 22nd Street
Suite 100
Oak Brook, IL  60523
(630) 573-5021
(630) 573-5130 (fax)
**********************************************************************
****
*******
CONFIDENTIALITY NOTICE:  This e-mail and any files transmitted with it are confidential
and may contain information which is legally privileged or otherwise exempt from
disclosure.  They are intended solely for the use of the individual or entity to whom this
e-mail is addressed.  If you are not one of the named recipients or otherwise have reason
to believe that you have received this message in error, please immediately notify the
sender and delete this message immediately from your computer.  Any other use, retention,
dissemination, forwarding, printing, or copying of this e-mail is strictly prohibited.

IRS CIRCULAR 230 NOTICE:  Internal Revenue Service regulations generally provide that, for
the purpose of avoiding federal tax penalties, a taxpayer may rely only on formal written
advice meeting specific requirements.  Any tax advice in this message, or in any
attachment to this message, does not meet those requirements.  Accordingly, any such tax
advice was not intended or written to be used, and it cannot be used, for the purpose of
avoiding federal tax penalties that may be imposed on you or for the purpose of promoting,
marketing or recommending to another party any tax-related matters.


-----Original Message-----
From: John J. Conway [mailto:johnconway@shlawfirm.com]
Sent: Wednesday, August 29, 2007 11:04 AM
To: 'Tricia L. Jennings'
Subject: RE: Harwood Heights - Emailing: 607-0651.doc

Bob,

      I believe your attached letter relates to Mr. Zahdan's station and not Victor's
although your letter references Victor's. With respect to the documentation you request,
can you please be more specific as to what records you are looking for?

John J. Conway
Sullivan, Hincks & Conway
120 West 22nd Street
Suite 100
Oak Brook, IL  60523
(630) 573-5021
(630) 573-5130 (fax)
**********************************************************************
****
*******
CONFIDENTIALITY NOTICE:  This e-mail and any files transmitted with it are confidential

and may contain information which is legally privileged or otherwise exempt from
disclosure.  They are intended solely for the use of the individual or entity to whom this
e-mail is addressed.  If you are not one of the named recipients or otherwise have reason
to believe that you have received this message in error, please immediately notify the
sender and delete this message immediately from your computer.  Any other use, retention,
dissemination, forwarding, printing, or copying of this e-mail is strictly prohibited.

IRS CIRCULAR 230 NOTICE:  Internal Revenue Service regulations generally provide that, for
the purpose of avoiding federal tax penalties, a taxpayer may rely only on formal written
advice meeting specific requirements.  Any tax advice in this message, or in any
attachment to this message, does not meet those requirements.  Accordingly, any such tax
advice was not intended or written to be used, and it cannot be used, for the purpose of
avoiding federal tax penalties that may be imposed on you or for the purpose of promoting,
marketing or recommending to another party any tax-related matters.


-----Original Message-----
From: Tricia L. Jennings [mailto:TJennings@emrslaw.com]
Sent: Wednesday, August 29, 2007 10:56 AM
To: John J. Conway
Cc: Ulice Payne; George Athans; Robert M. Riffle
Subject: Harwood Heights - Emailing: 607-0651.doc

 <<607-0651.doc>> Please see attached letter. Thanks.

Tricia L. Jennings
Legal Assistant to Robert M. Riffle
Elias, Meginnes, Riffle & Seghetti, P.C.
416 Main Street, Suite 1400
Peoria, IL 61602
(309) 637-6000


*Confidentiality Notice*

This message, together with any attachments, is intended only for the use of the
individual or entity to which it is addressed and may contain information that is legally
privileged, confidential and exempt from disclosure. If you are not the intended
recipient, you are hereby notified that any dissemination, distribution, or copying of
this message, or any attachment, is strictly prohibited. If you have received this message
in error, please notify the original sender immediately by telephone (309) 637-6000 or by
return E-mail and delete this message, along with any attachments, from your computer.
Thank you.


The message is ready to be sent with the following file or link
attachments:

607-0651.doc


Note: To protect against computer viruses, e-mail programs may prevent sending or
receiving certain types of file attachments.  Check your e-mail security settings to
determine how attachments are handled.

3

# EXHIBIT 10

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SOUTH SIDE GAS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. |
| | ) | |
| ESQUIRE PETROLEUM, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**PROPOSED INJUNCTION ORDER**

This matter coming on to be heard pursuant to Plaintiff's, South Side Gas, Inc., Motion For A

Preliminary Injunction and Expedited Discovery pursuant to the Petroleum Marketing Practices Act (15

U.S.C. 2801 et seq.) And Fed.R.Civ.P. 65, all parties having been notified and given the opportunity to

be heard, and the Court having been fully advised on the premises herein:

This Court having read Plaintiff's Motion For A Preliminary Injunction, and Expedited

Discovery in the above captioned cause, reviewed the supporting case law and authority, and having

heard argument of counsel;

The Court Finds:

1. Plaintiff is has demonstrated that his franchise as that term is defined under the PMPA was terminated by Defendant, ESQUIRE Petroleum, LLC ("ESQUIRE");

2. Plaintiff has demonstrated there exists sufficiently serious questions going to the merits to make the Plaintiff's claims ripe for litigation, and that Plaintiff has a reasonable chance of success on the merits.

3. There is a high probability that Plaintiff will be irreparably injured as a result of Defendants' conduct and that such injury is caused by the violations of section 2802 of the Petroleum Marketing Practices Act, 15 U.S.C. 2801, et seq.

4. The balance of hardships tips decidedly in favor of Plaintiff since the defendants will not suffer any significant or irreparable injury through entry of this Order.

**IT IS THEREFORE HEREBY ADJUDGED, ORDERED, AND DECREED AS FOLLOWS:**

1.     This Court has jurisdiction over the subject matter and over the parties to this action.

2.     The Defendant, Esquire Petroleum, LLC is hereby enjoined from effectuating any termination of the Plaintiff's franchise, franchise relationship, PMPA Supply Agreement, Lease/Option and/or Purchase And Sale Agreement and from taking any actions to evict the Plaintiff from the premises.

3.     That the Defendant, Esquire Petroleum, LLC, shall continue the franchise relationship with the Plaintiff until further order of this Court. Esquire shall continue to deliver Mobil branded gasoline to the Plaintiff's station as needed by the Plaintiff pursuant to the agreements of the parties and the past practices of the parties hereto.

4.     That no bond be required of the Plaintiff.

Dated: _____

                                **ENTER:**

                                _____
                                Judge
                                U.S. District Court Judge

John J. Conway
Sullivan Hincks & Conway
Attorneys For Plaintiff
120 West 22nd Street, Ste. 100
Oak Brook, IL 60523
(630) 573-5021